

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FILED

FEB - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |
|---|---|
| MARJORY UNGER, | ) |
| Plaintiff, | ) ) ) Civil Action No. 06-CV-0765 (N.D.N.Y.) |
| v. | ) |
| ALBANY MEDICAL CENTER, *et al.*, | ) ) |
| Defendants. | ) ORAL ARGUMENT REQUESTED |
| and | ) |
| MARISSA MADERAZO, *et al.* | ) ) |
| Plaintiffs, | ) Civil Action No. SA06CA0535OG (W.D. |
| v. | ) Tex.) |
| VANGUARD HEALTH SYSTEMS, *et al.*, | ) |
| Defendants. | ) |

CASE NUMBER   1:07MS00056

JUDGE: John D. Bates

DECK TYPE: Miscellanous

DATE STAMP: 02/05/2007

**MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM THE SERVICE
EMPLOYEES INTERNATIONAL UNION**

Pursuant to Fed. R. Civ. P. 45, HCA Inc., Methodist Healthcare System of San Antonio, Ltd.

L.L.P., and Seton Health System (collectively "Defendants") respectfully request this Court's

intervention to enforce subpoenas *duces tecum* issued under the auspices of this Court to the Service

Employees International Union ("SEIU") on November 14, 2006, in *Maderazo v. Vanguard Health*

*System*, Civ. Action No. SA06CA0535OG (W.D. Tex., filed June 20, 2006) (hereinafter

"*Maderazo*"), and on November 28, 2006, in *Unger v. Albany Medical Center*, Civ. Action No. 06-

CV-0765 (N.D.N.Y., filed June 20, 2006) (hereinafter "*Unger*").[1]  The SEIU has refused

meaningful compliance with the subpoenas notwithstanding the fact that it is the driving force

behind these cases and is in clear possession of relevant documents.  Defendants have sought a

reasonable compromise to no avail and thus are now forced to move to compel compliance with the

subpoenas.

## I.    BACKGROUND

The two actions that spurred the issuance of these subpoenas are pending in the United

States District for the Northern District of New York, and the United States District Court for the

Western District of Texas.  Both cases, filed by the same group of plaintiffs' counsel on the same

day, allege that the Defendants conspired, in the Albany and San Antonio areas respectively, to

suppress the compensation of registered nurses from June 20, 2002 through the filing of the

Complaints on June 20, 2006.  There are two counts to the class-action Complaints, both of which

allege violations of Section 1 of the Sherman Act.

While both cases present named Plaintiffs to serve as class representatives, it is undisputed

that the SEIU, a labor union that seeks to organize nurses and other health care employees,

instigated the filing of the underlying actions and actively supports them.  Indeed, the SEIU

conducted the investigation that purportedly forms the basis for these actions; recruited certain of

the nurses that serve as the named Plaintiffs; participated in the press conference announcing the

filing of the cases; interviewed and recommended the attorneys that now represent Plaintiffs; and is

even paying the fees and expenses of one of the law firms that represent Plaintiffs, James &

Hoffman.[2]  If this were not enough, the SEIU's retainer agreement with James & Hoffman reveals

---

[1] HCA Inc. and Methodist Healthcare System of San Antonio, Ltd. L.L.P. are defendants in *Maderazo*.  Seton Health System is a defendant in *Unger*.  The *Unger* and *Maderazo* Complaints are attached as Ex. 1.

[2] *See* Decl. of Mary Joyce Carlson ¶ 13 (Dec. 19, 2006) (hereinafter "Carlson Decl.") (attached as Ex. 2) ("[T]he SEIU played a critical role in the genesis of the nursing wage antitrust lawsuits and offers ongoing support.");

that the SEIU has a financial stake in this litigation, including (1) the right to "be reimbursed [any fees or costs paid to James & Hoffman], prior to any other payments to any other party or client, from any monetary recovery to [James & Hoffman] in the nurse wage litigation;" and (2) a claim to 25 percent of any fees recovered by James & Hoffman in connection with this litigation "beyond the amounts advanced by the SEIU." SEIU-A 0001-0002, Letter from N. Gleichman to D. Dean (Oct. 31, 2006) (attached as Ex. 5).

Given the SEIU's driving role in these lawsuits, HCA Inc. and Methodist Healthcare System of San Antonio, Ltd. L.L.P., defendants in *Maderazo*, served a subpoena on the SEIU at its Washington, D.C. office on November 14, 2006. (Subpoena attached as Ex. 6). Seton Health System, a defendant in *Unger*, served a nearly identical subpoena on the SEIU on November 28, 2006. (Subpoena attached as Ex. 7). The *Unger* subpoena included twenty-seven (27) production requests, while the *Maderazo* subpoena included twenty-six (26).

Because both the *Maderazo* and *Unger* courts bifurcated discovery between class certification and merits, the subpoenas only seek documents that relate to class certification, most notably the adequacy of the named Plaintiffs to serve as class representatives given their possible ties to the SEIU. The subpoenas specifically seek information relating to: (1) the SEIU investigation that purportedly forms the factual basis for the allegations made in the respective Complaints, *see Maderazo* Request Nos. 1(iv), 1(v), 2-4, 11, 13-15, 17-19 & 22-25; *Unger* Request

---

(continued...)

*Id.* ¶ 15 (James & Hoffman's "legal and factual research on behalf of SEIU" served as the basis for the nurses wage litigation; it "brought this research to Cohen, Milstein, Hausfeld and Toll," and "[f]ollowing further research and investigation ... began referring interested nurses as potential plaintiffs to the law firms."). *See also, e.g.*, Pl. Maderazo's Objs. and Resps. to Def. Christus Santa Rosa's Interrog. Nos. 1-13, Nos. 6 & 8, filed in *Maderazo* (hereinafter "Maderazo Resps.") (noting Plaintiff's decision to file suit after "receiv[ing] a letter advertisement from James & Hoffman," then counsel for the SEIU) (attached as Ex. 3); Todd Pack, *Nurses Sue HCA, Other Hospital Companies*, Tennessean, June 21, 2006, at 1E (Plaintiffs' counsel crediting the SEIU as the "forerunners in this litigation," noting that it poured "tremendous resources (into) looking at this issue from a number of perspectives.") (attached as Ex. 4).

Nos. 1(iv), 1(v), 2, 3, 5, 12, 14-16, 18-20 & 23-26; (2) the named Plaintiffs' relationship with the

SEIU, particularly the extent to which the named Plaintiffs owe their allegiance to the unionization

goals of the SEIU rather than the goals of the alleged class, *see Maderazo* Request Nos. 1(i), 2-6, 8-

15 & 17; *Unger* Request Nos. 1(i), 2-7, 9-16 & 18; (3) the SEIU's involvement in this lawsuit and,

in particular, the SEIU's relationship with Plaintiffs' counsel, *see Maderazo* Request Nos. 1(iii), 2,

4, 7-9, 11, 13-15, 16(i), 17, 22 & 26; *Unger* Request Nos. 1(iii), 2, 4, 5, 8-10, 12, 14-16, 17(i), 18,

23 & 27; and (4) the SEIU's relationship with the Defendants in *Maderazo* and *Unger* and the role

that this lawsuit and the related litigation plays in the SEIU's attempt to organize nurses at the

Defendants' hospitals, *see Maderazo* Request Nos. 1(ii), 1(vi), 1(vii), 2, 4, 11, 13-15, 16(ii), 17, 20,

21 & 26; *Unger* Request Nos. 1(ii), 1(vi), 1(vii), 2, 5, 12, 14-16, 17(ii), 18, 21, 22 & 27.[3]

On December 7, 2006 and December 12, 2006, the SEIU responded to the *Maderazo* and

*Unger* subpoenas, respectively, with virtually identical letters stating that the SEIU refused to

produce any documents to Defendants except those "relatively few" documents that it deemed

relevant to class certification. *See* Letter from A. Roth to M. Shumaker (Dec. 7, 2006), at 2, 6

(hereinafter "Roth Ltr. I") (attached as Ex. 8); Letter from A. Roth to T. Singer (Dec. 12, 2006), at

2, 6 (hereinafter "Roth Ltr. II") (attached as Ex. 9). Specifically, the SEIU agreed to produce only

non-privileged documents in response to a single request included within each subpoena –

*Maderazo* Request No. 10 and *Unger* Request No. 11, both of which seek "Documents concerning

or referring to Communications between or among the SEIU and the Named Plaintiff in the

Lawsuit." Roth Ltr. I at 2; Roth Ltr. II at 2. The SEIU objected to the remainder of Defendants'

---

[3] Subpoenas identical to those served on the SEIU's national office were also served on SEIU Local 5 in San Antonio on November 15, 2006, and SEIU Local 1199 in Albany on November 30, 2006. Motions to compel were filed with respect to those subpoenas. Magistrate Judge Homer, who presides over the *Unger* action, ordered SEIU Local 1199 to produce all documents in its custody, control or possession "reflecting the compensation rate for registered nurses in the Albany area for the period June 1, 1999 to date," but otherwise denied the motion on the grounds that nothing more was needed for class certification purposes. The motion to compel in the *Maderazo* action has not yet been heard and remains pending.

requests largely on the grounds that they were not sufficiently related to class certification, imposed an undue burden on the SEIU, or sought material that was protected from discovery by applicable legal privileges.

Ultimately, the SEIU produced only about 300 pages in response to either subpoena, most of which were duplicative and most of which raised additional questions regarding the SEIU's role in this case.[4] Despite Defendants' attempts to reach a reasonable compromise on the issues raised by the SEIU, the SEIU has refused to expand the scope of its productions. *See, e.g.*, Letter from M. Shumaker to A. Roth (Dec. 14, 2006); Letter from M. Shumaker to R. Levy (Jan. 3, 2007) (attached as Ex. 15).

## II.    ARGUMENT

### A.    The SEIU's Burden in Resisting the Subpoena

A party opposing a duly issued subpoena bears the "heavy burden" of showing that compliance with the subpoena would be "oppressive." *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984); *Westinghouse Elec. Corp. v. City of Burlington*, 351 F.2d 762, 766 (D.C. Cir. 1965). "In consideration of whether a subpoena places an undue burden on the party subpoenaed, . . . 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed' should be considered." *Alexander v. FBI*, 186 F.R.D. 21, 34 (D.D.C. 1998) (quoting *United States v. IBM Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979)). A non-party that claims it cannot comply with a subpoena because it imposes an undue

---

[4] Significantly, the SEIU's production includes the SEIU's October 31, 2006 retainer agreement with James & Hoffman, SEIU-SA 0001-0002 (attached as Ex. 10); a memorandum from Mary Joyce Carlson entitled "Advice to SEIU Organizers on Referring Nurses to Counsel," SEIU-SA 0079-0081 (attached as Ex. 11); correspondence between an SEIU organizer and Named Plaintiff Roselia Pollard regarding Pollard's efforts to recruit nurses to join the SEIU's organizing campaign, SEIU-SA 0073-0078 (emails from R. Pollard (Cdrmedsvs@aol.com) to H. Nguyen (nguyenh@SEIU.ORG)) (attached as Ex. 12); numerous SEIU recruiting pamphlets prominently featuring Pollard, *see, e.g.*, SEIU-SA 0045-0050, at 0050 (attached as Ex. 13); and the text of a speech written by (or for) Pollard that was given at an SEIU rally, *see* SEIU-SA 0032-0034 (attached as Ex. 14).

burden may not merely utter the claim, it must "make a specific, detailed showing of how the request is burdensome." *See SEC v. Brady*, 283 F.R.D. 429, 2006 U.S. Dist. LEXIS 74979, at \*16-17 (N.D. Tex. Oct. 16, 2006) ("A mere statement … that a request is 'overly broad and unduly burdensome' is not adequate to voice a successful objection.") (citation omitted); *see also Flatow v. Islamic Republic of Iran*, 196 F.R.D. 203, 207 (D.D.C. 2000) ("A showing of [undue] burden must be specific. As this Court has held before, assertions of a burden without specific estimates of staff hours needed to comply will be categorically rejected.") (internal quotation marks omitted), *aff'd in part, vacated in part, on other grounds*, 305 F.3d 1249 (D.C. Cir. 2002).

**B.     The Plain Relevance of Defendants' Requests to Class Certification**

As the SEIU correctly notes in its responses to the subpoenas, the courts have bifurcated discovery in both the *Maderazo* and *Unger* actions, ordering that class certification discovery precede merits discovery. *Maderazo* Scheduling Order on Class Certification Issues (Oct. 6, 2006) at 1 n.1 (attached as Ex. 16); *Unger* Order (Oct. 26, 2006) at 1-2 (attached as Ex. 17). *See also* Roth Ltr. I at 2; Roth Ltr. II at 2. Despite the SEIU's assertions to the contrary, however, the documents requested by Defendants' subpoenas relate directly to class certification issues. In particular, all of the requests relate to the nature and extent of the SEIU's involvement with this litigation, an issue that is central to the named Plaintiffs' ability to serve as adequate and proper representatives of the alleged classes.

Plaintiffs' alignment with the SEIU raises fundamental questions about Plaintiffs' ability to satisfy Rule 23(a)(4)'s adequacy of representation requirement. Most notably, the "'named plaintiffs must not have interests in conflict with those of the class.'" *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 185 F.R.D. 172, 175 (S.D.N.Y. 1999)).

The relevancy of a union's backing of a named plaintiff to the issue of class certification is plainly shown in a recent opinion issued by the National Labor Relations Board on facts that are remarkably similar to those before the Court. In *American Broadcasting Companies, et al.*, Case 31-CA-27698 (May 24, 2006), at 4 (attached as Ex. 18), the Writers Guild of America (the "Union") backed two state court wage and hour lawsuits that were being pursued as class actions against the defendant broadcasting companies. There, as here, class counsel represented the Union in other matters; the Union's general counsel was a partner in plaintiff's counsel's firm;[5] the Union had been involved in investigating the claims underlying the class action; and the Union was funding the litigation. *Id.* at 2. In an effort to explore the relationship between the named plaintiffs and the Union for class certification purposes, the defendant broadcasting companies issued interrogatories that asked, *inter alia,* how the named plaintiffs became involved in the litigation; what communications had occurred between the named plaintiffs and the Union; and for information concerning communications establishing the Union's role in the litigation. *Id.* at 3. The Union intervened and objected that the defendants' requests violated the employees' rights under Section 7 of the NLRA and thus were illegal under Section 8(a).[6] The NLRB concluded that the requests were neither unlawful nor in violation of the employees' Section 7 rights. It also concluded that the requests were relevant to the defendants' challenge to the "adequacy of class counsel and the named

---

[5] Judith Scott, the current General Counsel for the SEIU and upon whom the subpoenas in *Unger* and *Maderazo* were served, is a partner in James & Hoffman, counsel to Plaintiffs in both *Unger* and *Maderazo*.

[6] Section 7 of the NLRA grants employees "the right to self- organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." Section 8 of the NLRA defines unfair labor practices, including "interfere[nce] with, restrain[t of], or coerc[ion of] employees in the exercise of the rights guaranteed in section 7...."

plaintiffs, <u>specifically whether they have interests that may conflict with those of the putative class</u> <u>members.</u>" *Id.* at 6 (emphasis added).[7]

The very same issue arises here. If, as Defendants contend, the named Plaintiffs are nothing more than representatives of the SEIU, their interests are inherently antagonistic to certain of the class members they seek to represent. For example, some putative class members may not want an organized union, preferring instead to address compensation and working conditions on an individualized, as compared to a unionized, basis. Moreover, if a class were certified in either action, the putative class members may be willing to resolve the action in exchange for monetary compensation. But if the named Plaintiffs are really acting for the SEIU who seeks to organize nurses for collective bargaining purposes, monetary compensation, without more, may not be a suitable resolution.

The evidence suggests that Defendants' concerns are well-founded. On June 21, 2006, Plaintiff Marjory Unger was named to represent SEIU Local 1199 on its "Negotiating Committee" in labor negotiations with Columbia Memorial Hospital. *See* Statement from 1199SEIU Negotiating Comm. at Columbia Mem'l Hosp. (June 21, 2006), *available at* http://www.1199seiuonline.org/media/press.cfm?pr_id=1314 (attached as Ex. 19). The announcement of her appointment was made <u>the day after</u> she initiated this lawsuit by filing the Class Action Complaint.

Ms. Unger's alignment with the SEIU became even more clear when Plaintiff's counsel advised the Defendants on January 14, 2007 that Marjory Unger – currently the only named

---

[7] *Citing Kamean v. Teamsters Local 363*, 109 F.R.D. 391 (S.D.N.Y. 1986) (motion for class certification denied where named representatives and their counsel had alliances with competing union that was funding the lawsuit; conflict of interest precluded them from fairly and adequately representing the interests of the class); *Martinez v. Barash*, No. 01 Civ. 2289 (MBM), 2004 WL 1367445, at *7 (S.D.N.Y. June 16, 2004) (class decertified where named plaintiffs were "hand-picked" and coached for the litigation by a rival union and were effectively assigned counsel by the rival union).

plaintiff in the action – no longer wanted to participate in the action because she is not willing to comply with her discovery obligations.[8]

The lead plaintiff in the *Maderazo* action, Roselia Pollard, also is heavily involved in the SEIU's campaign to organize nurses in San Antonio. *See* SEIU-SA 0073-0078 (attached as Ex. 12). Indeed, she is literally the "public face" of the SEIU's campaign: in addition to having her picture prominently displayed in SEIU's organizing pamphlets, *see, e.g.,* SEIU-SA 0045-0050, at 0050 (attached as Ex. 13), Ms. Pollard recently spoke at a rally held by the Nurse Alliance, a division of the SEIU, *see* Jenny Lacoste-Caputo, *Nurses Pushing for Legislative Change*, San Antonio Express (Sept. 23, 2006) (attached as Ex. 20). Ms. Pollard appears to be plainly aligned with the SEIU's interests.[9]

## C.    The Reasonableness of Defendants' Requests Given Their Relevance

The SEIU complains that Defendants' subpoenas are "so overbroad, so unduly burdensome, and so intrusive as to fall well outside the bounds of a proper third-party subpoena." Roth Ltr. I at 4; Roth Ltr. II at 4. However, the SEIU fails to explain why production of any documents beyond those related to communications with the named Plaintiffs would impose an undue burden. *See Westinghouse*, 351 F.2d at 766 ("[t]he burden of proving that a subpoena *duces tecum* is oppressive is on the party moving for relief on this ground"). Moreover, the plain relevancy of the materials and Defendants' need for them outweighs any inconvenience to the SEIU in producing them. *See Northrop*, 751 F.2d at 407 ("A reasonable inconvenience must be borne to further the goals of discovery – the making available to litigants all relevant and available information . . . [the reasonableness of any inconvenience] must be determined according to the facts of the case.");

---

[8]  Plaintiff's counsel have sought to add two other named plaintiffs, but the Court has not yet ruled on the requested Amendment.

[9]  So much so, in fact, that Ms. Pollard hosted the SEIU Nurses Alliance Christmas party this year. *See* SEIU-SA 0024 (attached as Ex. 21).

*Westinghouse*, 351 F.2d at 767 ("Even though the subpoena is addressed to a non-party, inconvenience occasioned by compliance with the subpoena is not a sufficient reason to quash.").

In any event, the burden imposed by a particular request is but one factor in assessing the reasonableness of a subpoena; it must be balanced against the relevance of the information requested and the need of the requesting party for the documents.[10] For example, the SEIU claims that Defendants' request for "[a]ll documents concerning or referring to research, studies or reports prepared or funded in whole or in part by the SEIU regarding compensation paid to nurses or a nursing shortage" is unduly burdensome because compliance with its "broad literal terms" "would require the SEIU to search for, compile and produce a truly massive amount of materials." Roth Ltr. I at 5-6; Roth Ltr. II at 5. But the fact that there is a potentially high volume of relevant materials does not shield them from discovery completely. *Northrop*, 751 F.2d at 404 ("Certainly the volume of documents [the nonparty] claims it must search is extraordinary, but volume alone is not determinative."). And there can be no reasonable dispute regarding the relevance of the requested materials.[11] The SEIU has instigated a series of lawsuits that complain about the compensation paid to registered nurses and even has an agreement to share in any recovery obtained as a result of the litigation. They can hardly now seek to hide their own internal studies and investigative materials regarding nurse compensation on the basis that they are not relevant to class certification.

---

[10] *See Alexander*, 186 F.R.D. at 34 ("In consideration of whether a subpoena places an undue burden on the party subpoenaed, . . . 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed' should be considered.") (quoting *IBM*, 83 F.R.D. at 104)).

[11] It is presumably for this same reason that Plaintiffs in both actions have also requested that Defendants produce analyses or studies of nurse compensation. *See Unger* Pl.'s Request for Production of Documents to Defendant Seton Health System at Request Nos. 28-31 (attached as Ex. 22); *Maderazo* Pls.' Request for Production of Documents to Def. HCA Inc., a/k/a Methodist Healthcare System of San Antonio, Ltd. L.L.P. at Request Nos. 22-25 (attached as Ex. 23).

Moreover, whatever burden is associated with the production of these materials does not impact the remaining document requests. Defendants issued twenty-seven (27) separate requests in *Maderazo* and twenty-six (26) requests in *Unger*. In both cases, the SEIU agreed to respond to only one and complained that a handful of others were overly broad.[12] What of the other twenty plus requests? The fact that the SEIU takes certain requests to their logical extreme in order to make their undue burden argument does not invalidate the entirety of both subpoenas as the SEIU suggests. *See Northrop*, 751 F.2d at 403 ("A trial court has broad, but not unlimited, discretion in evaluating the circumstances of a case when considering quashing a subpoena on grounds of oppressiveness. It must carefully examine the circumstances presented to it and, when appropriate, consider the possibility of modifying the subpoena rather than quashing."). This is especially true when Defendants' attempt to compromise with the SEIU regarding the terms of the subpoenas was met with only silence.

**D.    The Inapplicability of SEIU's Privilege and Confidentiality Objections**

The SEIU maintains that certain documents responsive to Defendants' subpoenas are protected by the attorney-client privilege or work product doctrine. *See* Roth Ltr. I at 3; Roth Ltr. II at 3-4. In particular, they assert that the pre-litigation investigation conducted by the SEIU and its counsel, James & Hoffman – the same James & Hoffman that purports to represent Plaintiffs in *Unger* and *Maderazo* – is protected attorney work product. Roth Ltr. I at 3 n.2; Roth Ltr. II at 3 n.2; Carlson Decl. ¶ 15. This presupposes, however, that the <u>SEIU</u> – and not Plaintiffs – prepared the materials in anticipation of litigation. But the SEIU claims not to be a party to these cases. Carlson

---

[12] Roth Ltr. I at 2-6 (agreeing to produce documents responsive to Request 10; complaining that Requests 1, 13, and 15-18 are overbroad); Roth Ltr. II at 2-6 (agreeing to produce documents responsive to Request No. 11; complaining that Requests 1, 19, and 22 are overbroad).

Decl. ¶¶ 4, 13.[13]  Even more curiously (and inconsistent with the SEIU's assertion that the investigation was conducted at the union's behest), Plaintiffs' counsel in a related action recently asserted that the investigation conducted by the James & Hoffman firm was conducted on behalf of the Plaintiffs, not the SEIU.  Letter from T. Dove to M. Tully (Dec. 29, 2006), at 2 (hereinafter "Dove Ltr.") (attached as Ex. 24) (emphasis added).  In light of these contrasting representations, Defendants have been left to guess on whose behalf the investigation was conducted.

Either way, however, the material is not protected from discovery and should be produced. Assuming that James & Hoffman did, in fact, represent the SEIU at the time it conducted the investigation that forms the basis for the *Unger* and *Maderazo* actions, to the extent that any of those documents were subsequently shared with or disclosed to Plaintiffs, their other counsel (who do not represent the SEIU), or others, any attorney-client privilege or work product protection that conceivably attached to those documents would have been lost.  *See United States v. A T & T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980).[14]  And given the SEIU and James & Hoffman's contention that it

---

[13] *See Smith v. Fifthian*, No. Civ. 03-2076, 2006 WL 548529, at *1 (W.D. La. Mar. 2, 2006) ("The work product immunity, as set forth in Federal Rule of Civil Procedure 26(b)(3), does not protect documents prepared by or for a non-party."); *Ramsey v. NYP Holdings, Inc.*, No. 00 CIV 3478, 2002 U.S. Dist. LEXIS 11728, at *18-19 (S.D.N.Y. June 27, 2002) ("[F]ederal courts have repeatedly held, when confronted with the issue, that a non-party witness may not invoke work-product protection under [Fed. R. Civ. P. 26(b)(3)] to preclude production of materials prepared by or for that witness, even if created in contemplation of the witness's own pending or anticipated litigation.").

[14] As the D.C. Circuit has noted, while a voluntary disclosure to a third person will generally suffice to show waiver of the attorney client privilege or the work product privilege, the work product privilege is not waived in situations where the "transferor and transferee anticipate litigation against a common adversary on the same issue or issues, [such that] they have strong common interests in sharing the fruit of the trial preparation efforts." *AT&T*, 642 F.2d at 1299. Here, the SEIU cannot claim to share a common interest with the Plaintiffs, who are individuals alleged to have been injured as a result of Defendants' antitrust violations. The SEIU has not suffered any harm as a result of the alleged conduct and, therefore, does not have standing to sue for the alleged antitrust violations. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545-46 (1983). *See also SEIU Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1076 (D.C. Cir. 2001) (holding that the SEIU's health trust fund lacked standing to bring suit against cigarette companies for alleged violation of antitrust laws). Accordingly, the SEIU's investigation does not even qualify as work product, given that it was not prepared "in anticipation of litigation." *See* Fed. R. Civ. P. 26(b)(3).

was Plaintiffs and not the SEIU that decided to file these actions based upon the SEIU's investigation, those materials must have been shared with Plaintiffs and their other counsel.[15]

Moreover, if, as the SEIU asserts, it was the SEIU's investigation that formed the basis for the *Maderazo* and *Unger* actions, *see* Carlson Decl. ¶¶ 13, 15, and if, as Plaintiffs assert, that investigation shows that the compensation for the alleged classes of registered nurses as a whole was artificially suppressed and is now capable of class wide proof and treatment, *see* Class Action Complaint ¶¶ 18, 21, the SEIU and Plaintiffs arguably have put that investigation at issue such that piercing any conceivable privilege is justified. *See United States v. Exxon Corp.*, 94 F.R.D. 246, 248 (D.D.C. 1981) (a party waives privilege as to matters "he voluntarily injects into the suit").

The SEIU, a third party and admittedly the driving force behind this case, cannot selectively share all the fruits of its purported investigation with Plaintiffs' counsel and local SEIU branches,[16] and then assert that no discovery can be taken regarding that investigation because the materials relating to it are privileged. Courts have repeatedly admonished counsel that the protections provided by the attorney-client privilege and work product doctrine cannot be used as both a shield and a sword.[17] The SEIU's assertion that the James & Hoffman investigation is protected by the SEIU's work product privilege, followed by Plaintiffs' counsel's assertion in related litigation that the same investigation is protected by Plaintiffs' work product privilege, only further shows the

---

[15] In fact, the SEIU's retainer agreement with James & Hoffman specifically authorizes James and Hoffman "to share the results of those investigations conducted on SEIU's behalf with other law firms, and to use the results of such investigations to bring a series of class action antitrust suits." SEIU-A 0001-0002 at 0001 (attached as Ex. 5); SEIU-SA 0001-0002 at 0001 (attached as Ex. 10).

[16] Even the SEIU concedes that its sharing of allegedly privileged documents with the local SEIU offices constitutes a waiver of any applicable privilege. *See* Letter from R. Levy to Magistrate D. Homer (Jan. 19, 2007) ("[A]ny communication between SEIU and its attorneys that may have been privileged loses that privilege once it is shared with anyone at 1199.") (attached as Ex. 25).

[17] *See, e.g., Recycling Solutions, Inc. v. Dist. of Columbia*, 175 F.R.D. 407, 408 (D.D.C. 1997) ("As the adage states, privilege cannot be used both as a sword and as a shield."); *Computer Network Corp. v. Spohler*, 95 F.R.D. 500, 502 (D.D.C. 1982) ("A party cannot voluntarily disclose facts in his favor before a judicial tribunal, when they are helpful to his cause, and then invoke the attorney-client privilege as a shield to prevent a searching inquiry so that a court may determine the truthfulness of the facts initially presented.").

SEIU and Plaintiffs' selective application of privilege to ward off Defendants' legitimate requests. *See* Dove Ltr. at 2.

Finally, the SEIU's concern that compliance with the subpoena will somehow result in the misuse of confidential information is misplaced.[18] Both Stipulation and Order Governing the Production and Exchange of Confidential Information (attached as Ex. 28), entered by the *Unger* court on November 17, 2006, and the two competing proposed Protective Orders in *Maderazo* (attached as Ex. 27) submitted by the parties permit non-parties to take advantage of the confidentiality protections they offer, including the ability to designate materials "for attorneys' eyes only." This should more than address the SEIU's alleged confidentiality concerns.[19]

### III.    CONCLUSION

For the reasons set forth above, Defendants respectfully request that the SEIU be required to comply with its obligations pursuant to the subpoenas duly served upon it in accordance with the Federal Rules of Civil Procedure, and make sufficient efforts to locate and produce the documents requested.

---

[18] The SEIU objects to the production of documents containing "confidential and proprietary strategic planning information (akin to corporate trade secrets) that is protected against disclosure to outside parties who stand in an adversarial or potentially adversarial relationship to the SEIU." Roth Ltr. at 4; Levy Ltr. at 2-3.

[19] Contrary to the SEIU's assertion, confidential information of the type requested by Defendants is not specially protected from disclosure "in the labor relations context." *See American Broadcasting, supra.*

Respectfully Submitted,

Phillip A. Proger (D.C. Bar 929596)
Toby G. Singer (D.C. Bar 942524)
Michael R. Shumaker (D.C. Bar 434578)
JONES DAY
51 Louisiana Ave., NW
Washington, D.C. 20001-2113
Tel: (202) 879-3939
Fax: (202) 626-1700

*Attorneys for Defendants HCA, Inc. and Methodist
Healthcare System of San Antonio Ltd. L.L.P.
in Maderazo v. Vanguard Health System*

*Attorneys for Defendant Seton Health System
in Unger v. Albany Medical Center*

- 15 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st of February, 2007, I served the above document via electronic mail and first class mail to counsel for SEIU:

Robert M. Weinberg, Esq.
Andrew D. Roth, Esq.
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W., Suite 1000
Washington, D.C. 20005

and via electronic mail to counsel in the *Unger* and *Maderazo* cases:

| | |
|---|---|
| Allyson B. Baker | abaker@cmht.com |
| Ana M. Arrazola | aarrazola@lawdcm.com |
| April J. Tabor | atabor@mwe.com |
| Arnold Levin | alevin@lfsblaw.com |
| Brian M. Culnan | BCulnan@ICRH.com |
| Charles E. Schaffer | cschaffer@! lfsblaw. com |
| Charles E. Tompkins, IV | ctompkins@cmht.com |
| Charles Schaffer | cschaffer@lfsblaw.com |
| Christopher M. Hapka | hapkacm@bipc.com |
| Daniel A. Small | dsmall@cmht.com |
| Daniel E. Gustafson | dgustafson@gustafsongluek.com |
| Daniel J. Hurteau | DHurteau@nixonpeabody.com |
| David L. Hanselman, Jr. | dhanselman@mwe.com |
| David Marx | dmarx@mwe.com |
| David P. Dean | dpdean@jamhoff.com |
| Derick J. Rodgers | drodgers@lawdcm.com |
| Gordon L. Lang | glang@nixonpeabody.com |
| James H. Kizziar, Jr. | james.kizziar@bracewellgiuliani.com |
| Jason S. Kilene | jkilene@gustafsongluck.com |
| John H. Bright | jbright@kellerrohrback.com |
| Joseph Casseb | jcasseb@goodelaw.com |
| Joseph M. Sellers | jsellers@cmht.com |
| Kimberly A. Kralowec | kkralowec@furth.com |
| Layne E. Kruse | lkruse@fulbright.com |
| Luke C. Kellogg | lkellogg@perrykellogg.com |
| Mark A. Griffin | mgriffin@kellerrohrback.com |
| Mark Thomas | Mark.Thomas@wilsonelser.com |
| Mary Joyce Carlson | mjcarlson@jamhoff.com |
| Michael D. Hausfeld | mhausfeld@cmht.com |
| Michael Lehmann | mplehmann@furth.com |
| Michael R. Shumaker | mrshumaker@jonesday.com |

| Nicholas J. D'Ambrosio, Jr. | dambron@bsk.com |
|---|---|
| Phillip A. Proger | paproger@jonesday.com |
| Raymond J. Farrow | rfarrow@kellerrohrback.com |
| Ricardo G. Cedillo | rcedillo@lawdcm.com |
| Richard L. Weisz | rweisz@hodgsonruss.com |
| Robert C. Jones | rcjones@jonesday.com |
| Robert Gilchrist Newman | rnewman@fulbright.com |
| Robert H. Iseman | riseman@icrh.com |
| Steven E. Bizar | bizarse@bipc.com |
| Thomas P. Dove | tdove@furth.com |
| Toby G. Singer | tgsinger@jonesday.com |
| Wendelynne J. Newton | wendelynne.newton@bipc.com |
| William P. Butterfield | wbutterfield@cmht.com |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Cindy Cullen; Wendy Fleishman; and Marjory Unger, | ) ) ) |
| on behalf of themselves and all others similarly situated, | ) ) ) |
| Plaintiffs, | ) |
| v. | ) **Civil Action No. 06-CV-0765/ TJM/DRH** ) **CLASS ACTION COMPLAINT** ) **JURY TRIAL REQUESTED** |
| Albany Medical Center; Ellis Hospital; Northeast Health; Seton Health System; St. Peter's Health Care Service, | ) ) ) ) |
| Defendants. | ) ) |

**FILED**

### AMENDED COMPLAINT

Plaintiffs Cindy Cullen, Wendy Fleischman, and Marjory Unger, by and through

counsel, on behalf of themselves and all others similarly situated, bring this action against

defendants for damages, and demand a trial by jury, complaining and alleging as follows:

### NATURE OF THE ACTION

1.    Defendants, which own and operate hospitals in the Albany-Schenectady-

Troy Metropolitan Statistical Area ("Albany MSA" or "Albany area"), have for years

conspired among themselves and with other hospitals in the Albany MSA to depress the

compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.    In furtherance of their conspiracy, defendants and their co-conspirators

also agreed to regularly exchange detailed and non-public information about the

compensation each is paying or will pay to its RN employees.  The agreement to

exchange such information has facilitated the formation, implementation and enforcement of defendants' wage-fixing conspiracy. Pursuant to this agreement defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written surveys. The exchange of this information itself has suppressed competition among Albany-area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3.    Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage. Absent their conspiracy, Albany-area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals. The history of hospital RN compensation and vacancy rates in the Albany MSA, however, reveals that hospital RNs are not being compensated at competitive levels. Despite years of high vacancy rates, compensation for hospital RNs in the Albany MSA has remained low and surprisingly stagnant. The few compensation increases in the past several years have been far too small to substantially decrease the area's nursing shortage.

4.    Plaintiffs, on their own behalf and on behalf of the Class defined below, seek to recover for the compensation properly earned by RNs employed at Albany-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein. Plaintiffs also seek costs, including reasonable attorneys' fees and interest, as allowed by law.

Exhibit 1

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and

1337(a).

6.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and

28 U.S.C. § 1391(b), (c).

## PARTIES

7.      Plaintiff Cindy Cullen is an RN who has worked at Albany Medical

Center as an RN since 1991.  Ms. Cullen currently resides in Schenectady, New York.

8.      Plaintiff Wendy Fleischman is an RN who has worked at St. Peter's

Health Care Services since 1995.  Ms. Fleischman currently resides in Albany, New

York.

9.      Plaintiff Marjory Unger is an RN who worked at Albany Medical Center

as an RN from 2002 until 2005.  Ms. Unger currently resides in Catskill, New York.

10.     Defendant Albany Medical Center ("Albany Medical") is a New York

corporation with its principal place of business located at 43 New Scotland Avenue,

Albany, New York 12208.  Albany Medical is a hospital located within the Albany MSA.

It has a 584 bed capacity and employs approximately 859 RNs.

11.     Defendant Seton Health System ("Seton Health") is a New York

Corporation with its principal place of business located at 1300 Massachusetts Avenue,

Troy, New York 12180.  Seton Health is a healthcare system that owns and operates

hospitals within the Albany MSA, including St. Mary's Hospital ("St. Mary's"), which is

located at 427 Guy Park Avenue, Amsterdam, New York 12010.  St. Mary's has a 179

bed capacity, and employs approximately 256 RNs.

3

12.    Defendant St. Peter's Health Care Services is a New York corporation with its principal place of business located at 315 South Manning Boulevard, Albany, New York 12208. St. Peters is a hospital that has a 442 bed capacity and employs approximately 695 RNs.

13.    Defendant Ellis Hospital ("Ellis) is a New York corporation with its principal place of business located at 1101 Nott Street, Schenectady, New York 12308. Ellis is located within the Albany MSA and has a 351 bed capacity and employs approximately 379 RNs.

14.    Defendant Northeast Health, Inc. ("Northeast") is a New York corporation with its principal place of business located at 2212 Burdett Avenue, Troy, New York 12180. Northeast is a health care network that owns and operates hospitals and health care facilities within the Albany MSA, including two hospitals: Samaritan Hospital ("Samaritan"), located at 2215 Burdett Avenue, Troy, New York 12180, has a 238 bed capacity and employs approximately 259 RNs; and Albany Memorial Hospital ("Albany Memorial"), located at 600 Northern Medical Boulevard, Albany, New York, has a 165 bed capacity and employs approximately 156 RNs.

## CO-CONSPIRATORS

15.    Various other hospitals and individuals not named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein.

## CLASS ACTION ALLEGATIONS

16.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on behalf of the following Class:

4

All persons employed by any defendant or co-conspirator to work in a
hospital in the Albany MSA as an RN at any time from June 20, 2002 until
the present.

17.    Plaintiffs do not know the exact number of Class members because such

information is in the exclusive control of defendants. As of 2005 there were more than

2,300 full-time-equivalent RNs employed by Albany-area hospitals. Thus, the Class is so

numerous that joinder of all Class members is impracticable.

18.    Questions of law and fact that are common to the plaintiffs and other

members of the Class predominate over questions that affect only individual members.

The questions of law and fact that are common to the Class include:

a.  Whether Albany-area hospitals, including defendants, have conspired to depress

the compensation they paid to their RN employees during the Class period;

b.  Whether the alleged conspiracy has been effective in depressing RN

compensation;

c.  Whether Albany-area hospitals, including defendants, have agreed to share

regularly with each other detailed and non-public data about current and

prospective RN employee compensation;

d.  Whether defendants and the other Albany-area hospitals have regularly

exchanged detailed and non-public information about current and future RN

employee compensation;

e.  Whether the exchange of such information suppressed competition among

Albany-area hospitals in the compensation of RN employees, and depressed the

compensation paid to such employees; and

f.  The formula and data for estimating the amount by which Class members' compensation was depressed.

19.    Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs, like all Class members, are RNs who has been employed by one or more of the Albany-area hospitals during the Class period and have been damaged by the unlawful conduct alleged herein.  Plaintiffs, by advancing their own claims, will also advance the claims of all members of the Class.

20.    Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members.  There are no material conflicts between plaintiffs' interests in this litigation and those of Class members that would make class certification inappropriate. Counsel for plaintiffs are experienced in antitrust class actions, and will vigorously assert plaintiffs' claims and those of the other Class members.

21.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the causes of action alleged herein.  Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.  No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

**INTERSTATE TRADE AND COMMERCE**

22.    Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than New York.

23.    Each defendant named herein compensates the RNs it employs within the Albany MSA in part with funds provided by insurance carriers and other health care

6

providers that are located in states other than New York.  These carriers and providers

render payments to each named defendant by mailing funds across state lines.

24.     Each defendant named herein also compensates the RNs it employs within

the Albany MSA in part with Medicare funds paid to each defendant by the United

States; these payments to each named defendant are mailed across state lines.

25.     The unlawful conduct alleged herein directly involves and substantially

affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The Albany MSA Hospital RN Market

26.     The Albany MSA is comprised of Albany, New York, Schenectady, New

York and Troy, New York and their immediately surrounding towns and cities.

27.     Hospitals in the Albany MSA currently employ more than 2,300 full-time-

equivalent RNs.

28.     This market is heavily concentrated.  The five named defendants employ

approximately 73% of the hospital RNs in the Albany MSA.

### Conspiracy to Suppress RN Compensation

29.     Beginning before June 2002 and continuing to the present, defendants

have conspired with each other and with other Albany-area hospitals to depress the

compensation paid to RNs employed at hospitals within the Albany MSA.

30.     In furtherance of their conspiracy, defendants and their co-conspirators

have done those things they agreed to do, including:

    a.   Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

    b.   Agreeing not to compete, and not competing, with each other in the setting of RN employee compensation;

    c.   Paying RN employees at the same or nearly the same rate as each other; and

    d.   Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

31.    In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

32.    Human resources employees working at defendant and co-conspirator hospitals have regularly telephoned each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation. These information exchanges have increased in frequency and detail at the end of each fiscal year when hospitals draft budgets and decide on RN compensation levels for the following year. Hospital administrators in the Albany MSA have used this information to set RN compensation. Human resources employees have been evaluated by their superiors on their ability to accomplish this RN compensation coordination.

33.    The great majority of hospitals in the Albany MSA, including defendants, are members of the Iroquois Healthcare Association ("Iroquois"). Iroquois conducts and publishes an annual survey of the benefits and salaries of approximately 100 upstate hospitals. The published survey includes hospital-by-hospital data from as little as a

month before.  Although the published survey does not identify hospitals by name,

human resources employees can readily identify each surveyed hospital from identifying

information such as the numbers of different types of employees and the size of the

operating budget.  On request from individual members, Iroquois publishes survey

reports providing selected information on selected hospitals (e.g., a hospital's top five

competitors), making identification of the included hospitals even easier.

   34. Hospitals in the Albany MSA have paid very similar RN compensation.

For example, during the class period, all or nearly all Albany-area hospitals have

compensated entry-level RN employees at an hourly rate that has differed from one

another by no more than $1.

   35. Defendants' unlawful conspiracy has had the following effects, before and

during the Class period:

  a. Competition among defendants and their co-conspirators in the recruitment and

    compensation of hospital RN employees in the Albany area has been restrained;

  b. Compensation for hospital RN employees in the Albany MSA has been at

    artificially low levels; and

  c. Albany-area hospitals have underutilized RNs, yielding low nurse-to-patient

    ratios, forcing RNs to work harder for longer hours, and reducing patient quality

    of care.

   36. Defendants' conspiracy to depress RN wages raises a serious healthcare

issue.  The Antitrust Division of the U.S. Department of Justice noted in its "Statements

of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the

compensation paid to health care employees, for example, could adversely affect the

availability of health care personnel." Similarly, numerous studies have shown a strong

correlation between the numbers of RNs that a hospital employs per patient and the

hospital's morbidity and mortality rates. Although defendants and their co-conspirators,

like hospitals across the country, complain about the RN shortage, they have not taken

the most basic remedial action to alleviate it – they have not offered RNs competitive

wages.

### Injury to Plaintiffs and the Class

37.    During the Class Period (and before), plaintiffs have suffered substantial

economic harm in the form of lost compensation as a direct result of defendants' and

their co-conspirators' unlawful agreement to depress RN compensation and their

unlawful agreement to exchange RN compensation information.

### COUNT I

### CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

38.    Plaintiffs re-allege the allegations in paragraphs 1-37 as if set forth fully

herein.

39.    Beginning before June 2002 and continuing until the present, defendants

and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to

depress the compensation of RNs employed at hospitals in the Albany MSA, in violation

of Section 1 of the Sherman Act, 15 U.S.C. §1.

40.    Pursuant to this unlawful conspiracy, defendants and their co-conspirators

have set the compensation of RNs employed at hospitals in the Albany MSA at

artificially low levels.

41.    As a result of the unlawful conspiracy alleged in this Count, plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## COUNT II
### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

42.    Plaintiff re-alleges the allegations in paragraphs 1-41 as if set forth fully herein.

43.    Beginning before June 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed and non-public information about the compensation being paid or to be paid to their RN employees.  This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

44.    This information-exchange agreement has reduced competition among Albany-area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

45.    The relevant geographic market for the claim alleged in this Count is the Albany MSA, and the relevant service market consists of the services provided to hospitals by RN employees.

46.    A slight decrease in RN compensation from a competitive level could be imposed collectively by the conspiring hospitals in the Albany MSA without causing too many RNs to move to any non-conspiring hospitals within the Albany MSA, to non-hospital employers within the Albany MSA or to employers outside the Albany MSA.

11

47.    RNs often are constrained from moving to another geographic area because of region-specific licensing requirements, as well as other professional and familial obligations.

48.    Hospital RNs possess unique skill sets and gain industry-specific experience as they work, which renders them more valuable to hospitals than to non-hospital RN employers. As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge. Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

49.    Albany-area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the Albany MSA, but not about compensation paid to non-hospital RNs or RNs working outside the Albany MSA. Albany-area hospitals rely on this compensation information to set RN compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the Albany area.

50.    Defendants and their co-conspirators comprise 100% or nearly 100% of the hospitals within the Albany MSA. Collectively, they have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels. This joint power clearly exists because it in fact has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This

weakens their negotiating position with hospitals and enhances the hospitals' market power.

51.    The information-exchange agreement has had the effect of suppressing competition among Albany-area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

a.    The information regularly exchanged by Albany-area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that superior compensation will be timely and specifically known by competitors. Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

b.  Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

c.  The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages.  With such information, hospitals know what others are paying their RN employees, while RN employee applicants, who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

d.  The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

52.    For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

53.    As a result of the unlawful agreement alleged herein to exchange RN compensation information, plaintiff and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Plaintiffs and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 15 U.S.C. §15(a);

D.    Plaintiffs and the other members of the Class, to the greatest extent allowed by law, be awarded interest at the highest legal rate from and after the date of service of this Complaint;

E.    Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

F.    Plaintiffs and the other members of the Class be granted such other relief deemed proper to this Court.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: December 22, 2006                    By_____
                                            MICHAEL RHODES-DEVEY
                                            ABR # 102438
                                            JAMES T. TOWNE, JR.
                                            TOWNE LAW FIRM
                                            421 New Karner Road
                                            Albany, New York 12212-5072
                                            Tel: (518) 452-1800
                                            Fax: (518) 452-6435

Exhibit 1

MICHAEL D. HAUSFELD
DANIEL A. SMALL
JOSEPH M. SELLERS
CHARLES E. TOMPKINS
ALLYSON B. BAKER
KALPANA KOTAGAL
COHEN MILSTEIN HAUSFELD
& TOLL, P.L.L.C.
1100 New York Ave., NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

DAVID P. DEAN
MARY JOYCE CARLSON
JAMES & HOFFMAN
1101 17th St., NW
Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

MICHAEL P. LEHMANN
THOMAS P. DOVE
KIMBERLY A. KRALOWEC
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

DANIEL E. GUSTAFSON
JASON S. KILENE
Gustafson Gluek PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel.: (612) 333-8844
Fax: (612) 339-6622

MARK A. GRIFFIN
RAYMOND J. FARROW
KELLER ROHRBACK L.L.P
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

Charles E. Schaffer

16

Arnold Levin
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Attorneys for Plaintiffs

Exhibit 1

FILED

2006 SEP -7 P 3:10

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

DEPUTY

|  |  |
|---|---|
| Marissa Maderazo, Roselia Pollard, and Barbara Miles, on behalf of themselves and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> VHS San Antonio Partners, L.P. d/b/a Baptist Health Systems, HCA Inc., a/k/a Methodist Healthcare System of San Antonio, Ltd. L.L.P., Christus Santa Rosa Health Care Corp., <br><br> Defendants. | **Civil Action No.** SA06CA0535 <br><br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL REQUESTED** |

Plaintiffs Marissa Maderazo, Roselia Pollard and Barbara Miles, by and through

counsel, on behalf of themselves and all others similarly situated, bring this action against

defendants for damages, and demand trial by jury, complaining and alleging as follows:

## NATURE OF THE ACTION

1.      Defendants, which own and operate hospitals in the San Antonio

Metropolitan Statistical Area ("San Antonio MSA" or "San Antonio area"), have for

years conspired among themselves and with other hospitals in the San Antonio MSA to

depress the compensation levels of registered nurses ("RNs") employed at the conspiring

hospitals, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.    In furtherance of their conspiracy, defendants and their co-conspirators also agreed to regularly exchange detailed and non-public information about the compensation each is paying or will pay to its RN employees.  The agreement to exchange such information has facilitated the formation, implementation and enforcement of defendants' wage-fixing conspiracy.  Pursuant to this agreement defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written surveys.  The exchange of this information itself has suppressed competition among San Antonio-area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3.    Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage.  Absent their conspiracy, San Antonio-area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals.  The history of hospital RN compensation and vacancy rates in the San Antonio MSA, however, reveals that hospital RNs are not being compensated at competitive levels.  Despite years of high vacancy rates, compensation for hospital RNs in the San Antonio MSA has remained low and surprisingly stagnant.  The few compensation increases in the past several years have been far too small to substantially decrease the area's nursing shortage.

4.    Plaintiffs, on their own behalf and on behalf of the Class defined below, seek to recover for the compensation properly earned by RNs employed at San Antonio-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy

2

alleged herein.  Plaintiff also seeks costs, including reasonable attorneys' fees and interest, as allowed by law.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

6.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c).

## PARTIES

7.     Plaintiff Marissa Maderazo is an RN who has been employed at Methodist Children's Hospital of South Texas since before June 2002; she currently resides in San Antonio, Texas.

8.     Plaintiff Roselia Pollard is an RN who has been employed by hospitals within both the Santa Rosa System and the Baptist Health System during the relevant time period; she currently resides in San Antonio, Texas.

9.     Barbara Miles is an RN who has been employed by hospitals within both the Baptist Health System and the Methodist HealthCare System during the relevant time period; she currently resides in San Antonio, Texas.

10.     Defendant HCA Inc., ("HCA") is a Delaware corporation with its principal place of business at One Park Plaza, Nashville, Tennessee.  This Defendant may be served by agreement through its attorney, Robert C. Jones, Jones Day, 51 Louisiana Avenue, N.W., Washington, D.C. 20001-2113.  HCA is a holding company whose affiliates own and operate hospitals throughout the United States, England and

3

Switzerland. HCA, through its affiliated entities, operates four hospitals in the San Antonio MSA.

11.     Defendant Methodist Healthcare System of San Antonio, Ltd. L.L.P. is an affiliate or subsidiary of defendant "HCA." Defendant Methodist Healthcare System of San Antonio, Ltd. L.L.C. can be served by agreement by serving its attorney, Robert C. Jones, Jones Day, 51 Louisiana Avenue, N.W., Washington, D.C. 20001-2113.

12.     Defendants HCA and Methodist Healthcare System of San Antonio, Ltd. L.L.P. own and/or operate the following hospitals in the San Antonio MSA: (a) Methodist Hospital, located at 7700 Floyd Curl Drive, San Antonio, TX, 78229; (b) the San Antonio Metropolitan Methodist Hospital, located at 1310 McCullough Ave. San Antonio, TX 78212; (c) the Methodist Children's Hospital of South Texas, located at 7700 Floyd Curl Drive, 520 Madison Oak Drive, San Antonio, TX 78258; (d) the Methodist Ambulatory Surgery Hospital Northwest, located at 9150 Huebner Road, Ste 100, San Antonio, TX 78240; and other facilities within the San Antonio MSA. HCA's hospitals in the San Antonio MSA have a capacity of over 1,700 beds and through these hospitals HCA employs over 2,700 RNs, or approximately 28% of the RNs employed by hospitals in the San Antonio MSA.

13.     Defendant VHS San Antonio Partners, L.P. ("VHS") is a Delaware limited partnership. VHS is a part of Vanguard Health Systems, ("Vanguard") a holding company registered as a Delaware corporation, with its principal place of business at 20 Burton Hills Boulevard, Suite 100, Nashville, TN 37215. Vanguard owns and operates hospitals in multiple states including Texas, Illinois, Arizona, California and Massachusetts.

14.     VHS, doing business as Baptist Health Systems, owns five hospitals: (a) Northeast Baptist Hospital, 8811 Village Drive, San Antonio, TX 78217; (b) Baptist Medical Center, 111 Dallas St. San Antonio, TX, 78205; (c) St. Luke's Baptist Hospital, 7930 Floyd Curl Drive, San Antonio, TX 78229; (d) North Central Baptist Hospital, 520 Madison Oak Drive, San Antonio, TX 78258; and (e) Southeast Baptist Hospital. 4214 East Southcross Blvd., San Antonio, TX, 87222.  Through these hospitals Vanguard has 1,495 licensed beds and employs over 1,400 RNs, or approximately 14% of the RNs employed by hospitals in the San Antonio MSA.

15.     Defendant Christus Santa Rosa Health Care Corp. is a Texas non-profit corporation with its principal place of business at 5121 Steadmont, Houston, TX 77040. This Defendant can be served with process through its registered agent, Corporation Service Company, 701 Brazos Street, Suite 1050, Austin, Texas 78701.

16.     Christus Santa Rosa Health Care owns and/or operates the Christus Santa Rosa Hospital and the Christus Santa Rosa Children's Hospital, both located at 333 North Santa Rosa Street, San Antonio, TX 78207 and an additional facility at 2827 Babcock Road, San Antonio, TX 78229.  Through its Hospitals, Christus Santa Rosa Health Care employs over 1,400 RNs, or approximately 14% of the RNs employed by hospitals in the San Antonio MSA.

## CO-CONSPIRATORS

17.     Various other hospitals and individuals not named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein.

Case 1:07-mc-00050-JDB    Document 1-2    Filed 02/05/2007    Page 23 of 37
Case 5:06-cv-005⁀ ⁀LG    Document 22    Filed 09/07/2⁀    Page 6 of 20

Exhibit 1

## CLASS ACTION ALLEGATIONS

18.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a hospital in the San Antonio MSA as an RN at any time from June 20, 2002 until the present.

19.    Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of defendants. Approximately 9,800 full time equivalent RNs were employed by San Antonio MSA hospitals in 2005. Thus, the Class is so numerous that joinder of all Class members is impracticable.

20.    Questions of law and fact that are common to the plaintiffs and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

a.    Whether San Antonio-area hospitals, including defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

b.    Whether the alleged conspiracy has been effective in depressing RN compensation;

c.    Whether San Antonio-area hospitals, including defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

d.    Whether defendants and the other San Antonio-area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

e.  Whether the exchange of such information suppressed competition among San

Antonio-area hospitals in the compensation of RN employees, and depressed the

compensation paid to such employees; and

f.  The formula and data for estimating the amount by which Class members'

compensation was depressed.

21.    Plaintiffs' claims are typical of the claims of the members of the Class

because plaintiffs are RNs who have been employed by one of the San Antonio-area

hospitals during the Class period and have been damaged by the unlawful conduct

alleged herein.  Plaintiffs, by advancing their own claims, will also advance the claims of

all members of the Class.

22.    Plaintiff and her counsel will fairly and adequately protect the interests of

all Class members.  There are no material conflicts between plaintiff's interests in this

litigation and those of Class members that would make class certification inappropriate.

Counsel for plaintiff are experienced in antitrust class actions, and will vigorously assert

plaintiff's claims and those of the other Class members.

23.    Class action treatment is superior to the alternatives for the fair and

efficient adjudication of the causes of action alleged herein.  Such treatment will permit a

large number of similarly situated persons to prosecute their common claims in a single

forum simultaneously, efficiently, and without the duplication of effort and expense that

numerous individual actions would entail.  No difficulties are likely to be encountered in

the management of this case that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

24.    Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than Texas.

25.    Each defendant named herein compensates the RNs it employs within the San Antonio MSA in part with funds provided by insurance carriers and other health care providers that are located in states other than Texas.  These carriers and providers render payments to each named defendant by mailing funds across state lines.

26.    Each defendant named herein also compensates the RNs it employs within the San Antonio MSA in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

27.    Both HCA and Vanguard have their primary places of business in states other than Texas and operate hospitals in states other than Texas.

28.    The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The San Antonio MSA Hospital RN Market

29.    The San Antonio MSA is comprised of San Antonio, TX, and the immediately surrounding towns and cities.

30.    Hospitals in the San Antonio MSA employ approximately 9,800 full-time-equivalent RNs.

31.    This market is heavily concentrated.  The defendant hospitals employ approximately 56% of the hospital RNs in the San Antonio MSA.

**Conspiracy to Suppress RN Compensation**

32.    Beginning before June 2002 and continuing to the present, defendants have conspired with each other and with other San Antonio-area hospitals to depress the compensation paid to RNs employed at hospitals within the San Antonio MSA.

33.    In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

a.  Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

b.   Agreeing not to compete, and not competing, with each other in the setting of RN employee compensation;

c.  Paying RN employees at the same or nearly the same rate as each other; and

d.  Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

34.    In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

35.    Human resources employees working at defendant and co-conspirator hospitals have regularly telephoned each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation. Hospital administrators in the San Antonio MSA have used this information to set RN compensation.

36.    Hospital human resource departments purchase third party surveys of the benefits and salaries of San Antonio hospitals.    Human resources employees can readily identify each surveyed hospital from identifying information contained therein.  Hospital administrators in the San Antonio MSA have used this information to set RN compensation.

37.    Hospital recruiters attend meetings of the San Antonio Health Care Human Resources Administrators Association and other like organizations at which current wage information is shared.  Hospital administrators in the San Antonio MSA have used this information to set RN compensation.

38.    Hospitals in the San Antonio MSA have paid very similar RN compensation.  For example, during the class period, all or nearly all San Antonio-area hospitals have compensated entry-level RN employees at an hourly rate that has differed from one another by no more than $1.

39.    Defendants' unlawful conspiracy has had the following effects, before and during the Class period:

    a.    Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the San Antonio area has been restrained;

    b.    Compensation for hospital RN employees in the San Antonio MSA has been at artificially low levels; and

    c.    San Antonio-area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

40.    Defendants' conspiracy to depress RN wages raises a serious healthcare issue. The Antitrust Division of the U.S. Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel." Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per patient and the hospital's morbidity and mortality rates. Although defendants and their co-conspirators, like hospitals across the country, complain about the RN shortage, they have not taken the most basic remedial action to alleviate it – they have not offered RNs competitive wages.

### Injury to Plaintiff and the Class

41.    During the Class Period (and before), plaintiffs have suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

### COUNT I

### CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

42.    Plaintiffs re-allege the allegations in paragraphs 1-41 as if set forth fully herein.

43.    Beginning before April 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the San Antonio MSA, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

44.     Pursuant to this unlawful conspiracy, defendants and their co-conspirators have set the compensation of RNs employed at hospitals in the San Antonio MSA at artificially low levels.

45.     As a result of the unlawful conspiracy alleged in this Count, plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## COUNT II

### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

46.     Plaintiffs re-allege the allegations in paragraphs 1-41 as if set forth fully herein.

47.     Beginning before June 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed and non-public information about the compensation being paid or to be paid to their RN employees.  This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

48.     This information-exchange agreement has reduced competition among San Antonio-area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

49.     The relevant geographic market for the claim alleged in this Count is the San Antonio MSA, and the relevant service market consists of the services provided to hospitals by RN employees.

50.     A slight decrease in RN compensation from a competitive level could be imposed collectively by the conspiring hospitals in the San Antonio MSA without

12

causing too many RNs to move to any non-conspiring hospitals within the San Antonio MSA, non-hospital employers within the San Antonio MSA or to employers outside the San Antonio MSA.

51.    RNs often are constrained from moving to another geographic area because of region-specific licensing requirements, as well as other professional and familial obligations.

52.    Hospital RNs possess unique skill sets and gain industry-specific and employer-specific experience as they work, which renders them more valuable to hospitals than to non-hospital RN employers.  As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge.  Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

53.    San Antonio-area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the San Antonio MSA, but not about compensation paid to non-hospital RNs or RNs working outside the San Antonio MSA.  San Antonio-area hospitals rely on this compensation information to set RN compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the San Antonio area.

54.    Defendants and their co-conspirators comprise nearly 100% of the hospitals within the San Antonio MSA.  Collectively, they have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels.  This joint power clearly exists because it in fact

has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This weakens their negotiating position with hospitals and enhances the hospitals' market power.

55.    The information-exchange agreement has had the effect of suppressing competition among San Antonio-area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

a.    The information regularly exchanged by San Antonio-area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that superior compensation will be timely and specifically known by competitors.

Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

b.  Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

c.  The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages.  With such information, hospitals know what others are paying their RN employees, while RN employee applicants, who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

d.  The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

56.    For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

57.    As a result of the unlawful agreement alleged herein to exchange RN compensation information, plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays that:

      A.     The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

      B.     Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

      C.     Plaintiffs and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 15 U.S.C. §15(a);

      D.     Plaintiffs and the other members of the Class, to the greatest extent allowed by law, be awarded interest at the highest legal rate from and after the date of service of this Complaint;

      E.     Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

      F.     Plaintiffs and the other members of the Class be granted such other relief deemed proper to this Court.

Exhibit 1

### JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

a trial by jury of all issues so triable in this case.

Dated: September 7, 2006

PERRY & KELLOGG, L.L.P

By  _Luke C. Kellogg_
LUKE C. KELLOGG
7801 Broadway, Suite 200
San Antonio, Texas 78209
Tel.: (210) 821-3377
Fax: (210) 821-3388

MARK A. GRIFFIN
RAYMOND J. FARROW
KELLER ROHRBACK L.L.P
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

MICHAEL D. HAUSFELD
DANIEL A. SMALL
JOSEPH M. SELLERS
CHARLES P. TOMPKINS
ALLYSON B. BAKER
COHEN MILSTEIN HAUSFELD
& TOLL, P.L.L.C.
1100 New York Ave., NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

Exhibit 1

DAVID P. DEAN
MARY JOYCE CARLSON
JAMES & HOFFMAN
1101 17th St., NW
Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

MICHAEL P. LEHMANN
THOMAS P. DOVE
KIMBERLY A. KRALOWEC
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

DANIEL E. GUSTAFSON
JASON S. KILENE
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel.: (612) 333-8844
Fax: (612) 339-6622

Attorneys for Plaintiffs

Case 1:07-mc-00056-JDB    Document 1-2    Filed 02/05/2007    Page 30 of 37
Case 5:06-cv-0053 )LG    Document 22    Filed 09/07/2C    Page 19 of 20

Exhibit 1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Second Amended Class Action Complaint was sent via Certified Mail, Return Receipt Requested on the 7th day of September, 2006, to the following counsel of record:

Mr. David L. Hanselman, Jr.
MCDERMOTT, WILL & EMERY, L.L.P.
227 West Monroe Street
Chicago, IL 60606

     *Attorney for Defendant VHS San Antonio Partners, L.P.*
     *D/B/A Baptist Health System*

Layne E. Kruse
FULBRIGHT & JAWORSKI L.L.P.
Fulbright Tower, Suite 5100
1301 McKinney Street
Houston, Texas 77010-3095

Robert G. Newman
FULBRIGHT & JAWORSKI L.L.P.
300 Convent, Suite 2200
San Antonio, Texas 78205-3792

James H. Kizziar, Jr.
BRACEWELL & GUILIANI L.L.P.
800 One Alamo Center
106 S. St. Mary's Street
San Antonio, Texas 78205-3603

     *Attorneys for Defendant Christus Santa Rosa*
     *Health Care Corporation*

Robert C. Jones
Phillip A. Proger
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Ricardo G. Cedillo
Derick J. Rodgers
DAVIS, CEDILLO & MENDOZA, INC.
McCombs Plaza, Suite 500
755 E. Mulberry Avenue
San Antonio, Texas 78212-3149

*Attorneys for Defendants HCA and Methodist Healthcare*
*System of San Antonio, Ltd. L.L.P.*

Luke C. Kellogg

Exhibit 2

## Declaration of Mary Joyce Carlson

I, Mary Joyce Carlson, declare as follows,

1.      I am of counsel to the law firm of James & Hoffman, P.C. ("J&H") and counsel to the
        plaintiffs in the above captioned litigation.  David Dean, a J&H partner, is currently
        designated as a co-lead counsel in the litigation <u>Maderazo v. Vanguard Health Systems</u>
        Civ. No. SA06CA0535OG (W.D. Tex.).  Ms. Marissa Maderazo, the lead plaintiff,
        retained J&H to bring a class action lawsuit against hospitals in the San Antonio area
        that were colluding on nurse wages.  David Dean and other attorneys at J&H are long
        time practitioners of employee-side law in the health care industry with particular
        experience regarding nurses, and bring essential expertise, contacts and experience to
        the leadership counsel group in this litigation.

2.      I understand that certain Defendant hospitals nevertheless are proposing currently to bar
        from disclosure certain information in discovery to any plaintiffs' counsel "who
        currently represents, or who has represented at any time in the past five years, the SEIU
        or any other labor organization in a matter in which the labor organization was adverse
        to a hospital or health care system, including Mary Joyce Carlson, David Dean, and the
        members, associates, of counsel, and employees of James & Hoffman, P.C."

3.      I further understand that Defendants' exclusion proposal is based on the argument that
        plaintiffs are acting on behalf of the Service Employees International Union ("SEIU")
        and that information from discovery will or could be used to further SEIU public
        relations, organizing campaigns, or employee bargaining with the defendant hospitals.

4.      I offer the following Declaration to clarify the relationship of the SEIU to this litigation,
        to J&H, David Dean and myself.  In short, plaintiffs are acting on behalf of themselves

Exhibit 2

and similarly situated nurses, not the SEIU; and confidential information from discovery in this litigation will not be available to the SEIU to be used in public relations, organizing campaigns or bargaining with defendant hospitals.

THE SEIU AND J&H

5.    J&H is a litigation firm of six partners, three associates and, currently, three of counsel attorneys, that services a broad range of clients, both union and nonunion.  Aside from myself and J&H partner Judy Scott, who currently have retainer agreements with the SEIU, none of these J&H attorneys has a relationship with the SEIU beyond that of outside counsel to a client.

6.    David Dean and several other attorneys at J&H have in the past represented or advised the SEIU as to discrete matters when asked.  For example, David Dean over the last Spring and Summer, litigated a case for the SEIU Health Care Division against HCA, a defendant in this case, under a national agreement between SEIU and HCA.  That case was settled in July 2006 and David Dean is not currently representing the SEIU against HCA in any matter.  Neither David Dean nor any of these other J&H attorneys play any role in the SEIU's decisions regarding organizing or collective bargaining with any particular employer, including Defendants. None of these attorneys are employees or officers of the SEIU or related by blood or marriage to any employee or officer of the SEIU.  It is my understanding that, aside from the retainers for Ms. Scott's and my services, SEIU work represented only approximately 13% of J&H's overall billings in 2005.

7.    The SEIU has its own in-house, full-time legal staff consisting of over ten full-time lawyers.  The principal SEIU attorney with responsibility for SEIU activities in Texas,

Exhibit 2

including San Antonio, is Steven Ury, SEIU Southwest Regional Counsel, who is based in Los Angeles.

8.    The SEIU does have a long term retainer with J&H for the services of Ms. Scott, who serves as the SEIU's full-time General Counsel. Ms. Scott works full-time out of the SEIU headquarters in Washington and, to avoid any potential conflicts in this case, has been fully walled off since January 2006 from all the nurse wage antitrust litigations filed in June 2006 in which J&H is involved. Ms. Scott is not involved in any capacity in, has no access to any of the files or records relating to, and receives no confidential information about these nurse wage antitrust cases.

9.    The SEIU also has a one-year retainer with J&H for my services as counsel to the SEIU Health Care Division. Under that retainer, I sometimes call myself "Counsel" or "Special Counsel" to the Health Care Division. I am not an employee or officer of the SEIU. I continue to advise and represent a wide variety of other labor and non-labor clients in both litigation and non-litigation matters, recently including providing training for staff at the Ministry of Labor for the Republic of Taiwan and advising the United Food and Commercial Workers International Union on litigation matters.

10.    My principal current responsibility for the SEIU under the retainer agreement is to negotiate and maintain national agreements with Health Care systems. The SEIU presently has such agreements with HCA, Tenet Health Systems and Doctors Community Healthcare Corporation. In addition, I provide other advice to the SEIU on an as-requested basis. For example, in the 2004 election cycle, I spent four months, full-time, managing and litigating a voting rights case that the union was sponsoring. On a part-

Exhibit 2

time basis, I utilize an office and some support at the SEIU's headquarters in Washington to help fulfill my responsibilities.

11.  HCA is the only healthcare system with whom the SEIU has a national agreement that has a subsidiary in San Antonio. This HCA subsidiary is the Methodist Healthcare System of San Antonio, Ltd., LLP.  The SEIU is not conducting any organizing or collective bargaining activities in regard to the Methodist Healthcare System of San Antonio.  However, pursuant to my responsibilities to implement the national agreement with HCA, I have on occasion represented the SEIU in dealings with HCA that concern other SEIU activities in Texas.  I also on occasion have given advice to staff and members of the Nurse Alliance of SEIU, an association affiliated with SEIU, which advocates on patient care, nurse working conditions, healthcare reform, and other issues, in Texas and other states.

12.  Given my responsibilities to the SEIU in administering the national agreement with HCA, in order to avoid any possibility of inadvertent disclosure of any confidential information to the SEIU concerning HCA, I have agreed that I will not have any access to information in the above captioned litigation marked "CONFIDENTIAL—NOT TO BE DISCLOSED TO UNION" or "HIGHLY CONFIDENTIAL—NOT TO BE DISCLOSED TO UNION" from any hospital in San Antonio.

THE SEIU'S ROLE IN THE NURSE WAGE LITIGATIONS

13.  The SEIU has played absolutely no role in the direction or management of this lawsuit, exerts no control over the attorneys prosecuting it, and has not and cannot impose any conditions on any potential settlement of it.  Nevertheless, the SEIU played a critical role in the genesis of the nurse wage antitrust lawsuits and offers ongoing support consistent

Exhibit 2

with the public service nature of the suit and its own interests in championing nurse issues.

14.    In 2004, Barbara Bergman, an economist with American University, circulated an article to the SEIU seeking to show that hospital collusion on nurse wages was a likely cause of the long-term nurse shortage. The SEIU engaged her and the J&H law firm to investigate the issue. Based on J&H's own experience in the industry, we found Ms. Bergman's thesis more than plausible.

15.    J&H's legal and factual research on behalf of the SEIU indicated that collusion was, in fact, occurring in certain jurisdictions. J&H, through David Dean and me, brought this research to Cohen, Milstein, Hausfeld and Toll for their advice on whether the antitrust laws had been violated. Following further research and investigation, the SEIU began referring interested nurses as potential plaintiffs to the two law firms.

16.    Two nurses referred by the SEIU and one referred from elsewhere eventually retained the firms to bring suit. In addition to referring potential plaintiffs, the SEIU is currently providing support to the lawsuits through paying J&H a reduced fee for its work on the suits and for certain expenses. Such support is fully consistent with J&H's representation of Ms. Maderazo and the other members of the nurse class, and the SEIU has agreed not to make any demands on J&H concerning the litigations or otherwise interfere with J&H's professional judgment about how best to serve the plaintiffs and the plaintiff class' interests.

Exhibit 2

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my recollection. Executed on _12/19_, 2006 at _Washington_, _DC_.

Mary Joyce Carlson
Mary Joyce Carlson

Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| MARISSA MADERAZO,<br>ROSELIA POLLARD,<br>and BARBARA MILES,<br>on behalf of themselves and all others<br>similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VHS SAN ANTONIO PARTNERS, L.P.,<br>D/B/A BAPTIST HEALTH SYSTEMS,<br>HCA, INC., A/K/A METHODIST<br>HEALTHCARE SYSTEM OF SAN<br>ANTONIO, LTD., L.L.P.,<br>and CHRISTUS SANTA ROSA HEALTH<br>CARE CORP.,<br><br>Defendants. | § § § § § § § § § § § § § § § § § |

CIVIL ACTION NO. 5:2006-CV-00535-OG

FILED

FFR - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## PLAINTIFF MARISSA MADERAZO'S OBJECTIONS AND RESPONSES TO
## DEFENDANT CHRISTUS SANTA ROSA'S INTERROGATORY NOS. 1 - 13

### (CLASS ISSUES)

31218264.1

Exhibit 3

1.    Identify all persons who You believe have knowledge of relevant facts relating to
      class certification and identify the issues relating to class certification upon which
      You believe they have knowledge.

**Response**:    Plaintiffs Marissa Maderazo, Roselia Pollard and Barbara Miles have
knowledge of their suitability to represent the class, including their typicality and
adequacy under Rule 23. In addition, all persons named in Defendants' initial disclosures
made on December 1, 2006, may have relevant knowledge. All other persons with
knowledge are within the exclusive knowledge of Defendants or third parties.

2.    If you contend that some other person or legal entity is, in whole or in part, liable
      to You in this matter, identify that person or legal entity and describe in detail the
      basis of said liability.

**Response**:    All Defendants are jointly and severally liable for Plaintiff's damages in
this matter. Plaintiff is unable to identify any other entity at this time because the
information required to identify any such entity is in the exclusive control of Defendants
or any other co-conspirator, if such exist.

3.    Identify each and every one of the "co-conspirators" referred to in paragraph 2 of
      the Complaint.

**Response**:    This information is uniquely in the possession of Defendants and those
unidentified co-conspirators.

Exhibit 3

4.    Describe completely and identify the participants to all communications between
You and any actual or prospective employer or putative class member concerning
employment terms, conditions, benefits or other working conditions.

**Response**:    Plaintiff objects to this request as vague and ambiguous.  Subject to this
objection, Plaintiff has communicated with various other nurses, including supervisors, in
the nature of casual conversations about working conditions, but does not recall any
specific communication.

5.    Describe all communications between You and the SEIU or any other labor union,
association, organization or group, or any lawyer representing any such
association, organization or group, regarding compensation, salaries, benefits or
working conditions available or offered to nurses.

**Response**:    Plaintiff objects that this Request, by its terms, encompasses all
communications without reasonable limitation to exclude communications protected by
the attorney-client privilege and/or other legal privilege.  Plaintiff objects to the extent
that this Request encompasses communications protected by the First Amendment to the
U.S. Constitution, including but not limited to information regarding the exercise of the
rights of association, speech and petitioning, thereby invading and chilling protected First
Amendment rights.  Plaintiff objects to the extent that this Request seeks disclosure of
confidential, sensitive and legally protected information regarding employees' organizing
activities, union activities and other activities protected by the National Labor Relations
Act and other federal law.  Plaintiff objects to the extent that this Request seeks

Exhibit 3

disclosure of trade secrets and/or proprietary and confidential information, including but not limited to information reflecting strategies, plans, policies and methods (including confidential research and development) for conducting lawful organizing among employees, investigation, community organizing, advocacy, petitioning and association protected by the First Amendment and federal law.  Plaintiff objects to the extent that this Request would infringe on individuals' privacy rights.  Plaintiff objects to the extent that this Request is overly broad in scope, unduly burdensome, and seeks information not relevant to and not reasonably calculated to lead to admissible evidence in the pending lawsuit.

6.      Describe all communications between You and any person employed with the law firm of James & Hoffman prior to Your engagement of the firm to represent You in this suit regarding compensation, salaries, benefits or working conditions available or offered to nurses or the potential for a lawsuit against one or more of the Defendants.

**Response**:     Plaintiff objects to this request to the extent it seeks privileged attorney-client communications.  Subject to, and without waiving this objection, early in 2006 I received a letter advertisement from James and Hoffman.  In response I called someone at James and Hoffman.  The contents of that conversation are protected by the attorney client privilege.  I did not keep a copy of the letter and so cannot describe its contents.

7.      Identify by jurisdiction, court, style, docket number, index, file or case number, and filing date each and every action or proceeding, whether civil, criminal,

Exhibit 3

administrative or otherwise, in which You have been a party and a brief description thereof.

**Response**: I do not recall being involved in any other action or proceeding.

8.    Identify all sources of funds by which You intend to pay the costs of prosecution of this action as a class action, including but not limited to attorneys' fees and notice to putative class members.

**Response**:    Plaintiff's attorneys are employed on a contingent fee basis, hence the source of funds to pay such fees is any recovery that I, and other class members, make in this action. Plaintiff's attorneys have also agreed to advance all costs of this litigation, including the cost of notice, subject to their potential recovery from any recovery on behalf of the class. In addition, the SEIU is currently paying James & Hoffman a reduced fee for its work on this suit and for certain expenses.

9.    Describe completely the relevant geographic market alleged in paragraph 49 of the Complaint, including but not limited to the "immediately surrounding towns and cities" referred to in paragraph 29 of the Complaint.

**Response**: The Complaint defines the relevant geographic market as "the San Antonio Metropolitan Statistical Area." It is a matter of public information (*see* OMB Bulletin No. 06-01 (Corrected), December 5, 2005) what towns and cities comprise this MSA, and Defendant is as capable as Plaintiff of identifying what towns and cities are encompassed therein.

Exhibit 3

10.   Describe completely the "relevant service market" alleged in paragraph 49 of the Complaint, including but not limited to identifying the "hospitals or other facilities" included within the relevant market alleged in paragraph 49.

**Response**:   It is a matter of public information what hospitals are located within the San Antonio Metropolitan Statistical Area, and Defendant is as capable as Plaintiff of identifying those hospitals.  The Complaint makes no reference to "hospitals or other facilities" so Plaintiff cannot identify what Defendant might mean by "other facilities" within the San Antonio MSA.  The Complaint defines the relevant service market as "the services provided to hospitals by RN employees."

11.   Define what You mean by an "RN" as that term is used in the putative class defined in paragraph 18 of the Complaint, including a detailed description of the characteristics of the class of persons You seek to represent as class representative (including the education level, licensing, accreditation, certification or specializations, the range of years of work experience, nature of work, skill level, employers, employment positions or titles, and employment responsibilities of such persons), and how those characteristics differ from any nurses not in the putative class.

**Response**:   Plaintiff objects to this premature contention Interrogatory.  The scope of the class depends on the scope of the conspiracy among the Defendants and their co-conspirators.  Because Plaintiffs have had no access to Defendants' records regarding their employment of nurses and are prevented from conducting any discovery on the

Exhibit 3

merits of their claims at this time, this is information uniquely under the control of Defendants and their co-conspirators.

12.     Identify the basis for all damages sustained by You and each member of the putative class, including the formula(s) or methodology, if any, for calculating damages.

**Response**:     Damages sustained by every member of the Class arise from the conspiracy among Defendants.  Plaintiffs cannot predict in the abstract how class-wide damages will be calculated without having had any access to Defendants' records. Plaintiffs have not yet calculated total damages, which will require expert computation applied to Defendants', and other, data.  Plaintiffs will provide this information to Defendants in accord with the schedule set by the court.

13.     Identify all person(s) from whom You expect to offer an expert opinion to establish the propriety of class certification in this case. For each such expert, identify the subject matter of the testimony or opinion, the substance of all facts and opinions to be offered or relied on, a summary of the grounds for each opinion, and identify all documents provided to such expert.

**Response**:     Plaintiff objects to Interrogatory Number 13 as imposing obligations beyond those set forth by the Federal Rules of Civil Procedure and this Court's Scheduling Order. Plaintiff also objects to Interrogatory Number 13 to the extent it seeks information protected from disclosure by the attorney-client privilege, the work product doctrine, the self-analysis privilege, any examination privilege, and/or any applicable

Exhibit 3

privilege or similar reason for non-disclosure.  Plaintiff will make all required disclosures

regarding expert witnesses in accordance with the Federal Rules and this Court's Orders.

Exhibit 3

ANSWERS TO INTERROGATORIES DATED this 4th day of December 2006.

### CERTIFICATION

The undersigned attorney for Plaintiff Marissa Maderazo, has read the foregoing OBJECTIONS AND RESPONSES TO DEFENDANT CHRISTUS SANTA ROSA'S INTERROGATORIES NO 1-13 and they are in compliance with Fed. R. Civ. P. 26(g).

KELLER ROHRBACK L.L.P.

By: _____

Mark A. Griffin,
Raymond J. Farrow

Attorneys for Plaintiff Marissa Maderazo

STATE OF TEXAS          )
                        )
COUNTY OF _____    )

Marissa Maderazo being first duly sworn on oath deposes and says:

That Marissa Maderazo is a Plaintiff in the foregoing action; that Marissa Maderazo has read the above and foregoing answers to interrogatories, knows the contents thereof, and believes the same to be true.

_____

SUBSCRIBED AND SWORN TO before me this ____ day of _____, 2006.

_____

Print Name:_____
NOTARY PUBLIC in and for the State of Texas; residing at:_____
My commission expires:_____

Exhibit 3

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of December, 2006, I served the foregoing on the

parties listed below via email and regular U.S. Mail.

| | |
|---|---|
| James H. Kizziar, Jr.<br>Bracewell & Guiliani LLP<br>800 One Alamo Center<br>106 S. St. Mary's Street<br>San Antonio, TX  78205-3603<br>BUSINESS:  (210) 226-1166<br>FAX:  (210) 226-1133 | Layne E. Kruse<br>Robert Gilchrist Newman<br>Fulbright & Jaworski<br>1301 McKinney<br>Suite 1500<br>Houston, TX  77002-3095<br>BUSINESS:  (713) 651-5151<br>FAX:  (713) 651-5246 |
| Robert C. Jones<br>Michael R. Shumaker<br>Jones Day<br>51 Louisiana Avenue, NW<br>Washington, DC  20001-2113<br>BUSINESS:  (202) 879-3876<br>FAX:  (202) 626-1700 | Luke C. Kellogg<br>Perry & Kellogg, LLP<br>7801 Broadway, Suite 200<br>San Antonio, TX  78209<br>BUSINESS:  (210) 821-3377<br>FAX:  (210) 821-3388 |
| Ricardo G. Cedillo<br>Ana M. Arrazola<br>Derick J. Rogers<br>Davis, Cedillo & Mendoza, Inc.<br>McCombs Plaza, Suite 500<br>755 E. Mulberry Avenue<br>San Antonio, TX  78212-3149<br>BUSINESS:  (210) 822-6666<br>FAX:  (210) 822-1151 | David L. Hanselman, Jr.<br>David Marx<br>McDermott Will & Emery LLP<br>227 West Monroe Street<br>Chicago, IL  60606<br>BUSINESS:  (312) 372-2000<br>FAX:  (312) 984-7700 |
| Allyson B. Baker<br>Daniel A. Small<br>Charles E. Tompkins<br>Cohen, Milstein, Hausfeld & Toll, P.L.L.C.<br>1100 New York Avenue, NW<br>Suite 500<br>Washington, DC  20005<br>BUSINESS:  (202) 408-4697<br>FAX:  (202) 408-4699 | Joseph Casseb<br>Goode Casseb Jones Riklin Choate & Watson, P.C.<br>2122 N. Main Avenue<br>San Antonio, TX  78212<br>BUSINESS:  (210) 733-6030<br>FAX:  (210) 733-0330 |

Exhibit 3

| | |
|---|---|
| Mary Joyce Carlson<br>David P. Dean<br>James & Hoffman<br>1101 - 17th Street NW, Suite 510<br>Washington, DC 20036<br>mjcarlson@jamhoff.com<br>dpdean@jamhoff.com<br>BUSINESS    (202) 496-0500<br>FAX    (202) 496-0555 | Daniel E. Gustafson<br>Jason S. Kilene<br>Gustafson Gluek PLLC<br>650 Northstar East, 608 Second Avenue South<br>Minneapolis, MN 55402<br>dgustafson@gustafsongluek.com<br>jkilene@gustafsongluek.com<br>BUSINESS    (612) 333-8844<br>FAX    (612) 339-6622 |
| Michael Lehmann<br>Thomas P. Dove<br>Kimberly A. Kralowec<br>Furth Lehmann & Grant LLP<br>225 Bush Street, 15th Floor<br>San Francisco, CA 94104<br>mplehmann@furth.com<br>tdove@furth.com<br>kkralowec@furth.com<br>BUSINESS    (415) 433-2070<br>FAX    (415) 982-2076 | Arnold Levin<br>Charles Schaffer<br>Levin, Fishbein, Sedran & Berman<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106-3697<br>cschaffer@lfsblaw.com<br>alevin@lfsblaw.com<br>BUSINESS    (215) 592-1500<br>FAX    (215) 592-4663 |
| Phillip A. Proger<br>Jones, Day Reavis & Pogue<br>1450 G Street NW<br>Washington, DC 20005-2088<br>paproger@jonesday.com<br>BUSINESS    (202) 879-3939<br>FAX    (202) 626-1700 | |

Shelli Hugg
Legal Assistant

Page 1

Exhibit 4

1 of 1 DOCUMENT

Copyright 2006 The Tennessean
All Rights Reserved
The Tennessean (Nashville, Tennessee)

June 21, 2006 Wednesday 1st Edition

**SECTION:** BUSINESS; Pg. 1E

**LENGTH:** 730 words

**HEADLINE: Nurses sue HCA, other hospital companies**

**BYLINE:** TODD PACK

FILED

FEB - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**BODY:**

Actions in several states claim collusion in holding down pay

By TODD PACK

Staff Writer

A nurse is suing HCA Inc. in Texas on grounds that it conspired with other hospital systems in San Antonio to keep wages artificially low.

According to her lawsuit, the Nashville-based hospital chain shared detailed, private salary information with Christus Santa Rosa Health Care and Baptist Health Systems.

Baptist is owned by Vanguard Health Systems, which also is based in Nashville.

An HCA spokesman called the suit frivolous, while a Vanguard spokeswoman labeled it a ploy by the Service Employees International Union, which recently stepped up efforts to organize health-care workers.

Union leaders said in a conference call that the SEIU supports the lawsuit, one of four filed by nurses on Tuesday as potential class actions against hospital systems in several states.

One, filed in Memphis, listed the Baptist Memorial Healthcare and Methodist Healthcare hospital systems there, while another, filed in Albany, N.Y., named Ascension Health, the parent of Saint Thomas Health Services of Nashville, although Saint Thomas itself wasn't involved.

A fourth antitrust suit was filed against several hospital operators in the Chicago area.

Daniel Small, a lawyer involved with all four suits, said the hospitals had illegally shared information as part of a plan to keep salaries low, depriving nurses of hundreds of millions of dollars in lost wages over several years.

San Antonio nurses had been underpaid by about $1,300 a year, while those in Memphis had been underpaid by about $14,000 a year, said Small, an attorney with Cohen, Milstein, Hausfeld & Toll in Washington, D.C.

"The hospitals ... have decided to increase their profits on the backs of their nurses," he said

It's one thing for hospitals to look for ways to save money, but "pay should be set by the market, not by a secret agreement among hospitals," Small said.

In a conference call, he said the SEIU had been "forerunners in this litigation."

Small said the union, which launched a national organization for nurses this spring, had poured "tremendous resources (into) looking at this issue from a number of perspectives."



Nurses sue HCA, other hospital companies The Tennessean (Nashville, Tenn

**Exhibit 4**

Cathy Singer, a registered nurse and president of the union's Nurse Alliance, said the union isn't trying specifically to organize nurses at the hospitals named in the lawsuits, although union officials said at least some of the hospitals already were unionized. An SEIU spokeswoman in San Antonio said nurses there aren't organized.

Last month, the SEIU clashed with HCA over whether workers at the company's California hospitals could criticize the company at its annual meeting here.

Union officials said about 10 workers planned to protest staffing shortages the meeting, but soon after arriving in Nashville, the workers learned that an arbitrator had ruled they couldn't discuss their concerns about the company outside the state of California.

The SEIU accused HCA of obtaining a gag order against its members. HCA disputed that, saying the SEIU had previously agreed to "keep local issues local."

HCA spokesman Ed Fishbough called the filing against the company "one of four frivolous, money-wasting lawsuits apparently generated by a union and this law firm, designed to create publicity where the union is attempting to create its membership by attacking large employers."

Vanguard spokeswoman Tess Coody agreed, saying that the company's Baptist Health Systems "believes that this suit is part of a multicity public relations ploy by a ... labor union attempting to unionize nurses and other service workers in San Antonio and elsewhere." o

Todd Pack covers the business of health care. He can be reached at tpack@tennessean.com or 259-8075.

LAWSUITS AT A GLANCE

What the suits allege

Hospitals in various markets -- from San Antonio to Chicago -- are accused of sharing private salary information to help the hospital industry keep pay rates low.

The impact

Attorneys for nurses involved in the cases say hospital chains, including Nashville-based HCA and others, deprived nurses of hundreds of millions of dollars in lost wages over a several-year period.

What the hospitals say

HCA called the lawsuits "frivolous"; others blasted them as a tactic designed to help labor unions recruit nurses and others as new members.

--TODD PACK

**LOAD-DATE:** July 12, 2006

5200
con

Exhibit 5



**Stronger Together**

October 31, 2006

David P. Dean, Esq.
James & Hoffman, P.C.
1101 17th Street, NW, Suite 510
Washington, DC 20036

RE:    Nurse Wage Antitrust Litigation
       Special Project No. 280U-HSVRNLGL(R3)

Dear David:

    This is to formally confirm the retainer and funding relationship between Services Employees International Union ("SEIU") and your firm with respect to the matters referenced above.

    SEIU retained your firm to follow up on certain research by the SEIU Nurse Alliance on possible hospital collusion in various United States markets to suppress nurse wages. Your firm commenced investigations that found evidence of such unlawful collusion in certain jurisdictions. SEIU has authorized you to share the results of those investigations conducted on SEIU's behalf with other law firms, and to use the results of such investigations to bring a series of class action antitrust suits to stop and remedy such collusion. We agreed that SEIU and Judith Scott would be walled off from any confidential information in such litigations, that your firm would represent the plaintiffs and the plaintiff class in such cases, and that, as a nonparty, SEIU would not make any demands on your firm concerning the litigations or otherwise interfere with your professional judgment about how best to serve the plaintiffs and the plaintiff class' interests. SEIU has referred interested nurses to you as potential plaintiffs in such actions and has entered the following agreements with respect to billing and expenses.

    With respect to your billing for services rendered in such cases, you currently bill SEIU at a rate of *$165* per attorney hour. Paralegal hours are billed at a rate of *$75* per hour. Your office breaks down all statements by matter and/or case, identity of attorney performing the service, hours expended, and a brief description of the work involved. With respect to any expenses, you submit copies of receipts of all expenses incurred. Expenses must be listed under the applicable case or matter, and a subtotal for each case or matter including fees and expenses must be provided. Please be advised that the SEIU will not reimburse separately for general overhead expenses, such as secretarial overtime, absent unusual and compelling circumstances. Bills should be addressed to me, Norm Gleichman at the SEIU Legal Department and reference the case and SEIU Special Project No. 280U-HSVRN(R3). Consistent with our agreement that SEIU will not be privy to confidential information in such cases, we have agreed that your firm will refrain from revealing any confidential information in the billing entries, and that some entries may therefore be less detailed than is the firm's normal practice.

ANDREW L. STERN
International President

ANNA BURGER
International Secretary Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

1313 L Street, NW
Washington, DC 20005

202.898.3200
TDD: 202.898.3481
www.SEIU.org

Exhibit 5

David Dean, Esq.
October 31, 2006
Page Two

SEIU is funding this litigation through the payment of the partial hourly fee and costs incurred on the express understanding that any amounts SEIU pays to your firm in this matter will be reimbursed, prior to any other payments to any other party or client, from any monetary recovery to your firm in the nurse wage litigation for which the fee or expense was advanced. By funding this *litigation,* SEIU is sharing in the risk inherent in these litigations and thus expects: 1) to share in any fee recovery, if any, obtained above and beyond those amounts advanced by SEIU in the litigation, pursuant to the sharing agreement provided below; and 2) that J&H will use its best efforts to ensure that any settlement obtained in this litigation will be consistent with the plaintiff nurses' interests in the case.

As to the first matter, by signing this letter of understanding below, your firm agrees to the following agreements. First, your office agrees that SEIU will be repaid out of any recovery obtained for your firm (whether in a costs or fees award) for all monies advanced before any further distribution of fees and costs awards to your firm. Second, your firm agrees to share any fee recovery allocated to the hours worked by your firm[1] which is above and  beyond the amounts advanced by SEIU ("FEE PREMIUM") in the following manner. After repayment of costs and fees for a litigation, if any FEE PREMIUM remains, the amounts will be distributed as follows: 75% will be retained by your firm, with the remaining *25%* returned to the SEIU to compensate SEIU for the interest on the amounts advanced and other risk taken by agreeing to subsidize this litigation. Thank you for your assistance in this matter. We look forward to working with you.

Sincerely,

Norman M. Gleichman
Deputy General Counsel

So Agreed:

Date: _____ ( 10|3-|06 )

---

[1] The *FEE* PREMIUM only concerns amounts paid to your firm for hours worked by your firm. This term contemplates that any division of fees between other attorneys and your office will occur prior to the application of this provision of the agreement.

SEIU-A  0002

Exhibit 6

AO88  (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

WESTERN                    DISTRICT OF                    TEXAS

Marissa Maderazo, et al.

V.

VHS San Antonio Partners, L.P., et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] SA06CA0535

TO: SEIU, 1405 North Main **Ave., San** Antonio, Texas  78212  Phone (210) 225-1967

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attached schedule A.

| PLACE | DATE AND TIME |
|---|---|
| SEIU Local 5, 1405 North Main Avenue, Suite 200, San Antonio, TX 78212 | 12/14/2006 9:00 am |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| | 11/14/2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Derick J. Rodgers, Attorney for Defendants HCA, Inc. and Methodist Healthcare System of San Antonio, Ltd.
Davis, Cedillo & Mendoza, Inc., 755 E. Mulberry, Suite 500, San Antonio, TX  78212  Telephone: (210) 822-6666

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

If action is pending in district other than district of issuance, state district under case number.

# AFFIDAVIT OF SERVICE

Exhibit 6

COUNTY: USDC                CASE # SA06CA0535              **COURT**
                                                Clt. Ref.#                    Clt.# 14881

MARISSA MADERAZO, ET AL

VS
VHS SAN ANTONIO PARTNERS, LP, ET AL


The documents came to hand for service on 11/14/06  Time: 14:40:00

Documents received for service:

**FEDERAL DEPOSITION SUBPOENA**


The documents were delivered on **11/14/06**  **Time: 15:15:00**

Executed at: 1405 N Main Ave, Ste. 200
             San Antonio, TX 78212
to the following: **SEIU**
                 **By Delivering To Lisa Lopez.**

___✓___ PERSONALLY delivering the document(s) to the person above.
_____ SUBSTITUTE SERVICE per Order by delivering to _____ a person
        over sixteen (16) years of age, at the above listed address which is the usual
        place of abode/business of the above named person.
_____ POSTING per Order by securely affixing to the main entry way at the above address.

## AFFIDAVIT

I, Charles N Lambrecht _____ ,am over the age of eighteen, and am neither a
party to nor interested in the outcome of the above suit. I HAVE PERSONAL KNOWLEDGE OF THE
FACTS SET FORTH ABOVE.  I have never been convicted of a felony or misdemeanor involving
moral turpitude in any state OR federal jurisdicition, and I have studied and am familiar
with TEXAS RULES OF CIVIL PROCEDURE, VERNON'S TEXAS STATUTES, CIVIL PRACTICE AND REMEDIES
CODE and all other applicable rules and statutes relating to service of citation and/or
notices I am authorized by written order of the court to serve citations and other notices.

Service Fee:  83.00

Witness Fee Tendered:_____.00

Mileage:_____.00

STATE OF TEXAS}

Charles N Lambrecht
Texas LIC#: SCH-762
Professional Civil Process, San Antonio
4900 Broadway Suite 600
P.O. Box 6207
San Antonio, TX 78209

VERIFICATION

On this day Charles N Lambrecht appeared before me, a notary public, and being duly
sworn by me stated that he/she has personal knowledge of the facts set forth in the
foregoing affidavit and declared that the facts contained therein are true and
correct.  Given my hand and seal of office this _____ day of NOV 1 5 2006 200_____.

PCP Inv. #S11060210
charlesl





NOTARY PUBLIC FOR THE STATE OF TEXAS

JENNIFER RUTLEDGE JOHNSON
MY COMMISSION EXPIRES
November 30, 2008

Exhibit 6

## SCHEDULE A – DOCUMENT REQUESTS

1.      All Documents concerning or referring to any of (i) the Named Plaintiffs, (ii) the Hospital Defendants, (iii) the Lawsuit, (iv) compensation for registered nurses employed in or living in the San Antonio MSA, (v) the employment options for registered nurses employed in or living in the San Antonio MSA, (vi) any contemplated legal or other action against the Hospital Defendants or any other employer of registered nurses employed in the San Antonio MSA, and (vii) any contemplated legal or other action against the Hospital Defendants outside the San Antonio MSA.

**To the extent they are not encompassed by the foregoing general request, Defendants request the following Documents:**

2.      All Documents concerning or referring to Communications between or among, or sent or received by, the SEIU and Counsel of Record regarding any of the persons, entities, matters or subjects identified in Request 1 above.

3.      All Documents concerning or referring to any pre-filing investigation of the allegations or issues in the Lawsuit, including all notes or memoranda relating to any interviews or meetings with any nurse or any other individual.

4.      All Documents concerning or referring to Communications between or among, or sent or received by, any SEIU official, employee, agent, consultant, committee, affiliate or ad hoc working groups, including but not limited to Andrew Stern, Mary Kay Henry, Monica Russo, Sal Rosselli, Jane McAlevey, Mitch Ackerman or Larry Fox, regarding any of the persons, entities, matters or subjects identified in Request 1 above.

5.      All Documents concerning or referring to efforts by anyone to identify individuals to function as named plaintiffs for the Lawsuit.

Exhibit 6

6.    All Documents concerning or referring to efforts to encourage any Named Plaintiff or anyone else to obtain or accept employment with any Hospital Defendant.

7.    All Documents concerning or referring to contracts or agreements (including drafts or proposed contracts or agreements) between or among the SEIU and any Counsel of Record for the Named Plaintiffs, or any partner, agent, or employee of such counsel.

8.    All Documents concerning or referring to the payment or guarantee of payment, in whole or in part, of the Named Plaintiffs' attorneys fees or litigation costs in the Lawsuit, or the payment or guarantee of any funds, fee or cost, to or for any of the Named Plaintiffs.

9.    All Documents concerning or referring to any assistance or information that the SEIU offered or provided to any Named Plaintiff or any Counsel of Record for any Named Plaintiff relating to the persons, entities, matters or subjects identified in Request 1 above.

10.    All Documents concerning or referring to Communications between or among the SEIU and any of the Named Plaintiffs in the Lawsuit.

11.    All Documents concerning or referring to Communications between or among the SEIU and any member of the putative class in the Lawsuit relating to the persons, entities, matters or subjects identified in Request 1 above.

12.    All Documents concerning or referring to any contract or agreement (including drafts or proposed contracts or agreements) between, among or including the SEIU and any of the Named Plaintiffs in the Lawsuit.

Exhibit 6

13.    All Documents concerning or referring to Communications between or among the SEIU and any of the Hospital Defendants relating to the persons, entities, matters or subjects identified in Request 1 above.

14.    All Documents concerning or referring to Communications between or among the SEIU and any RN Employer in the San Antonio MSA relating to the persons, entities, matters or subjects identified in Request 1 above.

15.    All Documents concerning or referring to Communications between or among the SEIU and any person or entity, other than those referred to in Requests 2 through 14 above, that relate to any Hospital Defendant or any Named Plaintiff.

16.    All Documents concerning or referring to (i) the Lawsuit and (ii) any plan, proposal or action to organize the employees of any of the Hospital Defendants and/or obtain certification of the SEIU as the collective bargaining representative of any unit of any such Hospital Defendant's employees.

17.    All press releases, draft press releases and Documents relating thereto, created or distributed by the SEIU concerning or referring to any of the Named Plaintiffs, any of the Hospital Defendants, or the Lawsuit.

18.    All Documents concerning or referring to research, studies or reports prepared or funded in whole or in part by the SEIU regarding compensation paid to nurses or a nursing shortage, including, without limitation, the study titled "Solving the Nursing Shortage Through Higher Wages," purportedly issued by the Institute for Women's Policy Research.

19.    All Documents concerning or referring to Communications (written, oral or electronic) with the Institute for Women's Policy Research or Vicky Lovell, Ph.D.

3

Exhibit 6

20.    All Documents concerning or referring to any "neutrality" or "cooperation" agreement between the SEIU or any other union, and any RN Employer within the San Antonio MSA, or any request that any RN Employer within the San Antonio MSA enter into any such agreement.

21.    All Documents concerning or referring to the SEIU's Corporate Campaign or Public Campaign against any Hospital Defendant.

22.    All Documents concerning, referring, supporting or forming the basis for Daniel Small's statements in the Tennessean newspaper that the SEIU had been "forerunners in this litigation" and had poured "tremendous resources (into) looking at this issue from a number of perspectives." *See* Todd Pack, *Nurses Sue HCA, Other Hospital Companies*, Tennessean, June 21, 2006, at 1E.

23.    All documents discussing or analyzing the alleged market for registered nurses in the San Antonio MSA, including but not limited to the number of registered nurses that are employed and/or live within the San Antonio MSA, the San Antonio MSA's geographic boundaries, the employment opportunities for registered nurses within and outside the San Antonio MSA, and the staffing levels or trends for registered nurses within and outside the San Antonio MSA.

24.    All documents concerning or relating to registered nurses that live or work within the San Antonio MSA and who also work outside the San Antonio MSA.

25.    All documents concerning or referring to registered nurses who live outside the San Antonio MSA, but who would or could work within the San Antonio MSA.

26.    All documents concerning or referring to the actual or potential effect of this lawsuit on the SEIU and/or its efforts to organize registered nurses.



Exhibit 6

The subpoena is to be responded to in accordance with the following definitions and instructions.

## DEFINITIONS

1.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or entities whether oral, written, electronic or otherwise; whether in-person or telephonic; whether direct or through an intermediary.

2.    "Complaint" means the Complaint and all amended Complaints filed by the Named Plaintiffs in the Lawsuit.

3.    "Corporate Campaign" means any attempt by a union or other labor organization to persuade or influence an employer, either directly or through its employees, to yield to the union's or organization's position in connection with labor negotiations or an attempt to organize a place of business for the purpose of labor negotiations.

4.    "Counsel of Record" means any attorney or firm representing a party to the Lawsuit, including any partner, member, shareholder, affiliate, employee, agent, or representative of such attorney or firm.

5.    "Document" has the same meaning as in Rule 34 of the Federal Rules of Civil Procedure, and includes, without limitation, any writing, notes, photograph, chart, graph, video tape, audio tape, computer disk, or electronically stored data (including electronic mail) and metadata, which is in your actual or constructive possession, custody or control, and includes, without limitation, all originals, copies, drafts (sent or unsent), or other nonconforming copies of every kind.

5

Exhibit 6

6.    "Hospital Defendant" means any defendant named in the Lawsuit, including VHA San Antonio Partners, L.P.; Baptist Health Systems; HCA Inc.; Methodist Health System of San Antonio, Ltd., L.L.P.; and Christus Santa Rosa Health Care Corp.

7.    "Lawsuit" means the action captioned <u>Marissa Maderazo, Roselia Pollard, and Barbara Miles, et al. v. VHS San Antonio Partners, L.P., et al.</u>, Case number SA06CA05350G, currently pending in the United States District Court for the Western District of Texas, and includes any of the allegations made in the Complaint.

8.    "Named Plaintiffs" means Marissa Maderazo, Roselia Pollard, and Barbara Miles, and any further plaintiffs subsequently named in any amended complaints, and any of their employees, agents, attorneys or representatives.

9.    "Public Campaign" means any attempt by a union or other labor organization to persuade or influence public opinion in connection with labor negotiations or an attempt to organize a place of business for the purpose of labor negotiations.

10.    "RN Employer" means any person or entity that employs one or more registered nurses, including but not limited to a hospital, surgery center, ambulatory care center, nursing home, nurse agency, clinic or physician's office.

11.    "San Antonio MSA" means the San Antonio Metropolitan Statistical Area as that term is defined in the Complaint.

12.    "SEIU" means the Service Employees International Union, and its officers, agents, employees, representatives, members, affiliates, representatives and attorneys (in-house and outside counsel), including without limitations, the SEIU's Nurse Alliance.

Exhibit 6

13.    The definitions of "Named Plaintiffs," "Hospital Defendants," and "SEIU" further include the past and present officers, directors, agents, employees, attorneys, general partners, limited partners, members, representatives, divisions, subsidiaries, affiliates, predecessors and successors, of each individual or entity described therein.

## INSTRUCTIONS

1.    All documents covered by this request shall be produced in a manner consistent with Fed. R. Civ. P. 45(d)(1) at the place and time indicated by the subpoena or, if it is more convenient to do so, copies may be produced to Derick J. Rodgers at Davis, Cedillo & Mendoza, Inc., 755 E. Mulberry, Suite 500, San Antonio, TX 78212.

2.    Only a single copy of each responsive document is requested; however, all drafts and non-identical duplicates of each responsive document are requested, whether different from the original because of notes, marginalia, or attachments not present in or on the original document.

3.    If you refuse to disclose any document requested herein (or any portion thereof) on the grounds of privilege or otherwise, please provide the following information, as required by Fed. R. Civ. P. 45(d)(2): (a) the nature and type of document (e.g., memorandum, letter, report, etc.); (b) the subject matter of the document; (c) the date of the document; (d) an identification of each specific privilege or other claim asserted as grounds for non-production; (e) the holder of the privilege; and (f) such other information as is sufficient to identify the document, including the author(s), addressee(s), and any other recipient(s) of the document, and, where not apparent, the relationship of the author(s), addressee(s), and any other recipient(s) to each other.

4.    All requests seek documents from January 1, 2002 through the present.

Exhibit 7

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

FOR THE _____   DISTRICT OF _____   COLUMBIA

Marjory Unger

V.

Albany Medical Center, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  06CV0765 (N.D.NY)

TO:   Service Employees International Union
c/o Judith Scott, General Counsel, SEIU
1800 Massachusetts Avenue, NW
Washington, DC 20036

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attached schedule A.

| PLACE      Service Employees International Union 1800 Massachusetts Avenue, NW, Washington, D.C. 20036 | DATE AND TIME 12/28/2006 9:00 am |
|---|---|

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE 11/28/2006 |
|---|---|

*Toby G. Singer*

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Toby G. Singer, Attorney for Defendant Seton Health System
Jones Day, 51 Louisiana Avenue, N.W., Washington, DC 20001  Telephone: (202) 879-3939

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case                                                                **Exhibit 7**

| | PROOF OF SERVICE | |
|---|---|---|
| | DATE | PLACE |
| SERVED | | |
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                           DATE                                         _____
                                                                        SIGNATURE OF SERVER

                                                                        _____
                                                                        ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee

(2)  (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded

(3)  (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;
(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)  subjects a person to undue burden.

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

Exhibit 7

## <u>SCHEDULE A – DOCUMENT REQUESTS</u>

1.    All Documents concerning or referring to (i) the Named Plaintiff, (ii) the Hospital

Defendants, (iii) the Lawsuit, (iv) compensation for registered nurses employed in or living in

the Albany MSA, (v) the employment options for registered nurses employed in or living in the

Albany MSA, (vi) any contemplated legal or other action against the Hospital Defendants or any

other employer of registered nurses employed in the Albany MSA, and (vii) any contemplated

legal or other action against the Hospital Defendants outside the Albany MSA.

**To the extent they are not encompassed by the foregoing general request,**

**Defendants request the following Documents:**

2.    All Documents concerning or referring to Communications between or among, or

sent or received by, the SEIU (defined below and throughout to include Local 1199 SEIU) and

Counsel of Record regarding any of the persons, entities, matters or subjects identified in

Request 1 above.

3.    All Documents concerning or referring to any pre-filing investigation of the

allegations or issues in the Lawsuit, including all notes or memoranda relating to any interviews

or meetings with any nurse or any other individual.

4.    All Documents concerning or referring to the SEIU's payment of any funds,

money or other items of value for or towards the investigation of the allegations or issues in the

Lawsuit, including any checks, correspondence or bills for services rendered.

5.    All Documents concerning or referring to Communications between or among, or

sent or received by, any SEIU official, employee, agent, consultant, committee, affiliate or ad

1

Exhibit 7

hoc working groups regarding any of the persons, entities, matters or subjects identified in Request 1 above.

6.    All Documents concerning or referring to efforts by anyone to identify individuals to function as named plaintiffs for the Lawsuit.

7.    All Documents concerning or referring to efforts to encourage the Named Plaintiff or anyone else to obtain or accept employment with any Hospital Defendant.

8.    All Documents concerning or referring to contracts or agreements (including drafts or proposed contracts or agreements) between or among the SEIU and any Counsel of Record for the Named Plaintiff, or any partner, agent, or employee of such counsel.

9.    All Documents concerning or referring to the payment or guarantee of payment, in whole or in part, of the Named Plaintiff's attorneys fees or litigation costs in the Lawsuit, or the payment or guarantee of any funds, fee or cost, to or for the Named Plaintiff.

10.    All Documents concerning or referring to any assistance or information that the SEIU offered or provided to the Named Plaintiff or any Counsel of Record for the Named Plaintiff relating to the persons, entities, matters or subjects identified in Request 1 above.

11.    All Documents concerning or referring to Communications between or among the SEIU and the Named Plaintiff in the Lawsuit.

12.    All Documents concerning or referring to Communications between or among the SEIU and any member of the putative class in the Lawsuit relating to the persons, entities, matters or subjects identified in Request 1 above.

Exhibit 7

13.    All Documents concerning or referring to any contract or agreement (including drafts or proposed contracts or agreements) between, among or including the SEIU and the Named Plaintiff in the Lawsuit.

14.    All Documents concerning or referring to Communications between or among the SEIU and any of the Hospital Defendants relating to the persons, entities, matters or subjects identified in Request 1 above.

15.    All Documents concerning or referring to Communications between or among the SEIU and any RN Employer in the Albany MSA relating to the persons, entities, matters or subjects identified in Request 1 above.

16.    All Documents concerning or referring to Communications between or among the SEIU and any person or entity, other than those referred to in Requests 2 through 14 above, that relate to any Hospital Defendant or the Named Plaintiff.

17.    All Documents concerning or referring to (i) the Lawsuit and (ii) any plan, proposal or action to organize the employees of any of the Hospital Defendants and/or obtain certification of the SEIU as the collective bargaining representative of any unit of any such Hospital Defendant's employees.

18.    All press releases, draft press releases and Documents relating thereto, created or distributed by the SEIU concerning or referring to the Named Plaintiff, any of the Hospital Defendants, or the Lawsuit.

19.    All Documents concerning or referring to research, studies or reports prepared or funded in whole or in part by the SEIU regarding compensation paid to nurses or a nursing

Exhibit 7

shortage, including, without limitation, the study titled "Solving the Nursing Shortage Through Higher Wages," purportedly issued by the Institute for Women's Policy Research.

20.    All Documents concerning or referring to Communications (written, oral or electronic) with the Institute for Women's Policy Research or Vicky Lovell, Ph.D.

21.    All Documents concerning or referring to any "neutrality" or "cooperation" agreement between the SEIU or any other union, and any RN Employer within the Albany MSA, or any request that any RN Employer within the Albany MSA enter into any such agreement.

22.    All Documents concerning or referring to the SEIU's Corporate Campaign or Public Campaign against any Hospital Defendant.

23.    All documents discussing or analyzing the alleged market for registered nurses in the Albany MSA, including but not limited to the number of registered nurses that are employed and/or live within the Albany MSA, the Albany MSA's geographic boundaries, the employment opportunities for registered nurses within and outside the Albany MSA, and the staffing levels or trends for registered nurses within and outside the Albany MSA.

24.    All documents concerning or relating to registered nurses that live or work within the Albany MSA and who also work outside the Albany MSA.

25.    All documents concerning or referring to registered nurses who live outside the Albany MSA, but who would or could work within the Albany MSA.

26.    All documents concerning or referring to the actual or potential effect of this lawsuit on the SEIU and/or its efforts to organize registered nurses.

Exhibit 7

27.    All documents concerning or referring to the SEIU's employment of registered nurses including but not limited to their job descriptions, roles, compensation and benefits received.

The subpoena is to be responded to in accordance with the following definitions and instructions.

## DEFINITIONS

1.    "Albany MSA" means the Albany-Schenectady-Troy Metropolitan Statistical Area as that term is defined in the Complaint.

2.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or entities whether oral, written, electronic or otherwise; whether in-person or telephonic; whether direct or through an intermediary.

3.    "Complaint" means the Complaint and all amended Complaints filed by the Named Plaintiff in the Lawsuit.

4.    "Corporate Campaign" means any attempt by a union or other labor organization to persuade or influence an employer, either directly or through its employees, to yield to the union's or organization's position in connection with labor negotiations or an attempt to organize a place of business for the purpose of labor negotiations.

Exhibit 7

5.    "Counsel of Record" means any attorney or firm representing a party to the Lawsuit, including any partner, member, shareholder, affiliate, employee, agent, or representative of such attorney or firm.

6.    "Document" has the same meaning as in Rule 34 of the Federal Rules of Civil Procedure, and includes, without limitation, any writing, notes, photograph, chart, graph, video tape, audio tape, computer disk, or electronically stored data (including electronic mail) and metadata, which is in your actual or constructive possession, custody or control, and includes, without limitation, all originals, copies, drafts (sent or unsent), or other nonconforming copies of every kind.

7.    "Hospital Defendant" means any defendant named in the Lawsuit, including Albany Medical Center, Ascension Health, Inc., Catholic Health East, Ellis Hospital, Northeast Health, Seaton Health Systems, and St. Peter's Health Care Service.

8.    "Lawsuit" means the action captioned *Marjory Unger v. Albany Medical Center, et al*, Case number 06CV0765, currently pending in the United States District Court for the Northern District of New York, and includes any of the allegations made in the Complaint.

9.    "Named Plaintiff" means Marjory Unger, and any further plaintiffs subsequently named in any amended complaints, and any of their employees, agents, attorneys or representatives.

10.    "Public Campaign" means any attempt by a union or other labor organization to persuade or influence public opinion in connection with labor negotiations or an attempt to organize a place of business for the purpose of labor negotiations.

Exhibit 7

11.    "RN Employer" means any person or entity that employs one or more registered nurses, including but not limited to a hospital, surgery center, ambulatory care center, nursing home, nurse agency, clinic or physician's office.

12.    "SEIU" means the Service Employees International Union, including but not limited to Local 1199 SEIU, and its officers, agents, employees, representatives, members, affiliates, representatives and attorneys (in-house and outside counsel), including without the SEIU's Nurse Alliance.

13.    The definitions of "Named Plaintiff," "Hospital Defendants," and "SEIU" further include the past and present officers, directors, agents, employees, attorneys, general partners, limited partners, members, representatives, divisions, subsidiaries, affiliates, predecessors and successors, of each individual or entity described therein.

## INSTRUCTIONS

1.    All documents covered by this request shall be produced in a manner consistent with Fed. R. Civ. P. 45(d)(1) at the place and time indicated by the subpoena or, if it is more convenient to do so, copies may be produced to Toby G. Singer at Jones Day, 51 Louisiana Avenue, N.W., Washington, DC 20001.

2.    Only a single copy of each responsive document is requested; however, all drafts and non-identical duplicates of each responsive document are requested, whether different from the original because of notes, marginalia, or attachments not present in or on the original document.

Exhibit 7

3.     If you refuse to disclose any document requested herein (or any portion thereof) on the grounds of privilege or otherwise, please provide the following information, as required by Fed. R. Civ. P. 45(d)(2): (a) the nature and type of document (e.g., memorandum, letter, report, etc.); (b) the subject matter of the document; (c) the date of the document; (d) an identification of each specific privilege or other claim asserted as grounds for non-production; (e) the holder of the privilege; and (f) such other information as is sufficient to identify the document, including the author(s), addressee(s), and any other recipient(s) of the document, and, where not apparent, the relationship of the author(s), addressee(s), and any other recipient(s) to each other.

4.     All requests seek documents from January 1, 2002 through the present.

Exhibit 8

**BREDHOFF & KAISER, P.L.L.C.**
*Attorneys & Counselors*
**805 Fifteenth Street, N.W.**
**Washington, D.C. 20005-2207**
**(202) 842-2600**
**Facsimile: (202) 842-1888**
**http://www.bredhoff.com**

Robert M. Weinberg
Jeffrey L. Gibbs
Julia Penny Clark
Jeffrey R. Freund
W. Gary Kohlman
Jeremiah A. Collins
Mady Gilson
Bruce R. Lerner
Andrew D. Roth
John M. West
Douglas L. Greenfield
Roger Pollak
Anne Ronnel Mayerson
Leon Dayan
Alice O'Brien
Devki K. Virk
Robert Alexander

Kathleen Keller
Abigail V. Carter
Matthew Clash-Drexler
Dora V. Chen
Jennifer L. Hunter
Lisa Powell
Charlotte Garden
Joshua B. Shiffrin
Benjamin Takis

———
Laurence Gold
Patricia Polach
Sarah M. Fox
Todd E. Edelman
Of Counsel
———
George H. Cohen
Senior Counsel

———
Elliot Bredhoff
(1921 – 2004)
Henry Kaiser
(1911 - 1989)

December 7, 2006

**BY ELECTRONIC AND FIRST-CLASS MAIL**
Michael R. Shumaker, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington D.C. 20001-2113

> Re:    **Subpoena Issued to the Service Employees International**
>        **Union in Connection with *Marissa Maderazo, et al. v.***
>        ***VHS San Antonio Partners, L.P., et al.*, SA06CA0535**
>        **(W.D. Tex.)**

Dear Mr. Shumaker:

Pursuant to Fed. R. Civ. P. 45(c)(2)(B), this letter states the objections of the Service Employees International Union ("SEIU") to the dragnet subpoena for documents issued in connection with the case styled <u>Marissa Maderazo, et al. v. VHS San Antonio Partners, L.P., et al.</u>, SA06CA0535 (W.D. Tex.) ("Lawsuit"), and served on the SEIU by two of the defendants in the Lawsuit— HCA, Inc. and Methodist Health System of San Antonio Ltd., L.L.P.

At the outset, we note two facts that place the SEIU's objections to that dragnet subpoena in their full and proper context. First, the SEIU is not a party to the Lawsuit, which is an action brought by three registered nurses on their own behalf and on behalf of a proposed class of similarly-situated nurses alleging that they have been the victims of a conspiracy among San Antonio

Exhibit 8

Michael R. Shumaker
Jones Day
December 7, 2006
Page 2

hospitals to depress their wages in violation of the federal antitrust laws. And, second, an Order issued by the court in the Lawsuit on October 6, 2006 provides that in the present time period "[a]ll disclosures and discovery" in the case "shall be limited to issues relating to class certification." <u>See</u> Scheduling Order On Class Certification Issues (Oct. 6, 2006).

Against this background, the SEIU will produce in response to the subpoena *only* those requested, non-privileged documents in its possession, custody or control that fairly can be said to go to the issue of class certification. In this regard, we have reviewed the "Opposition to Plaintiffs' Motion for Class Certification" ("Brief in Opposition") filed by the defendants in the Lawsuit on November 10, 2006; and, based on that review, it is apparent that the *only* documents requested by the subpoena that go to the issue of class certification are those documents that bear on the claim asserted in the Brief in Opposition (at pp. 17-18) that "fundamental questions about the named plaintiffs' ability to satisfy Rule 23(a)(4)'s adequacy of representation requirement" exist by virtue of what the Brief in Opposition characterizes as "the named plaintiffs' alignment with the SEIU."

We have reviewed the subpoena as well, and it likewise is apparent that the *only* documents requested therein that bear on the foregoing class certification issue are those documents responsive to Request No. 10, which seeks "All Documents concerning or referring to Communications between or among the SEIU and any of the Named Plaintiffs in the Lawsuit." The SEIU therefore will produce *only* those non-privileged documents in its possession, custody or control that are responsive to Request No. 10 in the subpoena.[1] We

---

[1] To be sure, Document Request No. 10 is fairly broad, and on its face encompasses certain other subcategories of documents that are more specifically enumerated in other Requests—namely, documents "concerning or referring to efforts by anyone to identify" the Named Plaintiffs as possible plaintiffs in the first instance, <u>see</u> Document Request No. 5; documents "concerning or referring to efforts to encourage" any of the Named Plaintiffs "to obtain or accept employment with any Hospital Defendant," <u>see</u> Document Request No. 6; and documents "concerning or referring to" the provision of financial or other forms of assistance to the Named Plaintiffs or their Counsel of Record in connection with the prosecution of the Lawsuit, <u>see</u> Document Requests 7-9. Accordingly, to the extent that these various subcategories of documents exist; are in the SEIU's possession, custody or control; and are non-privileged, they will be included in the SEIU's production.

On the other hand, the SEIU objects to the production of documents (or portions of any documents that the SEIU will be producing) "concerning or referring to

Exhibit 8

Michael R. Shumaker
Jones Day
December 7, 2006
Page 3

still are in the process of identifying and collecting such documents, and will make every effort to produce them by the December 15, 2006 return date of the subpoena, or as soon thereafter as is reasonably practicable.

At the same time, the SEIU hereby objects to the production of any and all other documents requested in the subpoena, on the ground that those documents are irrelevant to the class certification issues presented by the Lawsuit (indeed, for the most part, to *any* issue presented by the Lawsuit) and are not reasonably calculated to lead to the discovery of relevant evidence on those class certification issues (or, for the most part, on *any* issue presented by the Lawsuit). Moreover, the SEIU objects to the production of those other documents to the extent that they: (i) fall within the attorney-client privilege; (ii) constitute protected attorney work product[2]; (iii) involve confidential and proprietary strategic planning information (akin to corporate trade secrets) that is protected against disclosure to outside parties who stand in an adversarial or potentially adversarial relationship to the SEIU[3]; and/or (iv) involve confidential

---

Communications between or among the SEIU and any member of the putative class in the Lawsuit," see Document Request No. 11; see also Document Requests 5-6, to the extent that those documents concern or refer to communications with putative class members who are *not* Named Plaintiffs in the Lawsuit. That objection is based on the ground that such documents would be irrelevant to any claim that the Named Plaintiffs are inadequate class representatives based on their asserted "alignment with the SEIU"; and on the further ground that the production of such documents would unnecessarily impinge upon the associational and privacy interests of the registered nurses in question. The SEIU also objects to the production of any documents "concerning or referring to any assistance or information that the SEIU offered or provided to . . . any Counsel of Record for any Named Plaintiff," see Document Request No. 2, prior to the time that Counsel of Record and any Named Plaintiff entered into an attorney-client relationship. That objection is based on the ground that such documents likewise would be irrelevant to any claim that the Named Plaintiffs are inadequate class representatives based on their asserted "alignment with the SEIU"; and on the further ground of attorney-client privilege.

[2] Much of the "pre-filing investigation," see Document Request No. 3, conducted by or for the SEIU into the likelihood that the Hospital Defendants have engaged in collusive behavior designed to depress the wages of registered nurses—which goes solely to the merits of the plaintiffs' claim of an antitrust conspiracy in any event—constitutes protected attorney work product.

[3] See infra pp. 4-6.

Exhibit 8

Michael R. Shumaker
Jones Day
December 7, 2006
Page 4

information the disclosure of which would impinge unnecessarily on the associational and privacy interests of registered nurses.[4]

Further, the subpoena served on the SEIU in this matter is on its face so overbroad, so unduly burdensome, and so intrusive as to fall well outside the bounds of a proper third-party subpoena. Two examples suffice to make the point.

First, the subpoena seeks the production of "[a]ll documents concerning or referring to" any of "the Hospital Defendants" in the Lawsuit and "any contemplated legal or other action against" any of "the Hospital Defendants." See Document Request No. 1; see also Document Requests 13, 15-17. One of those Hospital Defendants, of course, is HCA, Inc. As Jones Day knows full well based on its representation of HCA in connection with some of these matters, HCA and the SEIU have during the five-year period covered by the subpoena (i) engaged in extensive negotiations over a series of "peace accord" agreements governing the SEIU's conduct of organizing campaigns at hospitals throughout the country that are within the HCA network of hospitals; and (ii) arbitrated or settled a number of disputes arising under those agreements.[5] And, we doubt that it will come as a shock to Jones Day to learn that the SEIU has during this time period engaged in extensive contingency planning with regard to the conduct of organizing campaigns at HCA hospitals in the event of its inability to reach a satisfactory overall settlement agreement with HCA.

All this being so, the subpoena's requests for "[a]ll documents concerning or referring to" HCA and "any contemplated legal or other action against" HCA, to the extent complied with by the SEIU in accordance with their broad literal terms, would require the SEIU to search for, compile and produce a truly massive amount of materials relating to negotiations, actual disputes and potential future disputes between HCA and SEIU across the country having nothing whatsoever to do with any issue presented in the Lawsuit—much less the class certification issues to which discovery currently is limited. This in itself would constitute an undue burden on a third-party to the Lawsuit, but these requests are equally objectionable on the ground that compliance

---

[4] See infra p. 6.

[5] Indeed, it is our understanding that HCA and the SEIU currently are engaged in arbitration proceedings over certain issues arising under the most recent agreement between the parties.

Exhibit 8

Michael R. Shumaker
Jones Day
December 7, 2006
Page 5

therewith would require the SEIU to turn over *to HCA*—on the transparent
pretext that such information is relevant in some way to the issues presented
in the Lawsuit—confidential and proprietary strategic planning information
(akin to corporate trade secrets) respecting matters in which the SEIU and HCA
stand in an adversarial or potential adversarial relationship.  There is ample
precedent in the labor relations context for the proposition that confidential
and proprietary strategic planning information of this nature is protected from
disclosure to one's adversary or potential adversary, see, e.g., In Berbiglia, Inc.,
233 NLRB 1476, 1495 (1977); Champ Corp., 291 NLRB 803, 817 (1988),
enforced, 933 F.2d 688 (1990); Illinois Educational Labor Relations Board v.
Homer Community Consolidated School District No. 208, 547 N.E.2d 182, 183-
88 (Ill. 1989), and HCA's efforts to obtain access to such information in the
present context is both unseemly and vexatious.

Second, although the SEIU has not engaged in a "Corporate Campaign or
Public Campaign against any Hospital Defendant" during the time period
covered by the subpoena as those terms are defined therein—such that no
documents responsive to Document Request No. 21 exist—the SEIU has
engaged and currently is engaged on a nationwide basis in a Value Care/Value
Nurses campaign, which accurately has been described in press accounts as a
"grass roots advocacy movement" formed to give nurses around the country a
collective voice in the public arena and to spearhead legislative and public
policy changes in the health care industry.  See, e.g., Exhibit D to Brief in
Opposition.  And, in connection with that Value Care/Value Nurses campaign,
the SEIU has, among other things:  (i) engaged in or funded extensive research
into the general societal problems of low compensation paid to nurses and a
nursing shortage and potential solutions to those problems; (ii) strategized
about how best to mobilize nurses around the country around these public
policy issues; and (iii) engaged in such mobilization efforts, which have
included communications and meetings with nurses around the country about
the problems identified by the SEIU's research and potential solutions to those
problems.

All this being so, the subpoena's request for "[a]ll documents concerning
or referring to research, studies or reports prepared or funded in whole or in
part by the SEIU regarding compensation paid to nurses or a nursing
shortage," see Document Request No. 18, is objectionable on much the same
grounds as the subpoena's request for "[a]ll documents concerning or referring
to" any of "the Hospital Defendants" and "any contemplated legal or other
action against" any of "the Hospital Defendants."  To begin with, that request,

Exhibit 8

Michael R. Shumaker
Jones Day
December 7, 2006
Page 6

to the extent complied with by the SEIU in accordance with it broad literal
terms, would require the SEIU to search for, compile and produce a truly
massive amount of materials that have nothing whatsoever to do with any
issue presented in the Lawsuit—much less the class certification issues to
which discovery currently is limited.  Beyond that, HCA and the other Hospital
Defendants would as a result of that production obtain the disclosure of
confidential and propriety strategic planning information about the SEIU's
Value Care/Value Nurses campaign that they have no legitimate interest in
obtaining.  Finally, to the extent that the SEIU's production would disclose to
HCA and the other Hospital Defendants the identity of nurses who are involved
in that campaign, it would impinge unnecessarily on the associational and
privacy interests of those nurses.

      Given how overbroad and vexatious the subpoena is taken as a whole,
the SEIU would be fully justified in objecting to the subpoena in its entirety
notwithstanding the fact that it calls for the production of certain relevant
materials.  See, e.g., Tiberia v. Cigna Ins. Co., 40 F.3d 110, 112 (5th Cir. 1994)
(district court acted within its discretion by quashing entire subpoena that,
although susceptible to a narrowing construction, was vexatiously overbroad);
Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 53-54 (S.D.N.Y. 1996)
(where almost half of requests in subpoena were "vague, inexplicit and
overbroad" and were wholly irrelevant to underlying litigation, the subpoena
was objectionable in its entirety and would not be modified).  The SEIU has not
taken that position here, but rather has agreed to produce those (relatively few)
requested documents that fairly can be said to go to the issue of class
certification.  For all of the reasons and on all of the grounds previously recited,
however, the SEIU objects to going beyond that point in response to the
subpoena.

      Sincerely yours,

Robert M. Weinberg
Andrew D. Roth
Counsel for the SEIU

Exhibit 9

**BREDHOFF & KAISER, P.L.L.C.**
*Attorneys & Counselors*
**805 Fifteenth Street, N.W.**
**Washington, D.C. 20005-2207**
**(202) 842-2600**
**Facsimile: (202) 842-1888**
**http://www.bredhoff.com**

Robert M. Weinberg
Jeffrey L. Gibbs
Julia Penny Clark
Jeffrey R. Freund
W. Gary Kohlman
Jeremiah A. Collins
Mady Gilson
Bruce R. Lerner
Andrew D. Roth
John M. West
Douglas L. Greenfield
Roger Pollak
Anne Ronnel Mayerson
Leon Dayan
Alice O'Brien
Devki K. Virk
Robert Alexander

Kathleen Keller
Abigail V. Carter
Matthew Clash-Drexler
Dora V. Chen
Jennifer L. Hunter
Lisa Powell
Charlotte Garden
Joshua B. Shiffrin
Benjamin Takis
—————
Laurence Gold
Patricia Polach
Sarah M. Fox
Todd E. Edelman
Of Counsel
—————
George H. Cohen
Senior Counsel
—————
Elliot Bredhoff
(1921 – 2004)
Henry Kaiser
(1911 – 1989)

December 12, 2006

**BY ELECTRONIC AND FIRST-CLASS MAIL**
Toby G. Singer, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington D.C. 20001-2113

Re:  **Subpoena Issued to the Service Employees International Union in Connection with *Marjory Unger v. Albany Medical Center, et al.*, 06CV0735 (N.D.N.Y.)**

Dear Ms. Singer:

Pursuant to Fed. R. Civ. P. 45(c)(2)(B), this letter states the objections of the Service Employees International Union ("SEIU") to the dragnet subpoena for documents issued in connection with the case styled Marjory Unger v. Albany Medical Center, et al., 06CV0735 (N.D.N.Y.) ("Unger Lawsuit" or "Lawsuit"), and served on the SEIU by one of the defendants in the Lawsuit— Seton Health System.

We begin by noting that the dragnet subpoena served on the SEIU by Seton Health System in connection with the Unger Lawsuit is virtually identical to the dragnet subpoena served on the SEIU by the hospital defendants that Jones Day represents in another case entitled Marissa Maderazo, et al. v. VHS San Antonio Partners, L.P., et al., SA06CA0535 (W.D. Tex.).  Accordingly, as a

Exhibit 9

Toby G. Singer, Esq.
Jones Day
December 12, 2006
Page 2

point of reference, we attach hereto the SEIU's Rule 45 response to the subpoena served on the SEIU in connection with the <u>Maderazo</u> case.

As is true in the <u>Maderazo</u> case, the SEIU is not a party to the <u>Unger</u> Lawsuit, which is an action brought by a registered nurse on her own behalf and on behalf of a proposed class of similarly-situated nurses alleging that they have been the victims of a conspiracy among Albany hospitals to depress their wages in violation of the federal antitrust laws. And, as also is true in the <u>Maderazo</u> case, discovery in the <u>Unger</u> Lawsuit is—on motion of the hospital defendants therein—limited in the present time period to matters "relating to class certification." <u>See</u> Order, at 1-2 (filed Oct. 26, 2006). Against this background, the SEIU will, as in the <u>Maderazo</u> case, produce in response to the subpoena in the <u>Unger</u> Lawsuit <em>only</em> those requested, non-privileged documents in its possession, custody or control that fairly can be said to relate to the issue of class certification.

Unlike in the <u>Maderazo</u> case, the parties to the <u>Unger</u> Lawsuit have not yet filed any briefs in connection with the issue of class certification. Nevertheless, on the assumption that the hospital defendants in the <u>Unger</u> Lawsuit will, as in the <u>Maderazo</u> case, challenge the named plaintiff's ability adequately to represent the proposed class of registered nurses based on an asserted "alignment" between the named plaintiff and the SEIU, the SEIU will in response to the subpoena in the <u>Unger</u> Lawsuit produce those non-privileged documents in its possession, custody or control that bear on that class certification issue. Specifically, the SEIU will produce those non-privileged documents in its possession, custody or control that are responsive to Request No. 11 in the subpoena, which seeks "All Documents concerning or referring to Communications between or among the SEIU and the Named Plaintiff in the Lawsuit."[1] We still are in the process of identifying and collecting such

---

[1] Document Request No. 11 is fairly broad, and on its face encompasses certain other subcategories of documents that are more specifically enumerated in other Requests— namely, documents "concerning or referring to efforts by anyone to identify" the Named Plaintiff as a possible plaintiff in the first instance, <u>see</u> Document Request No. 6; documents "concerning or referring to efforts to encourage" the Named Plaintiff "to obtain or accept employment with any Hospital Defendant," <u>see</u> Document Request No. 7; and documents "concerning or referring to" the provision of financial or other forms of assistance to the Named Plaintiff or her Counsel of Record in connection with the prosecution of the Lawsuit, <u>see</u> Document Requests 8-10. Accordingly, to the extent that these various subcategories of documents exist; are in the SEIU's

Exhibit 9

Toby G. Singer, Esq.
Jones Day
December 12, 2006
Page 3

documents, and will make every effort to produce them by the December 28, 2006 return date of the subpoena, or as soon thereafter as is reasonably practicable.

At the same time, the SEIU hereby objects to the production of any and all other documents requested in the subpoena, on the ground that those documents are irrelevant to the class certification issues presented by the Lawsuit (indeed, for the most part, to *any* issue presented by the Lawsuit) and are not reasonably calculated to lead to the discovery of relevant evidence on those class certification issues (or, for the most part, on *any* issue presented by the Lawsuit). Moreover, the SEIU objects to the production of those other documents to the extent that they:  (i) fall within the attorney-client privilege; (ii) constitute protected attorney work product[2]; (iii) involve confidential and proprietary strategic planning information (akin to corporate trade secrets) that

---

possession, custody or control; and are non-privileged, they will be included in the SEIU's production.

On the other hand, the SEIU objects to the production of documents (or portions of any documents that the SEIU will be producing) "concerning or referring to Communications between or among the SEIU and any member of the putative class in the Lawsuit," see Document Request No. 12; see also Document Requests 6-7, to the extent that those documents concern or refer to communications with putative class members other than the Named Plaintiff in the Lawsuit.  That objection is based on the ground that such documents would be irrelevant to any claim that the Named Plaintiff is an inadequate class representative based on an asserted "alignment" with the SEIU; and on the further ground that the production of such documents would unnecessarily impinge upon the associational and privacy interests of the registered nurses in question.  The SEIU also objects to the production of any documents "concerning or referring to any assistance or information that the SEIU offered or provided to . . . any Counsel of Record for any Named Plaintiff," see Document Request No. 10, prior to the time that Counsel of Record and the Named Plaintiff entered into an attorney-client relationship.  That objection is based on the ground that such documents likewise would be irrelevant to any claim that the Named Plaintiff is an inadequate class representative based on an asserted "alignment" with the SEIU; and on the further ground of attorney-client privilege.

[2] Much of the "pre-filing investigation," see Document Request No. 3, conducted by or for the SEIU into the likelihood that the Hospital Defendants have engaged in collusive behavior designed to depress the wages of registered nurses—which goes solely to the merits of the plaintiffs' claim of an antitrust conspiracy in any event—constitutes protected attorney work product.

Exhibit 9

Toby G. Singer, Esq.
Jones Day
December 12, 2006
Page 4

is protected against disclosure to outside parties who stand in an adversarial or potentially adversarial relationship to the SEIU[3]; and/or (iv) involve confidential information the disclosure of which would impinge unnecessarily on the associational and privacy interests of registered nurses.[4]

Further, the subpoena served on the SEIU in this matter is on its face so overbroad, so unduly burdensome, and so intrusive as to fall well outside the bounds of a proper third-party subpoena. Two examples suffice to make the point.

First, the subpoena seeks the production of "[a]ll documents concerning or referring to" any of "the Hospital Defendants" in the Lawsuit and "any contemplated legal or other action against" any of "the Hospital Defendants," see Document Request No. 1—including but not limited to "[a]ll documents concerning or referring to" any SEIU "Corporate Campaign or Public Campaign against any Hospital Defendant," see Document Request No. 22. To be sure, the SEIU has *not* engaged in a "Corporate Campaign or Public Campaign against any Hospital Defendant" during the time period covered by the subpoena as those terms are defined therein. However, the SEIU has during that time period engaged in strategic analysis regarding the prospects for and various methods of assisting registered nurses in matters related to their employment in hospital systems throughout the country; and, in the process, generated confidential and propriety documents reflecting that strategic analysis—some of which may be or arguably may be responsive to Document Request No. 1. There is ample precedent in the labor relations context for the proposition that documents reflecting such internal strategic deliberations are protected from disclosure to one's adversaries or potential adversaries. See, e.g., In Berbiglia, Inc., 233 NLRB 1476, 1495 (1977); Champ Corp., 291 NLRB 803, 817 (1988), enforced, 933 F.2d 688 (1990); Illinois Educational Labor Relations Board v. Homer Community Consolidated School District No. 208, 547 N.E.2d 182, 183-88 (Ill. 1989). Thus, even if responsive documents of this nature were relevant in some way to the issue of class certification in the Unger Lawsuit—which they plainly are not—they would not be subject to production by the SEIU in connection with that Lawsuit.

---

[3] See infra pp. 4-6.

[4] See infra p. 5.

Exhibit 9

Toby G. Singer, Esq.
Jones Day
December 12, 2006
Page 5

Second, the SEIU has engaged and currently is engaged on a nationwide basis in a Value Care/Value Nurses campaign, which accurately has been described in press accounts as a "grass roots advocacy movement" formed to give nurses around the country a collective voice in the public arena and to spearhead legislative and public policy changes in the health care industry. See, e.g., Exhibit D to the Hospital Defendants' Brief in Opposition to Class Certification in the Maderazo case. And, in connection with that Value Care/Value Nurses campaign, the SEIU has, among other things:  (i) engaged in or funded extensive research into the general societal problems of low compensation paid to nurses and a nursing shortage and potential solutions to those problems; (ii) strategized about how best to mobilize nurses around the country around these public policy issues; and (iii) engaged in such mobilization efforts, which have included communications and meetings with nurses around the country about the problems identified by the SEIU's research and potential solutions to those problems.

All this being so, the subpoena's request for "[a]ll documents concerning or referring to research, studies or reports prepared or funded in whole or in part by the SEIU regarding compensation paid to nurses or a nursing shortage," see Document Request No. 19, is particularly objectionable, and on several grounds. To begin with, that request, to the extent complied with by the SEIU in accordance with it broad literal terms, would require the SEIU to search for, compile and produce a truly massive amount of materials that have nothing whatsoever to do with any issue presented in the Lawsuit—much less the class certification issues to which discovery currently is limited. Beyond that, the Hospital Defendants would as a result of that production obtain the disclosure of confidential and propriety strategic planning information about the SEIU's Value Care/Value Nurses campaign that they have no legitimate interest in obtaining. Finally, to the extent that the SEIU's production would disclose to the Hospital Defendants the identity of nurses who are involved in that campaign, it would impinge unnecessarily on the associational and privacy interests of those nurses.

Third, as you know, in addition to its representation of certain hospital defendants in the Unger and Maderazo antitrust lawsuits, Jones Day represents hospitals or hospital systems (including HCA, Inc.) in various unrelated matters in which its clients stand in an adversarial or potential adversarial relationship with the SEIU. That being so, the dragnet subpoena served on the SEIU here—like the dragnet subpoena served on the SEIU in connection with the Maderazo case—is doubly problematic and inappropriate

Exhibit 9

Toby G. Singer, Esq.
Jones Day
December 12, 2006
Page 6

to the extent that the subpoena calls upon the SEIU to produce the kind of internal strategy documents described above to the hospital defendants, and in so doing make those documents available to the law firm that represents hospital clients adverse to the SEIU in matters unrelated to the pending lawsuit—without any justification for or any limitation on the firm's access to and use of those documents.

    Given how overbroad and vexatious the subpoena is taken as a whole, the SEIU would be fully justified in objecting to the subpoena in its entirety notwithstanding the fact that it calls for the production of certain relevant materials.  See, e.g., Tiberia v. Cigna Ins. Co., 40 F.3d 110, 112 (5th Cir. 1994) (district court acted within its discretion by quashing entire subpoena that, although susceptible to a narrowing construction, was vexatiously overbroad); Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 53-54 (S.D.N.Y. 1996) (where almost half of requests in subpoena were "vague, inexplicit and overbroad" and were wholly irrelevant to underlying litigation, the subpoena was objectionable in its entirety and would not be modified).  The SEIU has not taken that position here, but rather has agreed to produce those (relatively few) requested documents that fairly can be said to relate to the issue of class certification.  For all of the reasons and on all of the grounds previously recited, however, the SEIU objects to going beyond that point in response to the subpoena.

                              Sincerely yours,

                              Robert M. Weinberg
                              Andrew D. Roth
                              Counsel for the SEIU

Attachment

Exhibit 10

October 31, 2006



**Stronger Together**

David P. Dean, Esq.
James & Hoffman, P.C.
1101 17th Street, NW, Suite 510
Washington, DC 20036

RE:    Nurse Wage Antitrust Litigation
       Special Project No. 280U-HSVRNLGL(R3)

Dear David:

This is to formally confirm the retainer and funding relationship between Services Employees International Union ("SEIU") and your firm with respect to the matters referenced above.

SEIU retained your firm to follow up on certain research by the SEIU Nurse Alliance on possible hospital collusion in various United States markets to suppress nurse wages. Your firm commenced investigations that found evidence of such unlawful collusion in certain jurisdictions. SEIU has authorized you to share the results of those investigations conducted on SEIU's behalf with other law firms, and to use the results of such investigations to bring a series of class action antitrust suits to stop and remedy such collusion. We agreed that SEIU and Judith Scott would be walled off from any confidential information in such litigations, that your firm would represent the plaintiffs and the plaintiff class in such cases, and that, as a nonparty, SEIU would not make any demands on your firm concerning the litigations or otherwise interfere with your professional judgment about how best to serve the plaintiffs and the plaintiff class' interests. SEIU has referred interested nurses to you as potential plaintiffs in such actions and has entered the following agreements with respect to billing and expenses.

With respect to your billing for services rendered in such cases, you currently bill SEIU at a rate of *$165* per attorney hour. Paralegal hours are billed at a rate of *$75* per hour. Your office breaks down all statements by matter and/or case, identity of attorney performing the service, hours expended, and a brief description of the work involved. With respect to any expenses, you submit copies of receipts of all expenses incurred. Expenses must be listed under the applicable case or matter, and a subtotal for each case or matter including fees and expenses must be provided. Please be advised that the SEIU will not reimburse separately for general overhead expenses, such as secretarial overtime, absent unusual and compelling circumstances. Bills should be addressed to me, Norm Gleichman at the SEIU Legal Department and reference the case and SEIU Special Project No. 280U-HSVRN(R3). Consistent with our agreement that SEIU will not be privy to confidential information in such cases, we have agreed that your firm will refrain from revealing any confidential information in the billing entries, and that some entries may therefore be less detailed than is the firm's normal practice.

ANDREW L. STERN
International President

ANNA BURGER
International Secretary-Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

1313 L Street, NW
Washington, DC 20005

202.898.3200
TDD: 202.898.3481
www.SEIU.org

SEIU-SA 0001

Exhibit 10

David Dean, Esq.
October 31, 2006
Page Two

SEIU is funding this litigation through the payment of the partial hourly fee and costs incurred on the express understanding that any amounts SEIU pays to your firm in this matter will be reimbursed, prior to any other payments to any other party or client, from any monetary recovery to your firm in the nurse wage litigation for which the fee or expense was advanced. By funding this *litigation,* SEIU is sharing in the risk inherent in these litigations and thus expects: 1) to share in any fee recovery, if any, obtained above and beyond those amounts advanced by SEIU in the litigation, pursuant to the sharing agreement provided below; and 2) that J&H will use its best efforts to ensure that any settlement obtained in this litigation will be consistent with the plaintiff nurses' interests in the case.

As to the first matter, by signing this letter of understanding below, your firm agrees to the following agreements. First, your office agrees that SEIU will be repaid out of any recovery obtained for your firm (whether in a costs or fees award) for all monies advanced before any further distribution of fees and costs awards to your firm. Second, your firm agrees to share any fee recovery allocated to the hours worked by your firm[1] which is above and beyond the amounts advanced by SEIU) ("FEE PREMIUM") in the following manner. After repayment of costs and fees for a litigation, if any FEE PREMIUM remains, the amounts will be distributed as follows: 75% will be retained by your firm, with the remaining *25%* returned to the SEIU to compensate SEIU for the interest on the amounts advanced and other risk taken by agreeing to subsidize this litigation. Thank you for your assistance in this matter. We look forward to working with you.

Sincerely,

Norman M. Gleichman
Deputy General Counsel

So Agreed:

Date: ( 10|3-|06 )

---

[1] The *FEE* PREMIUM only concerns amounts paid to your firm for hours worked by your firm. This term contemplates that any division of fees between other attorneys and your office will occur prior to the application of this provision of the agreement.

Exhibit 11

FAXED

## JAMES & HOFFMAN
A Professional Corporation
1101 17TH STREET, N.W., SUITE 510
WASHINGTON, D.C. 20036-4704

PACE
(202) 496-0500
Facsimile: 202-496-0555
www.jamhoff.com

Edgar N. James
Steven K. Hoffman
Judith A. Scott
Kathy L. Krieger
David P. Dean
Marie Chopra
Amy B. Fettig
Sean G. Bajkowski*
Katie B. Feiock

Of Counsel:
Mary Joyce Carlson*
Martha Walfoort
Christy L. Hoffman

* Not Admitted in DC

cjames@jamhoff.com
skhoffman@jamhoff.com
scottj@seiu.org
klkrieger@jamhoff.com
dpdean@jamhoff.com
mchopra@jamhoff.com
abfettig@jamhoff.com
sgbajkowski@jamhoff.com
kbfeiock@jamhoff.com

mjcarlson@jamhoff.com
mwalfoort@jamhoff.com
choffman@jamhoff.com

## FACSIMILE COVER SHEET

### PLEASE DELIVER IMMEDIATELY:

To:    Jamie Cohen
       SEIU Nurse Alliance

Facsimile Number:  202-350-6619

From:  Mary Joyce Carlson

Client Number:          5200.069

Number of pages, including cover sheet: 3

Date:  January 30, 2006          Time: 2:21 pm

Contact: The Receptionist at (202) 496-0500 if problems occur.

MESSAGE:

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY
CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR OTHERWISE EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING
THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR
COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR,
PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA
U.S. POSTAL SERVICE. THANK YOU.

Exhibit 11

**Confidential Attorney/Client Communication**

**ADVICE TO SEIU ORGANIZERS ON REFERRING NURSES TO COUNSEL**

SEIU has asked for advice on how best to refer nurses to counsel, if those nurses suspect they may have been the victims of hospital collusion on wages.

**I.**    **After talking about the overall Value Nurse, Value Care campaign, organizers may make the following points about potential litigations to nurses who have been on staff at acute care hospitals sometime during the last four years (members or nonmembers).** (Use judgment so that management is not immediately notified).

1. As part of its ongoing concern about nurse issues, and in response to various complaints, SEIU undertook an investigation of inappropriate information sharing and nurse wage suppression among hospitals.

2. SEIU's lawyers asked antitrust and class action specialists at an outside firm to confirm whether the results of the investigations revealed that hospitals in certain places conspire to maintain nurse wage levels at artificially low levels in violation of the antitrust laws.

3. If a nurse is interested in exploring her or his legal rights on this topic, ask: **"Would it be OK if we share your name and address with lawyers who are working on preparing an antitrust lawsuit against the hospitals so that they can mail you some written information that complies with the [name of state] rules for lawyer advertising and communication?"** If so, have the nurse sign some version of the sign-in sheet attached to this memo.

4. FAX sign-in sheets to James & Hoffman: 202-496-0555 (fax); 202-496-0500 (ph).

**II.    PROHIBITIONS**

You should avoid saying things that could lead to either of two mis-perceptions:

1. **It is important SEIU not be mis-perceived as controlling the antitrust litigations. It doesn't.** The litigations will be brought on behalf of nurses in an metropolitan area and the lawyers will act solely in those nurses' interests. SEIU will not control the timing of the suits, the prosecution of the suits, or their resolution.

2. **It is important SEIU not be mis-perceived as acting <u>as an agent</u> for some particular attorneys in referring nurses, soliciting legal business, and/or stirring up litigation.** SEIU is referring nurses to lawyers to help the nurses assert their rights because that is part of SEIU's own mission, not on behalf of any lawyers or groups of lawyers.

3. Also, you should <u>not</u> try to answer questions about the lawsuits. E.g. "What money might I get from the suit? What legal protections would I have as a plaintiff?" **Instead, you should suggest that the person ask the lawyers all their questions, after they get the mailing about the litigations.**

Exhibit 11

## SIGN-UP SHEET FOR FURTHER INFORMATION

By signing below, I ask that my name and address be shared with lawyers who are working on preparing an antitrust lawsuit so that they can mail me some written information that complies with the state rules for lawyer advertising and communications.

| Name | Address | Phone Number |
|------|---------|--------------|
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |
|      |         |              |

SEIU-SA  0081

**From:** Ha Nguyen [mailto:nguyenh@SEIU.ORG]
**Sent:** Mon 10/30/2006 7:55 PM
**To:** Ha Nguyen
**Subject:** FW: OCT 7 MEETING

**From:** Cdrmedsvs@aol.com [mailto:Cdrmedsvs@aol.com]
**Sent:** Fri 10/27/06 3:05 AM
**To:**
Nguyen;                              ; jkrawczyk@seiutx.org                              Ha
**Subject:** OCT 7 MEETING

REDACTED

HELLO FELLOW NURSES,

I WILL GIVE YOU WRITE SOME INFORMATION FROM THE MEETING THAT YOU WERE NOT ABLE TO ATTEND.

INTRODUCTIONS DONE FROM 10-15 NURSES AT THE MEETING.  AS THE TIME GOES BY I SEE MORE AND MORE NURSES JOIN THE ALLIANCE.  THE NURSES WERE FROM VARIOUS HOSPITALS (NE BAPTIST, UNIV HOSP, SANTA ROSA, METHODIST, AND ONE THAT USE TO WORK AT SANTA ROSA AND NOW IS POLITICALLY INVOLVED FOR ALL.

HA(THE ORGANIZER) SPOKE OF THE CANDIDATES THAT CAME TO OUR CANDIDATE FORUM AND SEVERAL QUESTIONS WERE ASKED TO EACH AND EVERY ONE OF THEM.  OF COURSE ALL THE CANDIDATES REPLY IN AGREEMENT TO OUR FIGHT FOR BETTER PT/NURSE RATIOS , VOICE FOR THE NURSES, AND INCR WAGES.

WE HAD 10 CANDIDATE AND WE SELECTED 5 CANDIDATES THAT WE BELIEVED WOULD ACTUALLY TRY TO HELP US IN THESE ISSUES. PRESENTLY WE ARE CAMPAIGNING FOR THESE 5 CANDIDATES AND MAKE THEM ACCOUNTABLE FOR THEIR ACTIONS.  THE NURSES THAT WERE AT THE CANDIDATE FORUM EXPLAINED THAT THE NEXT CANDIDATE FORUM WE NEE TO OBTAIN THE REPRESENTATIVE VOTING HISTORY.

ALSO, AFTER CANDIDATE FORUM WE HAD A PRESS CONFERENCE. COOKIE POLLARD AND HERNANDO MARTINEZ WERE INTERVIEWED BY EXPRESS NEWS AND SPOKE TO KSAT 12 NEWS WHERE BOTH rN EXPLAINED THE POSITION OF THE NURSE ALLIANCE, IE. NURSE TO PT RATIOS, WAGES, MANDATORY OVERTIME, ALSO TO INCREASE THE CHIP PROGRAM .

oN SPET 24 SERVERAL NURSES FROM SAN ANTONIO TRAVELED TO ST LOUIS, MISSOURI, WHERE WE NERWORKED WITH OTHER RNS FROM ACROSS THE NATION.  WE MET WITH NURSES THAT HAVE BEEN UNIONIZED SINCE 1970 TO NURSES THAT ARE STARTING TO UNIONIZE JUST LIKE US. ALSO, WE MET NURSES THAT ARE JUST AHEAD OF US AND EXPLAINED TO US THAT THEIR WAGES FOR STARTING PAY WENT FROM 20/HR TO NOW 37.50/HR STARTING PAY(NEW GRAD).
I ALSO MET WITH RN ORGANIZER FROM FLORIDA THAT ARE JUST ABOVE US IN ORGANIZING AND HE STATED THAT WE ARE GOING TO HAVE TO WORK HARD AND CANNOT STOP RECRUITING NEW NURSES AT ALL TIMES.  HIS NAME IS TIME GRAY AND HE IS THE ONE FROM FLORIDA THAT THE GRAD ARE NOW MAKING 37.50/HR STARTING PAY.

SEIU-SA  0073

WE MET WITH MANY OTHER NURSES AND STATED THAT AT THIS TIME THE SEIU HAVE 87,000 NURSES UNIONIZED.

HERE IN SA WE HAVE CLOSE TO 12,000 NURSES AND IF WE CAN OBTAIN ALL OF THEMWE CAN HAVE POWER. TO UNIONIZE A HOSP ALL WE NEED IS 5 10% OF THE RN.
WE NEED TO SPEAK TO NURSES THAT WE ARE CONCERN ABOUT OUR PT'S AND WAGES AND THEN WE WILL DISCUSS THE DUES.  SOME OF US ALREADY GAVE THE DUES WHICH IS ONLY 10$/MONTH HOWEVER IF YOU ARE AFRAID PLEASE COME TO ONE OF THE MEETINGS.

IN TIME WE ARE GOING TO REQUIRE DUES TO BE ABLE TO SUSTAIN OURSELVES AND BE EFFECTIVE ONT HE LOCAL LEVEL.

WE ARE GOING TO GET TOGETHER TO HAVE A NEWSLETTER AT LEAST ONCE A MONTH ON WHAT IS GOING ON FOR THAT MONTH.

OUR SLOGAN IS -----SI SE PUEDE OR YES WE CAN  ANOTHER SLOGANWILL BE "UNITED WE BARGAIN DIVIDED WE BEG---

DECISION WAS MADE TO HAVE THE MEETINGS ON THE FIRST THURS AT 745 AND SAT AT 1000 EVERY MONTH. ALL THE MEETINGS WILL BE 1 HOUR LONG

REMEMBER "SI SE PUEDE" OR UNITED WE BARGAIN -DIVIDED WE BEG"  LET'S NOT BEG.

COME TO THE MEETING ON NOV 2 AT 7 PM AND NOV 4 AT 1000


PLEASE COME TO THE MEETING AND MEET ALL OF US AND YOU WILL BE EXCITED AND ENCOURAGE TO JOIN US TO ORGANIZE.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

SEIU-SA  0074

12/12/2006

**From:** Ha Nguyen [mailto:nguyenh@SEIU.ORG]
**Sent:** Mon 10/30/2006 7:51 PM
**To:** Ha Nguyen
**Subject:** FW: FAMILY OUTING

**From:** Cdrmedsvs@aol.com [mailto:Cdrmedsvs@aol.com]
**Sent:** Sat 10/28/06 7:33 PM
**To:** Ha Nguyen
**Subject:** FAMILY OUTING

SORRY HA I WAS NOT ABLE TO ATTEND THE OUTTING. I WAS SLEEPING, AS YOU CAN TELL I AM
WRITING THIS AT 1930 WHICH IS MY WORK TIME.

LET ME KNOW WHAT OCCURRED AND I REALLY DO NOT WANT TO KNOW HOW MUCH FUN IT WAS
BECAUSE I ENVY ALL OF YOU GUYS.  TELL EVERYONE I WAS JUST IN MY FIRST DREAM WHILE THEY
WERE HAVING THEIR FACES PAINTED AND EATING.

THANKS
COOKIE

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

**SEIU-SA  0075**

12/12/2006

**From:** Ha Nguyen [mailto:nguyenh@SEIU.ORG]
**Sent:** Mon 10/30/2006 7:57 PM
**To:** Ha Nguyen
**Subject:** FW: FW: Quality Principles: Notes, Revised Principles and Next Call

**From:** Cdrmedsvs@aol.com [mailto:Cdrmedsvs@aol.com]
**Sent:** Fri 10/27/06 2:15 AM
**To:** Ha Nguyen
**Subject:** Re: FW: Quality Principles: Notes, Revised Principles and Next Call

I would like to be on the committee.  I was at the office today and heard you were ill.  I hope you are feeling fine.

I also found out about the question concerning the legal letter.  I will take it to one of the attorney here in town in the am.

Sorry I am writing so late but that is the time I am usually awake when I have to work the following day.  It is no big deal.


Cookie


This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

SEIU-SA 0076

12/12/2006

**From:** Ha Nguyen [mailto:nguyenh@SEIU.ORG]
**Sent:** Mon 10/30/2006 7:56 PM
**To:** Ha Nguyen
**Subject:** FW: FATHER IN LAW DEATH

**From:** Cdrmedsvs@aol.com [mailto:Cdrmedsvs@aol.com]
**Sent:** Fri 10/27/06 2:27 AM
**To:** Ha Nguyen
**Subject:** Re: FATHER IN LAW DEATH

Thank you so much for the prayers and thoughts from all of you guys.  Really need it at this time.  Now to get back to work.  I guess I was told that Life goes on as he would say.

Thank you

cookie

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

**SEIU-SA 0077**

**From:** Ha Nguyen [mailto:nguyenh@SEIU.ORG]
**Sent:** Mon 10/30/2006 7:57 PM
**To:** Ha Nguyen
**Subject:** FW: FW: Quality Principles: Notes, Revised Principles and Next Call

**From:** Cdrmedsvs@aol.com [mailto:Cdrmedsvs@aol.com]
**Sent:** Fri 10/27/06 2:25 AM
**To:** Ha Nguyen
**Subject:** Re: FW: Quality Principles: Notes, Revised Principles and Next Call

Ha,

I would like to be in this committee however have you already given this to someone else. If not please put me in. Horrorable grammar.

thank you.

cookie

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

**SEIU-SA 0078**

12/12/2006

Exhibit 13

# San Antonio Express-News

# Nurses pushing for legislative changes

**Jenny LaCoste-Caputo, Express-News Staff, Sunday, Sept. 26, 2006**

Members of a fledgling grass-roots advocacy movement formed to give San Antonio nurses a collective voice and spearhead changes in the healthcare industry held their first political forum Saturday.

Their goal: To outline issues they want to see addressed in the upcoming state legislative session.

"Our patients are frustrated and so are we," said Roselia Pollard, a registered nurse with nearly 30 years of experience. "We are tired of the threats. Nurses must stand up and protect our profession. Nurses must stand up and protect our patients."

Local nurses, under the organizing auspices of a national labor union called Nurse Alliance, came together several months ago to launch the "Value Care, Value Nurses" campaign, which aims to bring nurses back to the bedside in large part by improving current nurse-to-patient ratios.

Pollard said nurses are afraid to complain about unsafe conditions.

She recalls working at a hospital where she was the only registered nurse on duty for a 12-hour shift, taking care of 25 patients.

Besides new laws on nurse-to-patient ratio, the Nurse Alliance of San Antonio also wants to see a whistle-blower law passed to protect nurses and increased funding to insure the poor.

Hernando Martinez, a registered nurse at University Hospital, said the issues should be important to every Texan, not just healthcare workers.

"It's frustrating," he said. "You want to provide the best care you can for your patients, but it's impossible if you're stretched too thin."

He said it's time for lawmakers to get involved to remedy the situation.

"The Nurse Alliance plans to get involved in Texas elections," he said. "We are going to hold politicians accountable."

SEIU-SA  0045



Exhibit 13



nurse alliance
*of* SEIU

The Nurse Alliance of Texas
1405 N. Main Ste. 200, San Antonio, TX 78212
Phone: 210/242-4508, Fax: 210/225-1974
www.nursealliancetx.org www.valuecarevaluenurses.org

SEIU-SA  0046

Exhibit 13



NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# BUSINESS REPLY MAIL

FIRST-CLASS MAIL     PERMIT NO. 78001     SAN ANTONIO TX

POSTAGE WILL BE PAID BY ADDRESSEE

NURSE ALLIANCE
1405 N. MAIN #200
SAN ANTONIO TX 78212-9920

SEIU-SA  0047

Exhibit 13



There's a Health Care Crisis in San Antonio.



San Antonio nurses are ready to fix it.

nurse alliance



**BUSINESS REPLY MAIL**
FIRST CLASS          74088          SAN ANTONIO, TX
POSTAGE WILL BE PAID BY ADDRESSEE

NURSE ALLIANCE
1405 N. MAIN #200
SAN ANTONIO, TX 78212-9989

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES



SEIU-SA 0048

Exhibit 13

# Let's Work Together to Protect Our Patients and Our Profession

There's a health care crisis in San Antonio. Over 372,000 Bexar county residents have no health coverage.

At a time when more patients are struggling to access the health care they need, nurses—the central providers of that care—are leaving the bedside. Our expanded workloads, irregular scheduling, increased stress levels and the declining amount of time that were able to spend with our patients are just a few of the obstacles between nurses and the delivery of high quality care.

The Nurse Alliance of SEIU is doing something about it. Through our Value Care, Value Nurses

campaign, were uniting nurses in San Antonio and around the country to bring nurses back to the bedside.

On May 6, as part of National Nurses Week, nurses with the Nurse Alliance joined local elected officials and community members to start finding solutions to the crisis that we can take in San Antonio.

**You can take the first step now by participating in this survey.** *Just fill it out, detach it, tape it shut, and drop it in the mail.*

The results of this survey will be used to craft the Nurse Alliance legislative and public policy agenda.



*Brenda Perez, RN addresses her colleagues in the Nurse Alliance at the Value Care, Value Nurses campaign kickoff. Several major media outlets and San Antonio's elected officials came out to support our efforts to improve patient care.*

**To learn more about the Nurse Alliance, call
210-242-4508**

## Part 1—Your work

1  At what type of facility do you work?
- Acute care hospital
- Call center
- Clinic
- Hospice
- Other

2  Which of the following types of units or specialty areas best describe where you usually work?
- Medical Surgical
- Intensive Care/ Critical Care
- Emergency Department
- Operating Room/ Recovery Room
- OB/GYN
- Pediatrics
- Other

## Part 2—Adequacy of staffing levels and pay

3  What is the nurse to patient ratio in your unit now?  1 RN to ___ patients.

4  What do you think it should be? 1 RN to ___ patients.

5  What is your average hourly pay?
- Under $25/hr
- $25 - $30/hr
- $30 - $35/hr
- $35 - $40/hr
- $40/hr and higher

6  Do you think the pay is adequate for the work you do?
- Yes   - No

7  Only 37% of registered nurses work in hospitals. What do you think could attract nurses back to a hospital setting?(Circle a number.)

| | 1 - Strongly Agree | 2 - Agree | 3 - Disagree | 4 - Strongly disagree |
|---|---|---|---|---|
| Better Staffing/Workload | 1 | 2 | 3 | 4 |
| Better health care coverage | 1 | 2 | 3 | 4 |
| Better Pay | 1 | 2 | 3 | 4 |
| More pay in the care our patients receive | 1 | 2 | 3 | 4 |

Name
Address
Phone Number
Email
Employer
Name of facility

## Part 3—Your Solution to the health care crisis

8  Some laws and regulations exist in other parts of the country to deal with the issue of quality health care. Tell us how you would support. (Circle one number.)
1 – Strongly Support        3 – Somewhat Oppose
2 – Somewhat Support        4 – Strongly Oppose

a  Requiring hospitals to publicly disclose their nurse-to-patient ratios so that consumers can get information about the quality of patient care.
        1    2    3    4

b  Establishing a minimum nurse-to-patient ratio, that ensures that there are enough nurses to treat patients safely in our hospitals.
        1    2    3    4

c  Whistle-blower protection for nurses who report any unsafe practices by their employers.
        1    2    3    4

d  Other

9  Some laws and regulations exist in other parts of the country to deal with the issue of access of health care. Tell us how you would support. (Circle one number.)
1 – Strongly Support        3 – Somewhat Oppose
2 – Somewhat Support        4 – Strongly Oppose

a  Requiring all large employers to pay a portion of the share of their employees' health coverage, along with a share paid by the employees themselves or the federal government.
        1    2    3    4

b  Requiring every individual to have healthcare coverage and expanding CHIP and Medicaid so those who aren't quality and can't afford insurance will be covered.
        1    2    3    4

c  Requiring every hospital to pay a set amount of its state to be used to pay healthcare service costs for the uninsured.
        1    2    3    4

d  Putting more money in the State Budget for existing programs like CHIP and Medicaid.
        1    2    3    4

10. Nurses all over the country are participating in the legislative process urging their state legislators to address the health care crisis. How are you going to participate?
- Talk to my coworkers.
- Participate in planning meetings with other nurses in San Antonio.
- Sign on to petitions/postcards urging our state legislators to support nurse bills.
- Meet with our state legislators to talk about the health care crisis.
- Other

**All responses will be kept strictly confidential.**

SEIU-SA  0049

Exhibit 13



*"Everyday nurses struggle to provide quality care and it's getting harder. If we come together, we can improve conditions at the bedside. It's up to us."*

—**Roselia Pollard**
San Antonio Emergency Room RN and
Member of the Nurse Alliance of Texas





SEIU-SA 0050

Exhibit 14

My name is Cookie Pollard. I am a former Emergency Room charge nurse who now runs my own staffing agency. I am active in the Nurse Alliance of SEIU. I have been a registered nurse since 1981.

I left the Hospital bedside _____ years ago because I was frustrated by a health care system that does not value the contributions of nurses.

I am not alone. Currently 1,000 hospital nursing positions are vacant in San Antonio.

The Nurse Alliance recently surveyed San Antonio's acute care nurses about the challenges facing their profession.

The results reveal that San Antonio nurses believe that we have a patient care crisis.

600 acute care nurses completed the survey out of 6,000 nurses.

97% of nurses believe that Texas needs a state law mandating safe nurse to patient ratios

97% also believe that nurses need real whistle-blower protections when it comes to reporting inadequate patient care.

SEIU-SA 0032

Exhibit 14

I can tell you from personal experience that the pressure on hospitals to make a profit is enormous. Hospitals are reluctant to turn patients away from the ER even if there are no beds available.

Many times I have had to call the EMS director and beg for our ER to be placed diversion-this means ambulances have to drive to the next closest emergency room.

But usually diversion is denied and the waiting fills up with people who are ill but not sick enough to require immediate attention. These patients can wait for hours to see a doctor. They become understandably agitated.

So nurses are overloaded with patients and suffering from the low morale. Nurses are getting injured more frequently on the job. Back injuries from trying to lift patients are common.

When nurses speak out about unsafe staffing or refuse to take a shift floating in a department where we are not comfortable, we are told to go work someplace else.

SEIU-SA 0033

Exhibit 14

We are tired of threats. We are tired of being treated like just another expense the hospital has to pay for.

Nurses must stand up to protect our profession.
Nurses must stand up to protect our patients.

We should have a voice in our hospitals and a voice in our state Capitol.

The Nurse Alliance is our voice.

We are collecting examples of unsafe staffing that has led to inadequate care.
These stories will be shared with lawmakers during the upcoming legislative session.

Please call 210/242-4508 to report unsafe staffing in area hospitals. Again, nurses should call 210/242-4508 to report staffing problems at area hospitals.

Thank you.

SEIU-SA 0034

# JONES DAY

Exhibit 15

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001-2113
TELEPHONE: 202-879-3939 • FACSIMILE: 202-626-1700

Direct Number: (202) 879-4676
mrshumaker@jonesday.com

December 14, 2006

VIA ELECTRONIC AND U.S. MAIL

Robert M. Weinberg, Esq.
Andrew D. Roth, Esq.
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W., Suite 1000
Washington, D.C. 20005

      Re:    SEIU Subpoena *Duces Tecum* - Maderazo, et al. v. VHS San Antonio
              Partners, L.P., et al.

Dear Mr. Weinberg and Mr. Roth:

      I write in response to your letter dated December 7, 2006. In that letter, you indicate that the SEIU intends to produce documents in response to only one (1) of the twenty-six (26) requests for production listed in the subpoena *duces tecum* served on the SEIU. Your letter also indicates that the SEIU has arrived at this decision based upon your analysis of the issues in this case, and the fact that the Court properly limited discovery at this stage of the litigation to class certification issues. We disagree with your purported analysis and find its reasoning flawed.

      The inappropriateness of the SEIU's expressed intention to respond to only one of the production requests is apparent from the interroratory responses produced by the named plaintiffs in the *Maderazo* action. In those responses, the named plaintiffs make clear that the SEIU – having solicited the named plaintiffs to the litigation and having agreed to pay the legal fees and costs of one of their counsel of record – is a driving force behind this litigation. Clearly, the SEIU has documents responsive to more than the one request to which they are willing to respond.

      Regardless, and rather than waste time debating positions, HCA and Methodist Healthcare are willing to narrow the subpoena to the following requests: Requests 1 (iii), (iv) and (v), 2, 3, 5, 7-12, 15, 16 (i), 18, 19, and 21-26. Requests 2 and 11, both of which refer back to Request 1, would also be restricted by our agreement to limit Request 1 to subparts (iii)(iv) and (v). In total, six (6) requests would be dropped in their entirety and at least three (3) others would be significantly pared back. A highlighted copy of the subpoena, which identifies those requests to which response would still be demanded, is attached for your convenience. HCA and Methodist Healthcare make this offer only as a compromise and reserve the right to demand the production of documents in response to all of the requests if the SEIU rejects this offer.

      I hope that you find this a reasonable compromise and that your failure to discuss the issues raised in your December 7 letter with me prior to its sending does not mean you are

Exhibit 5
JONES DAY

Robert M. Weinberg, Esq.
December 14, 2006
Page 2

unwilling to discuss compromise now. I look forward to hearing from you and working together
to reach a mutually satisfactory resolution.

Sincerely yours,

Michael R. Shumaker

Exhibit 15

## SCHEDULE A – DOCUMENT REQUESTS

1.    All Documents concerning or referring to any of (i) the Named Plaintiffs, (ii) the

Hospital Defendants, (iii) the Lawsuit, (iv) compensation for registered nurses employed in or

living in the San Antonio MSA, (v) the employment options for registered nurses employed in or

living in the San Antonio MSA, (vi) any contemplated legal or other action against the Hospital

Defendants or any other employer of registered nurses employed in the San Antonio MSA, and

(vii) any contemplated legal or other action against the Hospital Defendants outside the San

Antonio MSA.

   **To the extent they are not encompassed by the foregoing general request,**

**Defendants request the following Documents:**

2.    All Documents concerning or referring to Communications between or among, or

sent or received by, the SEIU and Counsel of Record regarding any of the persons, entities,

matters or subjects identified in Request 1 above.

3.    All Documents concerning or referring to any pre-filing investigation of the

allegations or issues in the Lawsuit, including all notes or memoranda relating to any interviews

or meetings with any nurse or any other individual.

4.    All Documents concerning or referring to Communications between or among, or

sent or received by, any SEIU official, employee, agent, consultant, committee, affiliate or ad

hoc working groups, including but not limited to Andrew Stern, Mary Kay Henry, Monica Russo,

Sal Rosselli, Jane McAlevey, Mitch Ackerman or Larry Fox, regarding any of the persons,

entities, matters or subjects identified in Request 1 above.

Exhibit 15

5.    All Documents concerning or referring to efforts by anyone to identify individuals to function as named plaintiffs for the Lawsuit.

6.    All Documents concerning or referring to efforts to encourage any Named Plaintiff or anyone else to obtain or accept employment with any Hospital Defendant.

7.    All Documents concerning or referring to contracts or agreements (including drafts or proposed contracts or agreements) between or among the SEIU and any Counsel of Record for the Named Plaintiffs, or any partner, agent, or employee of such counsel.

8.    All Documents concerning or referring to the payment or guarantee of payment, in whole or in part, of the Named Plaintiffs' attorneys fees or litigation costs in the Lawsuit, or the payment or guarantee of any funds, fee or cost, to or for any of the Named Plaintiffs.

9.    All Documents concerning or referring to any assistance or information that the SEIU offered or provided to any Named Plaintiff or any Counsel of Record for any Named Plaintiff relating to the persons, entities, matters or subjects identified in Request 1 above.

10.    All Documents concerning or referring to Communications between or among the SEIU and any of the Named Plaintiffs in the Lawsuit.

11.    All Documents concerning or referring to Communications between or among the SEIU and any member of the putative class in the Lawsuit relating to the persons, entities, matters or subjects identified in Request 1 above.

2

Exhibit 15

12.    All Documents concerning or referring to any contract or agreement (including drafts or proposed contracts or agreements) between, among or including the SEIU and any of the Named Plaintiffs in the Lawsuit.

13.    All Documents concerning or referring to Communications between or among the SEIU and any of the Hospital Defendants relating to the persons, entities, matters or subjects identified in Request 1 above.

14.    All Documents concerning or referring to Communications between or among the SEIU and any RN Employer in the San Antonio MSA relating to the persons, entities, matters or subjects identified in Request 1 above.

15.    All Documents concerning or referring to Communications between or among the SEIU and any person or entity, other than those referred to in Requests 2 through 14 above, that relate to any Hospital Defendant or any Named Plaintiff.

16.    All Documents concerning or referring to (i) the Lawsuit and (ii) any plan, proposal or action to organize the employees of any of the Hospital Defendants and/or obtain certification of the SEIU as the collective bargaining representative of any unit of any such Hospital Defendant's employees.

17.    All press releases, draft press releases and Documents relating thereto, created or distributed by the SEIU concerning or referring to any of the Named Plaintiffs, any of the Hospital Defendants, or the Lawsuit.

18.    All Documents concerning or referring to research, studies or reports prepared or funded in whole or in part by the SEIU regarding compensation paid to nurses or a nursing

Exhibit 15

shortage, including, without limitation, the study titled "Solving the Nursing Shortage Through Higher Wages," purportedly issued by the Institute for Women's Policy Research.

19.    All Documents concerning or referring to Communications (written, oral or electronic) with the Institute for Women's Policy Research or Vicky Lovell, Ph.D.

20.    All Documents concerning or referring to any "neutrality" or "cooperation" agreement between the SEIU or any other union, and any RN Employer within the San Antonio MSA, or any request that any RN Employer within the San Antonio MSA enter into any such agreement.

21.    All Documents concerning or referring to the SEIU's Corporate Campaign or Public Campaign against any Hospital Defendant.

22.    All Documents concerning, referring, supporting or forming the basis for Daniel Small's statements in the Tennessean newspaper that the SEIU had been "forerunners in this litigation" and had poured "tremendous resources (into) looking at this issue from a number of perspectives." *See* Todd Pack, *Nurses Sue HCA, Other Hospital Companies*, Tennessean, June 21, 2006, at 1E.

23.    All documents discussing or analyzing the alleged market for registered nurses in the San Antonio MSA, including but not limited to the number of registered nurses that are employed and/or live within the San Antonio MSA, the San Antonio MSA's geographic boundaries, the employment opportunities for registered nurses within and outside the San Antonio MSA, and the staffing levels or trends for registered nurses within and outside the San Antonio MSA.

4

Exhibit 15

24.    All documents concerning or relating to registered nurses that live or work within the San Antonio MSA and who also work outside the San Antonio MSA.

25.    All documents concerning or referring to registered nurses who live outside the San Antonio MSA, but who would or could work within the San Antonio MSA.

26.    All documents concerning or referring to the actual or potential effect of this lawsuit on the SEIU and/or its efforts to organize registered nurses.



Exhibit 15

The subpoena is to be responded to in accordance with the following definitions and instructions.

## DEFINITIONS

1.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or entities whether oral, written, electronic or otherwise; whether in-person or telephonic; whether direct or through an intermediary.

2.    "Complaint" means the Complaint and all amended Complaints filed by the Named Plaintiffs in the Lawsuit.

3.    "Corporate Campaign" means any attempt by a union or other labor organization to persuade or influence an employer, either directly or through its employees, to yield to the union's or organization's position in connection with labor negotiations or an attempt to organize a place of business for the purpose of labor negotiations.

4.    "Counsel of Record" means any attorney or firm representing a party to the Lawsuit, including any partner, member, shareholder, affiliate, employee, agent, or representative of such attorney or firm.

5.    "Document" has the same meaning as in Rule 34 of the Federal Rules of Civil Procedure, and includes, without limitation, any writing, notes, photograph, chart, graph, video tape, audio tape, computer disk, or electronically stored data (including electronic mail) and metadata, which is in your actual or constructive possession, custody or control, and includes, without limitation, all originals, copies, drafts (sent or unsent), or other nonconforming copies of every kind.

6

Exhibit 15

6.    "Hospital Defendant" means any defendant named in the Lawsuit, including VHA San Antonio Partners, L.P.; Baptist Health Systems; HCA Inc.; Methodist Health System of San Antonio, Ltd., L.L.P.; and Christus Santa Rosa Health Care Corp.

7.    "Lawsuit" means the action captioned Marissa Maderazo, Roselia Pollard, and Barbara Miles, et al. v. VHS San Antonio Partners, L.P., et al., Case number SA06CA05350G, currently pending in the United States District Court for the Western District of Texas, and includes any of the allegations made in the Complaint.

8.    "Named Plaintiffs" means Marissa Maderazo, Roselia Pollard, and Barbara Miles, and any further plaintiffs subsequently named in any amended complaints, and any of their employees, agents, attorneys or representatives.

9.    "Public Campaign" means any attempt by a union or other labor organization to persuade or influence public opinion in connection with labor negotiations or an attempt to organize a place of business for the purpose of labor negotiations.

10.    "RN Employer" means any person or entity that employs one or more registered nurses, including but not limited to a hospital, surgery center, ambulatory care center, nursing home, nurse agency, clinic or physician's office.

11.    "San Antonio MSA" means the San Antonio Metropolitan Statistical Area as that term is defined in the Complaint.

12.    "SEIU" means the Service Employees International Union, and its officers, agents, employees, representatives, members, affiliates, representatives and attorneys (in-house and outside counsel), including without limitations, the SEIU's Nurse Alliance.

7



Exhibit 15

13.    The definitions of "Named Plaintiffs," "Hospital Defendants," and "SEIU" further include the past and present officers, directors, agents, employees, attorneys, general partners, limited partners, members, representatives, divisions, subsidiaries, affiliates, predecessors and successors, of each individual or entity described therein.

## INSTRUCTIONS

1.    All documents covered by this request shall be produced in a manner consistent with Fed. R. Civ. P. 45(d)(1) at the place and time indicated by the subpoena or, if it is more convenient to do so, copies may be produced to Michael R. Shumaker at Jones Day, 51 Louisiana Avenue, N.W., Washington, DC 20001.

2.    Only a single copy of each responsive document is requested; however, all drafts and non-identical duplicates of each responsive document are requested, whether different from the original because of notes, marginalia, or attachments not present in or on the original document.

3.    If you refuse to disclose any document requested herein (or any portion thereof) on the grounds of privilege or otherwise, please provide the following information, as required by Fed. R. Civ. P. 45(d)(2): (a) the nature and type of document (e.g., memorandum, letter, report, etc.); (b) the subject matter of the document; (c) the date of the document; (d) an identification of each specific privilege or other claim asserted as grounds for non-production; (e) the holder of the privilege; and (f) such other information as is sufficient to identify the document, including the author(s), addressee(s), and any other recipient(s) of the document, and, where not apparent, the relationship of the author(s), addressee(s), and any other recipient(s) to each other.

4.    All requests seek documents from January 1, 2002 through the present.

# JONES DAY

Exhibit 15

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001-2113
TELEPHONE: 202-879-3939 • FACSIMILE: 202-626-1700

Direct Number:  (202) 879-4676
mrshumaker@jonesday.com

January 3, 2007

VIA ELECTRONIC AND U.S. MAIL

Richard A. Levy, Esq.
Levy Ratner, P.C.
80 Eighth Avenue
New York, New York 10011-5126

Re:    SEIU 1199 Subpoena *Duces Tecum* – Unger v. Albany Medical Center, et al.

Dear Mr. Levy:

I write in response to your letter to Philip Rosenberg, dated December 18, 2006.  In that letter, you indicate that 1199 SEIU United Healthcare Workers East ("SEIU 1199") intends to produce documents in response to only one (1) of the twenty-seven (27) requests for production listed in the subpoena *duces tecum* served on SEIU 1199.  Your letter indicates that SEIU 1199 has arrived at this decision based upon the fact that the Court properly limited discovery at this stage of the litigation to class certification issues, and your conclusion that only one request relates to class certification.  Given that your letter is in large part identical to the letter that Bredhoff & Kaiser sent me on December 7 regarding the subpoenas served on the SEIU in Washington D.C. and San Antonio, I suspect your conclusion is really the conclusion of Bredhoff & Kaiser.  Regardless, we disagree with the purported analysis and find its reasoning flawed.

The inappropriateness of SEIU 1199's expressed intention to respond to only one of the production requests is apparent from a declaration recently filed by Mary Joyce Carlson, Counsel to the SEIU's Health Care Division, and also counsel to Plaintiffs in this action.  In her Declaration, Ms. Carlson asserts that the SEIU – having investigated the issue of alleged hospital collusion with respect to RN wages and having agreed to pay the legal fees and costs of one of Plaintiffs' counsel of record – is a driving force behind this litigation.  Clearly, SEIU 1199 has documents responsive to more than the one request to which they are willing to respond.

Regardless, and rather than waste time debating positions, Seton Health System ("Seton") is willing to narrow the subpoena to the following requests:  Requests 1 (iii), (iv) and (v), 2, 3, 4, 6, 8-13, 16, 17 (i), 19, 20, and 22-27.  Requests 2 and 12, both of which refer back to Request 1, would also be restricted by our agreement to limit Request 1 to subparts (iii)(iv) and (v).  In total, six (6) requests would be dropped in their entirety and at least three (3) others would be significantly pared back.  A highlighted copy of the subpoena, which identifies those requests to which response would still be demanded, is attached for your convenience.  Seton makes this

JONES DAY

Richard A. Levy, Esq.
January 3, 2007
Page 2

offer only as a compromise and reserves the right to demand the production of documents in response to all of the requests if the SEIU 1199 rejects this offer.

I look forward to hearing from you and working together to reach a mutually satisfactory resolution.

Sincerely yours,

Michael R. Shumaker

cc:    Philip Rosenberg, Esq.

Exhibit 16

**FILED**

OCT 6 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MARISSA MADERAZO, ROSELIA )
POLLARD, and BARBARA MILES, )
on behalf of themselves and all others )
similarly situated, )
)
Plaintiffs )
)
v. )    CIVIL NO. SA-06-CA-535-OG
)
)
VHS SAN ANTONIO PARTNERS, L.P. )
d/b/a BAPTIST HEALTH SYSTEMS, )
HCA INC., a/k/a METHODIST )
HEALTHCARE SYSTEM OF SAN )
ANTONIO, LTD., L.L.P., CHRISTUS )
SANTA ROSA HEALTH CARE CORP., )
)
Defendants )

**SCHEDULING ORDER ON CLASS CERTIFICATION ISSUES**

The Court has considered the parties' Agreed Motion for Entry of Agreed Order

Concerning Schedule for Class Certification (Dkt. # 44). The Court finds that the proposed

scheduling order does not comply with the local rules, and the deadlines therein are too remote in

time. Therefore, the parties' motion (Dkt. # 44) is denied, and the Court issues the following

Scheduling Order with respect to class certification issues:[1]

---

[1] All disclosures and discovery required or permitted by this scheduling order shall be limited to
issues relating to class certification. Discovery and disclosures related to the merits will be addressed in
a subsequent scheduling order.

1

Exhibit 16

1.    Plaintiffs shall file their Motion for Class Certification, pursuant to local rule CV-23 and Appendix A, on or before October 27, 2006.

2.    Defendants shall file their response on or before November 10, 2006.

3.    Initial disclosures pursuant to Rule 26(a)(1) will be limited to class certification issues, and will be exchanged between the parties on or before December 1, 2006.

4.    The parties shall complete all discovery on class certification issues by May 4, 2007.[2]  Counsel may continue discovery beyond this date by agreement, but no subsequent deadlines will be vacated because of information obtained in post-deadline discovery.

5.    Plaintiffs will submit supplemental class certification briefing, with any supporting evidence, by June 1, 2007.

6.    Defendants will submit supplemental class certification briefing, with any supporting evidence, by July 2, 2007.

7.    A reply brief may be filed within ten days thereafter, and a surreply may be filed within ten days after the reply brief.

8.    The initial motion to certify and response thereto shall be limited to twenty (20) pages, and supplemental briefs shall be limited to thirty (30) pages, excluding exhibits and appendices.  The reply and surreply briefs, if any, shall be limited to ten (10) pages.

---

[2]The parties may determine the manner and order in which they conduct discovery.

Exhibit 16

9.    The Court may schedule a hearing after receipt of all briefs, and anticipates ruling

on the motion for class certification no later than September 30, 2007.  If the

Court grants class certification, the parties will have 45 days from the date of

certification to attempt to mediate and settle the lawsuit.

SIGNED this _____6_____ day of October, 2006.

_____
ORLANDO L. GARCIA
UNITED STATES DISTRICT JUDGE

3

Exhibit 17

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

MARJORY UNGER,

                              Plaintiff,

            v.                                          No. 06-CV-765
                                                        (TJM/DRH)
ALBANY MEDICAL CENTER et al.,                   FILED

                              Defendants.        FEB - 5 2007

                                                NANCY MAYER WHITTINGTON, CLERK
                                                    U.S. DISTRICT COURT
_____

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### ORDER

A conference was held with counsel for all parties in the above-captioned case on

October 24, 2006 pursuant to Fed. R. Civ. P. 16. This order memorializes the various

rulings made during that conference.


#### A. Defendants' Liaison Counsel

The following attorney is designated as Liaison Counsel for all defendants:

>           David Marx, Jr., Esq.
>           McDermott Will & Emery
>           227 West Monroe Street
>           Suite 4700
>           Chicago, Illinois 60606
>           Tel. (312) 372-2000

#### B. Class Certification Proceedings

Defendants requested that proceedings concerning plaintiff's anticipated motion for

class certification be bifurcated from and precede proceedings regarding the merits of the

Exhibit 17

case.  Plaintiff opposed the request and sought an order permitting discovery and motions regarding class certification to proceed simultaneously with discovery and motions on the merits of the case.  Finding that the interests of economy and reduced costs outweigh any minimal prejudice which would befall plaintiff from delaying discovery on the merits, defendants' request is **GRANTED** and it is **ORDERED** that proceedings concerning class certification be bifurcated from and precede proceedings on the merits of the case according to the following schedule:

1. The initial disclosures required by Fed. R. Civ. P. 26(a)(1) shall be made by all parties[1] regarding class certification on or before **November 3, 2006**;

2. All discovery relating to class certification, except the parties' responses to expert discovery and depositions of class certification experts, shall be completed on or before **March 1, 2007**;

3. Plaintiff shall file her motion for class certification on or before **April 2, 2007**;

4. Defendants shall file their opposition to that motion on or before **June 1, 2007**;

5. Plaintiff shall file any reply on or before **July 16, 2007**;[2]

6. If plaintiff offers the report of an expert witness on class certification, defendants may depose any such expert on or before **June 1, 2007**; and

---

[1]Defendant Ellis Hospital is excused from this requirement pending a decision on its motion for summary judgment.  Docket No. 53; see also subsection C infra.

[2]No sur-reply will be permitted without the permission of the district court.

2

Exhibit 17

7. If defendants offer the report of an expert witness on class certification, plaintiff may depose any such expert on or before **July 13, 2007**.[3]

### C. Pre-Discovery Motions for Summary Judgment

Defendant Ellis Hospital has moved for summary judgment before discovery is conducted. Docket No. 53. That motion shall proceed according to the following schedule:

1. Plaintiff shall file her opposition on or before **November 17, 2006**;

2. Defendant Ellis Hospital shall file its reply on or before **December 1, 2006**; and

3. The motion shall be returnable before the district court in Albany on **December 11, 2006** at **10:00 a.m.**[4]

During the conference, other defendants indicated that they also may wish to file pre-discovery motions for summary judgment. Accordingly, it is further **ORDERED** that any pre-discovery motion for summary judgment shall be filed on or before **December 1, 2006**.

---

[3]After a final decision is rendered by the district court on plaintiff's motion for class certification, a further conference will be held to establish a schedule for completion of the case.

[4]The return date established herein is the same as that set forth in the docket of this case. See Docket No. 53. However, the deadlines for plaintiff's opposition papers and defendant Ellis Hospital's reply papers are different. The dates set in this order rather than the dates reflected in the docket shall be deemed the deadlines for the filings of these pleadings.

3

Exhibit 17

## D. Protective Order

During the conference, the parties advised that they have been negotiating a protective order providing various levels of protection [collectively referred to herein as "confidential"] for information to be disclosed during discovery by defendants.  The parties have reached agreement on most of the terms to be included in such order.  As to the remainder, after hearing the arguments of the parties, those issues were resolved as follows:

1. **Plaintiff's Counsel.**  It appears from the conference that plaintiff's counsel of record, the law firm of Cohen Milstein Hausfeld & Toll, PLLC, is being assisted in this action by David P. Dean and Mary Joyce Carlson, Esqs. from the law firm of James & Hoffman.[5]  James & Hoffman provides legal services to a national organization of nurses. Those services include assistance in negotiating collective bargaining agreements and related matters.  Defendants are concerned that information relating to wages and similar matters which they deem confidential will be disclosed in this action and could be used adversely to defendants' interests by James & Hoffman on behalf of its other clients in unrelated proceedings.  Defendants wish to include a term in the protective order precluding the disclosure of certain confidential information to Dean and Carlson.  Plaintiffs oppose such a term.

As to Dean, it appears that he has no involvement in providing legal services to the national organization that would adversely affect defendants' interests in unrelated matters. It further appears that adequate "fire walls" may be erected within James & Hoffman to

---

[5]It is noted that James & Hoffman has not entered a formal appearance on behalf of plaintiff and, therefore, is not yet listed in the docket as an attorney of record.

4

Exhibit 17

protect confidential information from disclosure to others in the firm involved in unrelated matters adverse to the interests of defendants.  Accordingly, defendants' request for inclusions of a provision in the protective order precluding plaintiffs from disclosing certain information to Dean is **DENIED**.  However, plaintiffs shall disclose to defendants (a) the identities of employees of James & Howard who will assist Dean and will have access to such information, and (b) the steps taken to create the "fire walls" to prevent disclosure of such information by Dean or other employees of James & Hoffman to others in that law firm.

As to Carlson, it appears from the conference that Carlson is directly involved in providing assistance to members of the national organization on the negotiation of collective bargaining agreements and related matters, although she does not provide such assistance directly to those employed by defendants.  Given Carlson's close involvement in unrelated matters adverse to defendants' interests, it does not appear possible to create safeguards adequate to protect against the use in unrelated proceedings of confidential information disclosed by defendants in this action.  Accordingly, defendants' request to include in the protective order a term precluding disclosure of certain confidential information to Carlson is **GRANTED**.

2. **Procedures and Burdens for Challenges to Confidentiality Designations.**

The parties could not agree on the procedures for challenging a party's designation of certain information as confidential and what party would bear the burden of (I) seeking a ruling on such a challenge and (ii) proving or disproving the validity of a designation.  In this

5

Exhibit 17

regard, it is **ORDERED** that:

a. If a party disputes the confidentiality designation of a document under the protective order and the parties cannot agree on a resolution, the party challenging the designation bears the burden of seeking a ruling on the designation from the Court;

b. Any such challenge shall be raised by a letter to the Court identifying by Bate-stamp number or other identifying information the document or documents at issue. A hearing will then be scheduled at which the parties may present their arguments for or against the confidentiality designation; and

c. At the hearing, the party asserting the confidentiality designation bears the burden of persuasion.[6]

## E. Status Conference

A telephone status conference will be held with plaintiff's counsel and Defendants' Liaison Counsel on **January 23, 2007** at **10:00 a.m.** The chambers of the undersigned will initiate the conference telephone call. At that conference, counsel will be asked to advise the Court of, inter alia, the status of written discovery regarding class certification, the

---

[6]It is anticipated that with these rulings, the parties will complete and sign a protective order satisfactory to the parties and submit that order to the undersigned for consideration.

6

Exhibit 17

schedule for depositions, and any discovery issues which the parties have not been able to

resolve among themselves.


**IT IS SO ORDERED.**

DATED:  October 26, 2006
          Albany, New York

_David R. Homer_
United States Magistrate Judge

**United States Government**
**National Labor Relations Board**                          Exhibit 18
OFFICE OF THE GENERAL COUNSEL

# Advice Memorandum

DATE:  May 24, 2006

TO      :  James J. McDermott, Regional Director
           Region 31

FROM  :  Barry J. Kearney, Associate General Counsel
           Division of Advice

SUBJECT:  American Broadcasting Companies, et al.
           Case 31-CA-27698

                                        512-5030-8000
                                        512-5030-8050
                                        512-5030-8075


    This case was submitted for advice as to: (1) whether,
in two state court wage and hour lawsuits, the charged party
Employers' requests for discovery of communications between
the named class action plaintiffs and the Union -- in
furtherance of an anticipated motion to disqualify the class
counsel due to its joint representation of the Union and the
plaintiffs -- were unlawful under Section 8(a)(1) of the
Act; and (2) whether the discovery requests that were
limited or withdrawn during the "meet and confer" process
were unlawful under Section 8(a)(1).

    We conclude that the Employers lawfully sought this
information, as it was clearly relevant to determining
whether the class counsel should be removed due to a
conflict of interest, and the Employers' interest in
obtaining the information outweighed any harm to employees'
Section 7 rights.  We further conclude that the requests
that the Employers revised or withdrew were not coercive
under the totality of the circumstances, particularly in
light of the Employers' legitimate conflict-of-interest
concerns and their agreement to narrow or withdraw those
requests.

## Background and Facts

    The Writers Guild of America, West (WGA or Union) is
engaged in a campaign to organize writers who work on
"reality" television shows.  In July and August 2005, a
group of these writers filed two class action lawsuits, each
against several employers, alleging various wage and hour
violations.[1]  The two lawsuits were consolidated by the Los

---

[1] Specifically, on July 7, 2005, a group of twelve named
plaintiffs filed a lawsuit against eight employers.  Sharp,
et al. v. Next Entertainment, Inc. et al., BC 336170.  On
August 23, 2005, a similar class action lawsuit was filed by

Exhibit 18
                                - 2 -

Angeles County Superior Court.  Each of the charged party
Employers is a named defendant in one of the two lawsuits.
The class action plaintiffs in the consolidated lawsuit are
represented by the law firm of Rothner, Segall & Greenstone
(class counsel), which also represents the WGA in other
matters.  The WGA's general counsel is also a partner in the
firm.  It is undisputed that the WGA has been involved in
investigating the claims underlying the class action and
that it is fully funding the litigation.

     In November 2005, attorney Jeffrey Richardson informed
class counsel of defendants' position that the WGA is
"driving" the litigation, and that they intended to move to
disqualify Rothner, Segall & Greenstone as class counsel
because of a conflict of interest between employees in the
class and the WGA (by virtue of its representing both the
plaintiffs and, in other matters, the Union).  He added that
the named plaintiffs should also be disqualified from the
class if they were "put up to" the litigation by the Union.
Richardson stated that he would need to conduct discovery on
this issue in order to develop the Employers'
disqualification motion.

     In December 2005, the defendants/charged parties
propounded interrogatories and requests for production of
documents concerning individual plaintiffs and the WGA.  On
January 13, 2006,[2] the plaintiffs' attorneys filed
objections to many of these requests on the ground (among
others) that they infringe upon employees' Section 7
rights.[3]  On January 20, the Employers gave notice of the
depositions of several of the class action plaintiffs and
the Union.  The plaintiffs objected to the depositions and
refused to appear for them.

     The Employers duly "met and conferred" with the
plaintiffs in an attempt to resolve these discovery
disputes.  At that time, the defendants agreed to limit
and/or withdraw some of the contested discovery requests.
Also, in connection with the unresolved discovery requests,
the defendants, on two occasions, asked the plaintiffs to
propose alternative or less intrusive means that would allow
the necessary discovery without raising confidentiality

---

ten named plaintiffs against two employers.  <u>Shriver, et al.
v. Rocket Science Laboratories, LLC, et al.</u>, BC 338746.

[2] All subsequent dates are 2006.

[3] The Union also objected to many of the discovery requests
on the grounds that they infringed upon the attorney-client
privilege and the plaintiffs' associational rights under the
First Amendment.

- 3 -

concerns.  The plaintiffs did not propose such alternatives.
After these attempts at resolution, the charged party
defendants moved to compel the plaintiffs to comply with
their discovery requests.

On February 2, Rothner, Segall & Greenstone filed the
instant charge on behalf of the Union, alleging that certain
of the discovery demands violate employees' Section 7
rights.  Specifically, the Union objects to: (1)
interrogatories asking the plaintiffs to describe the role
of the Union in the litigation, how and by whom class
counsel was selected, how they became involved in the
litigation, and communications that they have had with the
Union pertaining to the litigation; (2) requests for
documents showing communications between the plaintiffs and
the Union since January 2004[4] and communications evidencing
the "role of the WGA" in the litigation; (3) notice of
deposition of the plaintiffs regarding the above subject
matters; and (4) notice of deposition of the Union regarding
its role in and financing of the litigation, the selection
of class counsel, the role of the litigation in the Union's
organizing campaign, whether the Union would support a
litigation settlement that did not include Union
organization, and how the named plaintiffs became involved
in the litigation.  The Union also objected to a request in
the notice of deposition of the Union regarding whether the
named plaintiffs have signed authorization cards and support
the WGA's organizing campaign.  Defendants withdrew this
last request.

A hearing on the defendants' motion to compel discovery
was held on March 23.  On March 27, the judge granted the
motion in part and denied it in part.  As to class counsel's
argument that the discovery request infringes on employees'
Section 7 rights, the judge ruled that Section 7 does not
insulate the plaintiffs from the discovery of communications
regarding the lawsuit.  The judge stated that evidence of
communications between named class members and the WGA is
"essential" to prove or disprove the claim that WGA's
interests in this class action diverge and conflict with
those of the putative class.  The judge stated:

    Thus, even if the discovery might work to inhibit
    the free and confidential exchanges between
    employees and the union, such effect is incidental
    and is far outweighed by the present need in this
    litigation to decide whether the relationship
    between WGA and class members vis-a-vis Class

---

[4] During the meet and confer sessions, the defendants
limited this particular document request to communications
regarding these cases.

- 4 -

> Counsel should be severed because of the existence
> *vel non* of a conflict of interest.  This is
> particularly so where the discovery is narrowly
> drawn and reviewed in advance by the court to
> insure that it is narrowly drawn for the specific
> purpose of revealing a potential conflict, and is
> the least intrusive alternative available for
> discovering material evidence.

The judge determined that a "prima facie disqualification
issue exists warranting further discovery," and that there
is "good cause" to consider removal of class counsel because
of its joint representation of the named plaintiffs and the
Union.  The court was concerned, however, about the
potential for intrusion into the attorney-client
relationship between class representatives and class counsel
and between class counsel and the WGA.  It recognized the
possibility that such communications are privileged,
especially those mediated by (or "copied-to") class counsel,
but only on or after the date class counsel was retained by
the named plaintiffs.  Accordingly, the court narrowed the
required responses for certain of the information requests
in order to protect the attorney-client relationship.[5]
Moreover, the court did not compel a response to requests
seeking evidence of the "role of the WGA" in connection with
the litigation[6] because the term "role" is "too ambiguous to
be enforced."

### ACTION

     We conclude that the Employers lawfully sought the
information at issue here, as it was clearly relevant to
determining whether class counsel should be removed due to a
conflict of interest, and the Employers' interest in
obtaining the information outweighed any harm to employees'
Section 7 rights.  We further conclude that the withdrawn or
revised requests were not coercive under the totality of the
circumstances.
     When an employer pursues in discovery information
regarding Section 7 activity, the Board must consider
whether the employer's constitutional interest in access to
the courts and its legitimate use of legal proceedings in
pursuit of such claims justifies the employer's actions.

---

[5] For example, certain responses were limited to non-
privileged written communications or communication copied or
addressed to class counsel, the Union, and any named
plaintiff jointly where no confidentiality is reasonably
expected given the content of the communication.

[6] Document Request #38 and Interrogatory #33.

Case 31-CA-27698                                                    Exhibit 18

- 5 -

That inquiry has turned in part on the relevance of the
protected information sought to the matter at issue in the
lawsuit.[7]

     In Guess, the Board announced a three-step analysis
for determining whether questions that pertain to
employees' protected concerted activities are permissible
when propounded during discovery in a civil proceeding.[8]
Specifically, it held that (1) the questioning must be
relevant; (2) if the questioning is relevant, it must not
have an "illegal objective;" and (3) if the questioning is
relevant and does not have an illegal objective, the
employer's interest in obtaining the information must
outweigh the employees' Section 7 confidentiality
interests.[9]

---

[7] See Maritz Communications Co., 274 NLRB 200 (1985); Wright
Electric, Inc., 327 NLRB 1194 (1999), enfd. 200 F.3d 1162
(8th Cir. 2000); and Guess?, Inc., 339 NLRB 432 (2003)
(Guess).

[8] 339 NLRB at 434.

[9] Id.

Case 31-CA-27698                                                    Exhibit 18
                                    - 6 -

     Applying <u>Guess</u>,[10] we first conclude that the
information sought by the Employers in the instant case was
highly relevant. Each of the discovery requests at issue
concerns factors relevant to the adequacy of class counsel
and the named plaintiffs, specifically whether they have
interests that may conflict with those of the putative
class members.[11]  As noted by the Region, each of the

_____

[10]  Although <u>Guess</u> is extant Board law, we have serious
concerns as to whether the balancing of an employer's need
for information against the impact on Section 7 rights has a
role in any aspect of a reasonably-based lawsuit in light of
<u>BE & K Construction Co. v. NLRB</u>, 536 U.S. 516 (2002).
Moreover, there are some questions about what the Board
means by "illegal objective" in the discovery request
context.  To date, only <u>Wright Electric</u> and <u>Guess</u>, supra,
have included an illegal objective consideration in the
analysis of discovery requests, and neither decision has
clearly delineated the parameters of discovery requests that
generally will evince an illegal objective.  Indeed, all
that they definitively indicate is that the Board has
discussed illegal objective in the context of discovery only
as to requests for authorization cards or other information
that infringes on employees' rights to preserve the
confidentiality of their union activities.  As authority for
its illegal objective finding, <u>Wright Electric</u> relied solely
on footnote 5 of <u>Bill Johnson's</u>, which in turn applies only
to the underlying substance of a lawsuit, i.e. whether the
requested remedy in the lawsuit would constitute a ULP in
and of itself.  That construction of footnote 5 was not
used in either <u>Wright Electric</u> or <u>Guess</u>.  In any event, it
is unclear whether an illegal objective, however defined by
the Board in those cases, would be insulated by the Supreme
Court's holding in
<u>BE & K</u>.  However, in light of our conclusion here that there
is no violation under existing Board precedent, this case is
not an appropriate vehicle for asking the Board to clarify
these issues.

[11] See, e.g., <u>Kamean v. Teamsters Local 363</u>, 109 F.R.D. 391
(S.D.N.Y. 1986) (motion for class certification denied in
wage and hour suit against local union where the named
representatives and their counsel had alliances with a
competing union that was funding the lawsuit; conflict of
interest precluded them from fairly and adequately
representing the interests of the class).  See also <u>Martinez
v. Barash</u>, not reported in F.Supp.2d, 2004 WL 1367445
(S.D.N.Y.) (class decertified where named plaintiffs were
"hand-picked" and coached for the litigation by a rival
union and were effectively assigned counsel by the rival
union).

- 7 -

interrogatories, requests for production, and matters for inquiry relates to one or more of the following topics: (1) the role of the Union in connection with the litigation; (2) how (and by whom) class counsel was selected; (3) how the named plaintiffs were selected or became involved in the litigation; (4) communications between the plaintiffs and the Union about the litigation; and (5) how the class action suits relate to the Union's organizing campaign. These are all valid areas of inquiry relevant to the appropriateness of class certification.[12]  Moreover, in ruling on the motion to compel discovery, the judge found that evidence of communications between named class members and the WGA is "essential" to prove or disprove the claim that WGA's interests in this class action diverge and conflict with those of the putative class.  Further, the court specifically determined that a "prima facie disqualification issue exists warranting further discovery" and that there is "good cause" to consider removal of class counsel because of its joint representation of the named plaintiffs and the Union.

Assuming, as did the Board in Guess, that the requests did not have an "illegal objective"[13] and applying the balancing prong of the Guess test, we conclude that the Employers' interest in the information outweighs any potential harm to employees' Section 7 rights.  Unlike Guess and Wright Electric, where the employees about whom information was sought were non-parties who had not otherwise disclosed their own union affiliation or actions,[14] the named plaintiffs in this case have made known their ties to the Union.  For example, the plaintiffs apparently accompanied Union officials to press releases publicizing the Union's central role in the class actions and the role of the lawsuit in the WGA organizing effort. As the judge noted, the "associational ties as between the named plaintiffs and the WGA are already obvious."  Thus the discovery was propounded in order to confirm the truth of allegations publicly disclosed by the plaintiffs and the

---

[12] Id.

[13] 339 NLRB at 434.  See also fn. 10, above, discussing the uncertainty over the meaning of "illegal objective" as a factor to consider in discovery cases.

[14] See Guess, 339 NLRB at 432; Wright Electric, 327 NLRB at 1194-1195.

- 8 -

Union.  The defendants did not attempt to ascertain the identity of non-named party employees who may have joined the WGA's organizing efforts.  In light of all of the above, any infringement on employees' confidentiality interests in this case would be minimal at most.

In contrast, the Employers' interest in the requested information is critical to determining whether the Union controls the class actions to a degree that renders class action status inappropriate under California law.  And, as found by the judge, the discovery is narrowly tailored to that purpose.  Further, during the meet and confer process, the defendants agreed to limit and/or withdraw some of the contested discovery requests.  And, in connection with the unresolved discovery requests, the defendants asked the plaintiffs on two occasions to propose alternative or less intrusive means that would allow the necessary discovery without raising confidentiality concerns.  The plaintiffs did not propose any alternatives.

We therefore find that the Employers' substantial need for the requested information clearly outweighs any potential harm to employees' Section 7 rights.

The Region also seeks advice as to whether the charged parties' discovery requests that were limited or withdrawn during the "meet and confer" process were nevertheless unlawful under Section 8(a)(1) for having been propounded at all.  In determining whether questioning of employees violates Section 8(a)(1), the Board considers whether, under the totality of the circumstances, the questioning "reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act."[15]

The only potentially troubling request that was limited or withdrawn is the one asking whether the named plaintiffs support the WGA's campaign to organize and/or have signed authorization cards.  In this case, however, the requested information was relevant to the ability of the named plaintiffs to adequately and fairly represent the interests of the class, because if they are aligned with the Union, they may have interests that conflict with those putative class members who are not aligned with the Union.[16]  In any

---

[15] See, e.g., <u>Rossmore House</u>, 269 NLRB 1176, 1177-78 (1984).

[16] See, e.g., <u>Chateau de Ville Productions, Inc. v. Tams-Witmark Music Library, Inc.</u>, 586 F.2d 962, 966 (2d Cir. 1978) (discovery to show a conflict of interest and that named plaintiffs had used the class action for personal

- 9 -

event, the named plaintiffs were not compelled to answer
this request, as the defendants withdrew it upon the
objection of the class counsel.   In these circumstances, we
conclude that the discovery request was not coercive.

### **Conclusion**

Accordingly, we conclude that the discovery requests
were not unlawful and that, absent withdrawal, the charge
should be dismissed.


B.J.K.

---

purposes was "highly relevant" to question of adequacy of
named plaintiffs as class representatives).

**FOR IMMEDIATE RELEASE**

June 22, 2006

Exhibit 19

**CONTACT**

Mindy Berman

(518) 810-5326

# JUNE 21ST STATEMENT FROM 1199SEIU NEGOTIATING COMMITTEE AT COLUMBIA MEMORIAL HOSPITAL

"The union has been contacted today by Columbia Memorial Hospital Vice President of Human Resources, Ray Jones, who told us that the Federal Mediator has asked the hospital to resume negotiations on June 28. The union has agreed to this process and has told the mediator that the Negotiating Committee will be prepared to further modify and change our proposals to resolve this issue without a strike."

The 1199SEIU CMH bargaining unit includes registered nurses, pharmacists, physical therapists and other professionals, LPNs, medical technicians and technologists, and housekeeping and dietary workers.

1199SEIU United Healthcare Workers East, is the largest healthcare workers union on the east coast, representing more than 275,000 professional, technical, clerical and service workers, pharmacists, registered nurses, licensed practical nurses, nurses' aides and home health aides employed in pharmacies, hospitals, nursing homes, clinics, home care and social service agencies.

1199 SEIU Negotiating Committee Members:

FILED

FEB - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| Marlene Brashears | Cindy Northrup |
| RN | Pharmacist |
| Scott Brashears | Randy Pike |
| RN | Nuc. Med. |
| Janice Brodowski | Melinda Quinlivan |
| RN | Housekeeping |
| Sharon Buckley | Kurt Randall |
| LPN | PT |
| Beth Clarke | Nancy Richardson |
| RN | Housekeeping |
| Jeannetta Domkoski | Cathy Robertson |
| LPN | RN |
| Wanda Fason | Sharon Rouse |
| Dietary | OR Aide |
| Bridget Fonda | Nancy Smith |
| RN | RN |
| Gary Grimes | Peter Tice |
| MHA | RN |
| Robin Johnson PACU, | Janet Torchia |
| RN | RN |
| Maggie Jones | Marjorie Unger |
| PCA | RN |
| Denise Krapf | Geri Weaver |
| RN | RN |

Press Center | 1199SEIU ◯ ◯

Please visit this link to the Columbia Memorial homepage feature: http://www.1199seiu.org/media/news.cfm?nid=1152

**Exhibit 19**

###

*Representing more than 275,000 members and retirees in New York, Maryland, the District of Columbia and Massachusetts, 1199SEIU United Healthcare Workers East is the largest Local union in the world. Our mission is to achieve affordable, high quality healthcare for all.*

| Browse By Year |
| --- |
| All... ▼  » Browse |



# Nurses pushing for legislative changes

**Web Posted: 09/23/2006 10:47 PM CDT**

**Jenny LaCoste-Caputo**
**Express-News Staff**

Members of a fledgling grass-roots advocacy movement formed to give San Antonio nurses a collective voice and spearhead changes in the healthcare industry held their first political forum Saturday.

Their goal: To outline issues they want to see addressed in the upcoming state legislative session.

"Our patients are frustrated and so are we," said Roselia Pollard, a registered nurse with nearly 30 years of experience. "We are tired of the threats. Nurses must stand up and protect our profession. Nurses must stand up and protect our patients."

Local nurses, under the organizing auspices of a national labor union called Nurse Alliance, came together several months ago to launch the "Value Care, Value Nurses" campaign, which aims to bring nurses back to the bedside in large part by improving current nurse-to-patient ratios.

One of the group's first actions was to mail surveys to 6,000 registered nurses. So far, 600 have responded. Of those, 93 percent say they want unsafe staffing practices to stop; 97 percent want whistle-blower protections for nurses; and 88 percent support expanding CHIP and Medicaid to cover the uninsured.

Pollard said nurses are afraid to complain about unsafe conditions. She recalls working at a hospital where she was the only registered nurse on duty for a 12-hour shift, taking care of 25 patients. She said getting information through surveys is a great way to show state legislators the true state of the nursing profession.

Besides new laws on nurse-to-patient ratio, the Nurse Alliance of San Antonio also wants to see a whistle-blower law passed to protect nurses and increased funding to insure the poor.

Hernando Martinez, a registered nurse at University Hospital, said the issues should be important to every Texan, not just healthcare workers. Martinez, who works in the medical and cardiac intensive care units, said staffing ratios in his departments are adequate, but that's not the case hospital-wide.

"It's frustrating," he said. "You want to provide the best care you can for your patients, but it's impossible if you're stretched too thin."

He said it's time for lawmakers to get involved to remedy the situation.

"The Nurse Alliance plans to get involved in Texas elections," he said. "We are going to hold politicians accountable."

Exhibit 20

State Rep. Jose Menendez supports the alliance and hopes state lawmakers can address the issues brought up by its members when the Legislature meets in January.

"This is an issue for every Texan," said Menendez, D-San Antonio. "Nurses are leaving the profession. They have too many patients and the working conditions are not very good at all."

The nursing shortage is a crisis felt across the country. About half a million registered nurses have left the profession for a host of reasons, experts say, including low pay, long hours and stressful working conditions.

The shortage is only expected to grow as aging baby boomers flood the healthcare system. Adding to the problem, today's nurses are older — the average age is 46 — and younger nurses aren't stepping in to fill the gaps as they retire.

It's estimated that by 2014 there could be a shortage of 1.4 million nurses nationwide.

In San Antonio, Pollard said, there are plenty of qualified nurses, even though there's an estimated 1,000 vacant nursing jobs at area hospitals.

---

*jcaputo@express-news.net*

Online at: http://www.mysanantonio.com/news/metro/stories/MYSA092406.02B.NURSES.2ca3564.html

Exhibit 21



You're Invited to the
## *First Annual Nurse Alliance Christmas Party*

Date: Saturday, December 9th
4:00 pm
at
Cookie's place

**REDACTED**

RSVP:    **REDACTED**

*Catering and Refreshments Served,
Games, Music, BYOB.*

SEIU-SA  0024

© Gartner Studios

FILED

FEB - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Exhibit 22

2.    Documents sufficient to identify or define your job classifications or codes for nurses, including documents reflecting the hierarchy of your nurse job classifications or codes and the educational, seniority, training or other prerequisites that are required for each job classification or code.

3.    All documents that constitute refer or relate in any way to the schedules of compensation, including monetary compensation (*e.g.*, wages, overtime, and bonuses), benefits, and other forms of monetary or non-monetary remuneration, paid to your nurses.

4.    All documents that refer or relate in any way to the method by which you determined the compensation, including monetary compensation (*e.g.*, wages, overtime, and bonuses), benefits, and other forms of monetary or non-monetary remuneration, that you paid to your nurses.

5.    All documents that reflect your policies for vacation time, sick time, and overtime for nurses from June 20, 2002 through the present.

6.    All documents that refer or relate in any way to the method by which you determined the policies for vacation time, sick time, and overtime for nurses from June 20, 2002 through the present.

7.    All documents that refer or relate in any way to the monetary valuation of any form of non-monetary compensation provided to your nurses.

8.    All documents referring or relating to any proposals for modification of any aspect of the compensation structure for any of your nurse positions (whether or not those proposals were adopted).

9.    All documents or databases, including documents sufficient to define and explain any code keys, abbreviations, headings or other definitions used in the documents or databases, that contain the following information for nurses from January 1, 1996 through the present:

(a)    Personnel information including but not limited to name, job title(s), hire date, termination date (if any), residence address (including zip code), telephone

Exhibit 22

number, gender, race or ethnicity, marital status, level of certification, and licenses held (and dates obtained);

        (b)    Job history, including but not limited to past and present job title(s), work location(s) and department(s), employment status, and full- or part-time status;

        (c)    Compensation history, including past and present hourly wage, overtime earnings, shift premiums, bonuses, and other forms of monetary compensation;

        (d)    Non-monetary compensation history, including benefits.

    10.    All documents that refer or relate in any way to any form of contact or communication between you and any non-governmental entity, including any other defendant in this action or any other Healthcare provider in the Albany area (including but not limited to Albany Memorial Hospital; St. Peter's Hospital; Veteran's Affairs Medical Center; Amsterdam Memorial Hospital; Nathan Littauer Hospital; Conifer Park; Sunnyview Hospital and Rehabilitation Center; Bellview Women's Hospital; St. Claire's Hospital of Schenectady; and Samaritan Hospital), in which nurse compensation was discussed or alluded to in any way.

    11.    All documents that refer or relate in any way to any form of contact or communication between you and any non-governmental entity, including any other defendant in this action or any other Healthcare provider in the Albany area (including but not limited to Albany Memorial Hospital; St. Peter's Hospital; Veteran's Affairs Medical Center; Amsterdam Memorial Hospital; Nathan Littauer Hospital; Conifer Park; Sunnyview Hospital and Rehabilitation Center; Bellview Women's Hospital; St. Claire's Hospital of Schenectady; and Samaritan Hospital), in which any condition of employment of any nurses was discussed or alluded to in any way.

    12.    All documents that refer or relate in any way to any form of contact or communication between you and any governmental entity relating in any way to the exchange with competing hospitals of information about employee compensation or conditions of employment.

    13.    All documents that constitute, refer to or relate in any way to any salary surveys or other information relating to nurses' compensation or conditions of employment

Exhibit 22

received by you from any source, including but not limited to Iroquois Healthcare Association, Iroquois Consortium of Up State New York, Health Association of New York (HANYS), the Association of Healthcare Human Resource Administrators of Greater New York, Capital Region Human Resources Association, JWT Employment Communications, National Association for Healthcare Recruiters (NAHCR), Metropolitan Health Administrators Association, the Greater New York Association of Nurse Recruiters, Health Information Management Association of NYC, Healthcare Executives Club, Healthcare Executive Coordinating Counsel, Metropolitan Health Administrators Association, New York Association of Training and Employment Professionals (NYATEP), National Association for Healthcare Recruitment (New York Chapter/Area), American Society for Healthcare Human Resources Administration (New York Chapter), Southern New York Association, New York State Emergency Nurses Association, New State Association of School Nurses, New York Korean Nurse's Association, the New York State Nursing Association, Central New York Healthcare Human Resource Administrators, Iroquois Association of Healthcare Human Resource Administrators, Northeastern New York Healthcare Human Resources Association, Northern Metropolitan Hospital Association of Healthcare Human Resources Administration and Rochester Regional Hospital Human Resources Administration.

14.    All documents that constitute, refer or relate in any way to any summary or abstract prepared by you of any information contained in any surveys of nurse compensation or conditions of employment received by you from any source.

15.    All documents that constitute refer or relate in any way to any survey of nurse compensation created by you.

16.    All documents that constitute, refer or relate in any way to any request for information made to or received by you relating in any way to nurse compensation or conditions of employment, including but not limited to any formal or informal salary surveys conducted by any third party.

17.    All documents that constitute, refer or relate in any way to any response received or provided by you to any request for information relating in any way to nurse

Exhibit 22

compensation or conditions of employment, including but not limited to your responses to formal or informal salary surveys conducted by any third party.

18.    All documents that refer to or reflect your membership or participation in any trade or professional association relating to nurses, human resources, or hiring, including but not limited to the Iroquois Healthcare Association, Iroquois Consortium of Up State New York, · Health Association of New York (HANYS), the Association of Healthcare Human Resource Administrators of Greater New York, Capital Region Human Resources Association, JWT Employment Communications, National Association for Healthcare Recruiters (NAHCR), Metropolitan Health Administrators Association, the Greater New York Association of Nurse Recruiters, Health Information Management Association of NYC, Healthcare Executives Club, Healthcare Executive Coordinating Counsel, Metropolitan Health Administrators Association, New York Association of Training and Employment Professionals (NYATEP), National Association for Healthcare Recruitment (New York Chapter/Area), American Society for Healthcare Human Resources Administration (New York Chapter), Southern New York Association, New York State Emergency Nurses Association, New State Association of School Nurses, New York Korean Nurse's Association, the New York State Nursing Association, Central New York Healthcare Human Resource Administrators, Iroquois Association of Healthcare Human Resource Administrators, Northeastern New York Healthcare Human Resources Association, Northern Metropolitan Hospital Association of Healthcare Human Resources Administration and Rochester Regional Hospital Human Resources Administration.

19.    All documents that refer to or relate in any way to any meetings of any trade or professional association relating to nurses, human resources, or hiring (including but not limited to the Iroquois Healthcare Association, Iroquois Consortium of Up State New York, Capital Region Resource Association Health Association of New York (HANYS), the Association of Healthcare Human Resource Administrators of Greater New York, JWT Employment Communications, National Association for Healthcare Recruiters (NAHCR), Metropolitan Health Administrators Association, the Greater New York Association of Nurse Recruiters, Health Information Management Association of NYC, Healthcare Executives Club,

Exhibit 22

Healthcare Executive Coordinating Counsel, Metropolitan Health Administrators Association, New York Association of Training and Employment Professionals (NYATEP), National Association for Healthcare Recruitment (New York Chapter/Area), American Society for Healthcare Human Resources Administration (New York Chapter), Southern New York Association, New York State Emergency Nurses Association, New State Association of School Nurses, New York Korean Nurses Association, the New York State Nursing Association, Association of Healthcare Human Resources Administers of Greater New York, Central New York Healthcare Human Resource Administrators, Iroquois Association of Healthcare Human Resource Administrators, Northeastern New York Healthcare Human Resources Association, Northern Metropolitan Hospital Association of Healthcare Human Resources Administration and Rochester Regional Hospital Human Resources Administration), including but not limited to meeting agendas, notes, minutes or rosters; documents exchanged or handed out during or in connection with the meetings; and documents relating to work performed in preparation for or as a result of the meetings.

20.    All documents that refer or relate in any way to any meetings or events of any kind sponsored by or affiliated with Metropolitan Nurse webpage.

21.    All documents that refer or relate in any way to any information of any kind received by you relating to nurse compensation or employment conditions from or through any recruiting firms involved in nurse recruiting activities in the Albany area, including but not limited to Global Nurse Recruiters Corporation, Albanyjobs.net, Cultural Education Center, Nursefinders, Maxim, Albany Home Care and Staffing, Bernard Hodes Group, Erexchange.com, and Healthfinders.

22.    All documents that refer or relate in any way to any information relating to nurse compensation or terms of employment distributed or received by you at any job fairs.

23.    All documents that identify or describe any compensation determinations or decisions made with respect to any nurses as a result of any salary surveys or other nurse compensation information received by you from any source.

Exhibit 22

24.    All documents that refer or relate to any recommendation with respect to any compensation adjustments for nurses; the purposes of any information exchanges in which you participated; the cost of any information exchanges in which you participated; and/or the benefits to you of any information exchanges in which you participated.  For purposes of this request, "information exchanges" means giving or receiving of information relating in any way to the compensation or terms of employment of any nurses.

25.    All documents that constitute recruiting materials relating to nurses generated by you or on your behalf, including but not limited to advertisements for nurse positions, job or vacancy listings, materials distributed at job fairs, documents relating to referral bonuses for employees, and pages from your website relating to nurse recruiting.  This request encompasses both successful and unsuccessful recruitment efforts.

26.    All documents that refer or relate in any way to your strategies for the recruitment of nurses, including but not limited to documents reflecting the geographic locations from which you recruit nurses and the manner in which you recruit nurses in each geographic location.  This request encompasses both successful and unsuccessful recruitment efforts.

27.    All documents that refer or relate in any way to any communication received by you reflecting a complaint or grievance of any kind relating in any way to nurse compensation or employment conditions.

28.    All documents reflecting any market study or analysis that refers or relates in any way to the labor market for hospital employees in the Albany area, including but not limited to all market studies that refer or relate in any way to nurse compensation.

29.    All documents reflecting any market study or analysis that refers or relates in any way to the market for healthcare services in which each of your Albany-area hospitals participates.

30.    All documents reflecting any study or analysis of nurse job mobility, including but not limited to the residence locations of nurses who work in the Albany area and the job locations of nurses who live in the Albany area; the proportion of registered nurses

Exhibit 22

working as hospital nurses vs. working as non-hospital nurses in the Albany area; and the proportion of registered nurses who live in the Albany area but are not employed as nurses.

31.    All documents reflecting any analysis, forecast, projection, budget or review concerning any markets for nurse labor, including but not limited to the supply of or demand for this labor, the characteristics of any such markets, the structure of any such markets, or changes in any such markets.

32.    All documents that reflect your nurse-to-patient ratios from June 20, 2002 through the present, including both the nurse-to-patient ratios adopted by you as staffing goals and the nurse-to-patient ratios actually achieved, as well as any guidelines or procedures relating to achieving your nurse-to-patient ratios.

33.    All documents on which you relied, in whole or in part, to establish the nurse-to-patient ratios adopted by you as staffing goals and effective from June 20, 2002 through the present.

34.    All documents necessary to determine whether you met any or all of your nurse-to-patient ratios from June 20, 2002 through the present.

35.    All documents in your possession, custody and control that refer to or reflect any nurse-to-patient ratios established, adopted, or recommended by any professional, trade association, or governmental entity from June 20, 2002 through the present.

36.    All documents that reflect your staffing goals and vacancy rates for nurses from January 1, 1996 through the present.

37.    All documents that reflect the nature of your patient population from June 20, 2002 through the present, including documents identifying your patient care units or departments, patient volumes within those units or departments, the number of patient care days within those units or departments, the geographic region(s) from which your patient population is drawn.

38.    All documents that reflect your acute care patient volumes from June 20, 2002 through the present, including documents reflecting the number of inpatient days, the number of admissions, your case mix index, and any other measures of case complexity.

Exhibit 22

39.    All documents that reflect your non-acute care patient volumes from June 20, 2002 through the present, including documents reflecting the number of inpatient days, the number of admissions, your case mix index, and any other measures of case complexity.

40.    All documents that reflect your outpatient volumes from June 20, 2002 through the present, including the number of outpatient procedures and any measures of the complexity of the outpatient procedures.

41.    All documents that reflect your use of agency nurses from June 20, 2002 through the present, including documents reflecting the number of agency nurses employed at your hospitals (broken down based on whether the agency nurse was paid by the hospital or paid by the agency); the shifts to which the agency nurses were assigned to work; how long each agency nurse was employed; the hourly rate(s) paid for each nurse and shift; the proportion of the hourly rate received by the agency and the proportion received by the nurse; and any guidelines or standards for the employment of agency nurses as opposed to non-agency nurses to perform particular tasks or within particular patient care units or departments (including any limits on the number of agency nurses that may be employed within a particular facility, patient care unit, or department at any given time).  For purposes of this request, the term "employed" includes nurses whose services you obtained through a third-party employment agency.

42.    All documents that reflect the qualifications the agency nurses must have in order to be qualified to be employed at your hospitals from June 20, 2002 through the present. For purposes of this request, the term "employed" includes nurses whose services you obtained through a third-party employment agency.

43.    All documents that reflect your use of part-time nurses as you define the term "part-time," from June 20, 2002 through the present, including documents reflecting the number of part-time nurses employed at your hospitals, the shifts to which the part-time nurses were assigned to work, how long each part-time nurse was employed, the hourly rate(s) and other compensation (monetary and non-monetary) paid, and any guidelines or standards for the employment of part-time nurses as opposed to non-part-time nurses to perform particular tasks or within particular patient care units or departments (including any limits on the number of part-

Exhibit 22

time nurses that may be employed within a particular facility, patient care unit, or department at any given time).

44.    All documents that reflect your use of registry nurses from June 20, 2002 through the present, including documents reflecting the number of registry nurses employed at your hospitals, the shifts to which the registry nurses were assigned to work, how long each registry nurse was employed, the hourly rate(s) and other compensation (monetary and non-monetary) paid, and any guidelines or standards for the employment of registry nurses as opposed to non-registry nurses to perform particular tasks or within particular patient care units or departments (including any limits on the number of registry nurses that may be employed within a particular facility, patient care unit, or department at any given time).

45.    All documents that reflect your use of floater nurses from June 20, 2002 through the present, including documents reflecting the number of floater nurses employed at your hospitals, the shifts to which the floater nurses were assigned to work, how long each floater nurse was employed, the hourly rate(s) and other compensation (monetary and non-monetary) paid, and any guidelines or standards for the employment of floater nurses as opposed to non-floater nurses to perform particular tasks or within particular patient care units or departments (including any limits on the number of floater nurses that may be employed within a particular facility, patient care unit, or department at any given time).

46.    All documents that reflect your policies and practices from June 20, 2002 through the present respecting whether job duties typically performed by nurses (hereafter "nursing tasks") may be performed by non-nurse employees, such as certified nursing assistants, orderlies and licensed practical (vocational) nurses, including a description of the nursing tasks that may be performed by non-nurse employees, the types of non-nurse employees who may perform the tasks, the circumstances under which the tasks may be performed by non-nurse employees, and the patient care units or departments within which non-nurse employees may perform the tasks.

47.    All documents that constitute, refer or relate in any way to the schedules of compensation, including monetary compensation (*e.g.*, wages, overtime, and bonuses),

Exhibit 22

benefits, and other forms of monetary or non-monetary remuneration, that you paid to non-nurse employees (including but not limited to certified nursing assistants, orderlies, and licensed practical (vocational) nurses) who are authorized to perform nursing tasks (as defined in request 46, above).

48.    All documents that refer or relate in any way to the method by which you determined the compensation, including monetary compensation (*e.g.*, wages, overtime, and bonuses), benefits, and other forms of monetary or non-monetary remuneration, that you paid to non-nurse employees (including but not limited to certified nursing assistants, orderlies, and licensed practical (vocational) nurses) who are authorized to perform nursing tasks (as defined in request 46, above).

49.    All documents or databases, including documents sufficient to define and explain any code keys, abbreviations, headings or other definitions used in the documents or databases, that contain the following information from January 1, 1996 through the present for all non-nurse employees (including but not limited to certified nursing assistants, orderlies, and licensed practical (vocational) nurses) who are authorized to perform nursing tasks (as defined in request 46, above):

(a)    Personnel information including but not limited to name, job title(s), hire date, termination date (if any), residence address (including zip code), telephone number, gender, race or ethnicity, marital status, level of certification, and licenses held (and dates obtained);

(b)    Job history, including but not limited to past and present job title(s), work location(s) and department(s), and full- or part-time status;

(c)    Compensation history, including past and present hourly wage, overtime earnings, shift premiums, bonuses, and other forms of monetary compensation;

(d)    Non-monetary compensation history, including benefits.

50.    All documents that constitute job descriptions for all positions within your hospitals, including lists of duties and responsibilities for each position, the qualifications

Exhibit 22

required for each position, and the types of patients, patient care units and/or departments to which each position relates.

51.    All documents that constitute, refer or relate to schedules of the compensation, including monetary compensation (*e.g.*, wages, overtime, and bonuses), benefits, and other forms of monetary or non-monetary remuneration, that you provided for all positions within your hospitals.

52.    All documents that refer or relate in any way to any communication between you and any non-governmental entity, including any other defendant in this action or any other Healthcare provider in the Albany area (including but not limited to Albany Memorial Hospital; St. Peter's Hospital; Veteran's Affairs Medical Center; Amsterdam Memorial Hospital; Nathan Littauer Hospital; Conifer Park; Sunnyview Hospital and Rehabilitation Center; Bellview Women's Hospital; St. Claire's Hospital of Schenectady; and Samaritan Hospital), in which the compensation or employment conditions of any position within your hospital or any other hospital in the Albany area was discussed or alluded to in any way.

53.    All documents or databases, including documents sufficient to define and explain any code keys, abbreviations, headings or other definitions used in the documents or databases, that contain the following information from January 1, 1996 through the present for all professional, managerial, and technical non-nursing employees (for purposes of this request, "professional, managerial, and technical non-nursing employees" means employees who fall into categories 1.1, 1.2, 2 and 3 as used in the U.S. Equal Employment Opportunity Commission's Employer Information Report ("EEO-1"):

(a)    Personnel information including but not limited to name, job title(s), hire date, termination date (if any), residence address (including zip code), telephone number, gender, race or ethnicity, marital status, level of certification, and licenses held (and dates obtained);

(b)    Job history, including but not limited to past and present job title(s), work location(s) and department(s), and full- or part-time status;

Exhibit 22

          (c)     Compensation history, including past and present hourly wage, overtime earnings, shift premiums, bonuses, and other forms of monetary compensation;

          (d)     Non-monetary compensation history, including benefits.

     54.     Your document retention policy or policies from January 1, 1996 through the present.

     55.     Your antitrust compliance policy or policies from January 1, 1996 through the present, including but not limited to any policies relating to the sharing of information with employees of competing hospitals.

Dated: October 18, 2006

By: _____

MICHAEL D. HAUSFELD
DANIEL A. SMALL
CHARLES E. TOMPKINS
ALLYSON B. BAKER
COHEN MILSTEIN HAUSFELD
& TOLL, P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

DAVID P. DEAN
MARY JOYCE CARLSON
JAMES & HOFFMAN
1101 17th St., N.W.
Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

MICHAEL P. LEHMANN
THOMAS P. DOVE
KIMBERLY A. KRALOWEC
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

Exhibit 22

DANIEL GUSTAFSON
JASON S. KILENE
Gustafson Gluek PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

MARK A. GRIFFIN
RAYMOND J. FARROW
KELLER ROHBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Tel: (206) 623-1900
Fax: (206) 623-3384

Attorneys for Plaintiffs

Exhibit 22

## **CERTIFICATE OF SERVICE**

This is to certify that the foregoing Plaintiff's Request for Production of Documents to

Defendant Seton Health System was served this 25th day of October, 2006 via UPS and electronic

mail to the following:

Mark Thomas
Wilson Elser Moskowitz Edelman & Dicker, LLP
677 Broadway, 9th Floor
Albany, NY, 12207-2996

Philip A. Proger
Michael R. Shumaker
Toby G. Singer
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001

/s/ Shubha Chandra
Shubha Chandra

LAW OFFICES OF

# KELLER ROHRBACK L.L.P.

Exhibit 23

LAURIE B. ASHTON † ⊕ ⊙
IAN S. BIRK
STEPHEN R. BOATWRIGHT † ⊕ ⊙
KAREN E. BOXX ⊕
JOHN H. BRIGHT
GRETCHEN FREEMAN CAPPIO
JASON P. CHUKAS
T. DAVID COPLEY ⊠
ALICIA M. CORBETT † ⊕ ⊙
CLAIRE CORDON
SHANE P. CRAMER ⊠ ⊙
ROB J. CRICHTON ⊙
JULI FARRIS DESPER ⊙
MAUREEN M. FALECKI ⊙
RAYMOND J. FARROW
DANIEL S. FRIEDBERG ⊙ ⊙

GLEN P. GARRISON ⊠
LAURA R. GERBER
GARY A. GOTTO † ⊕ ⊙
MARK A. GRIFFIN ⊙
AMY N.L. HANSON ⊙
IRENE M. HECHT
SCOTT C. HENDERSON
MICHAEL F. JOHNSON
RON KILGARD ⊙ ⊕ ⊙
TOBIAS J. KAMMER
HEIDI LANTZ
CARI CAMPEN LAUFENBERG
ELIZABETH A. LELAND
TANA LIN ⊕ ⊙
DEREK W. LOESER

DAVID R. MAJOR
JOHN MELLEN ⊙
ROBERT S. OVER ⊠ ⊙
AMY PHILLIPS
LORRAINE LEWIS PHILLIPS
ERIN M. RILEY ⊙
PAUL M. ROSNER
DAVID J. RUSSELL
MARK D. SAMSON † ⊕ ⊙
LYNN LINCOLN SARKO ⊕ ⊙
FREDERICK W. SCHOEPFLIN
WILLIAM C. SMART
THOMAS A. STERKEN
BRETT L. TINGLUM ⊙
LAURENCE R. WEATHERLY
MARGARET E. WETHERALD ⊙

AMY WILLIAMS-DERRY
MICHAEL WOERNER
BENSON D. WONG

† ADMITTED IN ARIZONA
⊠ ALSO ADMITTED IN ARIZONA
⊕ ALSO ADMITTED IN CALIFORNIA
⊙ ALSO ADMITTED IN COLORADO
⊙ ALSO ADMITTED IN IDAHO
⊙ ALSO ADMITTED IN ILLINOIS
⊙ ALSO ADMITTED IN MARYLAND
⊙ ALSO ADMITTED IN MICHIGAN
⊙ ALSO ADMITTED IN NEW YORK
⊙ ALSO ADMITTED IN OREGON
⊙ ALSO ADMITTED IN WASHINGTON, D.C.
⊙ ALSO ADMITTED IN WISCONSIN
⊙ NOT ADMITTED IN WASHINGTON
⊙ OF COUNSEL

October 23, 2006

RECEIVED
OCT 2 6 2006

Mr. Robert C. Jones
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001-2113

Re:    *Maderazo v. VHS San Antonio Partners, L.P., et al.*

Dear Mr. Jones:

It has come to my attention our previous discovery requests directed to HCA Inc. are not being accepted due to them being served via Federal Express. We now enclose our revised discovery requests being sent to you via the U.S. Postal Service. We look forward to your timely response.

Very truly yours,

Mark A. Griffin

MAG:sh
Enclosures
cc:    Raymond Farrow
       Lorraine Lewis Phillips
N:\CLIENTS\27245\1\CORRESPONDENCE\OPPOSING COUNSEL\GRIFFINJONES101306.DOC

Exhibit 23

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARISSA MADERAZO, ROSELIA POLLARD, and BARBARA MILES, on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | No. SA-06-CA-0535-OG |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| VHS SAN ANTONIO PARTNERS, L.P. d/b/a BAPTIST HEALTH SYSTEMS, HCA INC., a/k/a METHODIST HEALTHCARE SYSTEM OF SAN ANTONIO, LTD. L.L.P., CHRISTUS SANTA ROSA HEALTH CARE CORP., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS
TO DEFENDANT HCA INC., a/k/a METHODIST HEALTHCARE
SYSTEM OF SAN ANTONIO, LTD., L.L.P.**

Pursuant to this Court's order and Federal Rule of Civil Procedure 34, plaintiffs Marissa Maderazo, Roselia Pollard and Barbara Miles request that defendant HCA Inc., a/k/a Methodist Healthcare System of San Antonio, Ltd., L.L.P. respond to the requests for production of documents below within 30 days of service.

For purposes of these requests, in addition to the definitions and rules of construction set forth in Rule CV-26, the term "documents" includes electronic data; the term "you" means HCA

Exhibit 23

Inc., a/k/a Methodist Healthcare System of San Antonio, Ltd., L.L.P. and all hospitals operated by HCA Inc., a/k/a Methodist Healthcare System of San Antonio, Ltd., L.L.P. in the San Antonio area; the term "nurse" means any kind of nurse (including but not limited to registered nurses, staff nurses, supervising or managing nurses, clinical nurses, ER nurses, registry nurses, agency nurses, and floater nurses); and the phrase "the San Antonio area" means the San Antonio TX Metropolitan Statistical Area as defined by the United States Office of Management and Budget as of December 2005 (OMB Bulletin No. 06-01 Corrected). Unless otherwise specified, the requests encompass documents from January 1, 1996 through the present.

REQUEST FOR PRODUCTION NO. 1:  All documents identified in your Rule 26(a) disclosures and supplemental disclosures.

RESPONSE:

REQUEST FOR PRODUCTION NO. 2:  Documents sufficient to identify or define your job classifications or codes for nurses, including documents reflecting the hierarchy of your nurse job classifications or codes and the educational, seniority, training or other prerequisites that are required for each job classification or code.

RESPONSE:

REQUEST FOR PRODUCTION NO. 3:  All documents that constitute, refer or relate in any way to the schedules of compensation, including monetary compensation (*e.g.*, wages,

Exhibit 23

overtime, and bonuses), benefits, and other forms of monetary or non-monetary remuneration, paid to your nurses.

RESPONSE:

REQUEST FOR PRODUCTION NO. 4:  All documents that refer or relate in any way to the method by which you determined the compensation, including monetary compensation (*e.g.*, wages, overtime, and bonuses), benefits, and other forms of monetary or non-monetary remuneration, that you paid to your nurses.

RESPONSE:

REQUEST FOR PRODUCTION NO. 5:  All documents that reflect your policies for vacation time, sick time, and overtime for nurses from June 20, 2002 through the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 6:  All documents that refer or relate in any way to the method by which you determined your policies for vacation time, sick time, and overtime for nurses from June 20, 2002 through the present.

Exhibit 23

RESPONSE:

REQUEST FOR PRODUCTION NO. 7:  All documents that refer or relate in any way to the monetary valuation of any form of non-monetary compensation provided to your nurses.

RESPONSE:

REQUEST FOR PRODUCTION NO. 8:  All documents referring or relating to any proposals for modification of any aspect of the compensation structure for any of your nurse positions (whether or not those proposals were adopted).

RESPONSE:

REQUEST FOR PRODUCTION NO. 9:  All documents or databases, including documents sufficient to define and explain any code keys, abbreviations, headings or other definitions used in the documents or databases, that contain the following information for nurses from January 1, 1996 through the present:

Exhibit 23

    a.    Personnel information including but not limited to name, job title(s), hire date, termination date (if any), residence address (including zip code), telephone number, gender, race or ethnicity, marital status, level of certification, and licenses held (and dates obtained);

    b.    Job history, including but not limited to past and present job title(s), work location(s) and department(s), employment status, and full- or part-time status;

    c.    Compensation history, including past and present hourly wage, overtime earnings, shift premiums, bonuses, and other forms of monetary compensation;

    d.    Non-monetary compensation history, including benefits.

RESPONSE:

REQUEST FOR PRODUCTION NO. 10: All documents that constitute, refer to or relate in any way to any salary surveys or other information relating to nurses' compensation or conditions of employment received by you from any source, including but not limited to the Texas Society for Healthcare Human Resources Administration and Education ("TSHHRAE) and Werling Associates.

RESPONSE:

Exhibit 23

REQUEST FOR PRODUCTION NO. 11: All documents that constitute, refer or relate in any way to any summary or abstract prepared by you of any information contained in any surveys of nurse compensation or conditions of employment received by you from any source.

RESPONSE:

REQUEST FOR PRODUCTION NO. 12: All documents that constitute, refer or relate in any way to any survey of nurse compensation created by you.

RESPONSE:

REQUEST FOR PRODUCTION NO. 13: All documents that refer to or reflect your membership or participation in any trade or professional association relating to nurses, human resources, or hiring, including but not limited to the San Antonio Human Resources Management Association ("SAHRMA"), the Texas Organization of Nurse Executives ("TONE"), the Texas Society for Healthcare Human Resources Administration and Education ("TSHHRAE") and the American Organization of Nurse Executives ("AONE").

RESPONSE:

Exhibit 23

REQUEST FOR PRODUCTION NO. 14: All documents that refer to or relate in any way to any meetings of any trade or professional association relating to nurses, human resources or hiring (including, but limited to, the San Antonio Human Resources Management Association ("SAHRMA"), the Texas Organization of Nurse Executives ("TONE"), the Texas Society for Healthcare Human Resources Administration and Education ("TSHHRAE") and the American Organization of Nurse Executives ("AONE")), including but not limited to meeting agendas, notes, minutes or rosters; documents exchanged or handed out during or in connection with the meetings; and documents relating to work performed in preparation for or as a result of the meetings.

RESPONSE:

REQUEST FOR PRODUCTION NO. 15: All documents that refer or relate in any way to any information of any kind received by you relating to nurse compensation or employment conditions from or through any recruiting firms involved in nurse recruiting activities in the San Antonio area, including but not limited to Bernard Hodes Group, Maxim, and Erexchange.com.

RESPONSE:

Exhibit 23

REQUEST FOR PRODUCTION NO. 16: All documents that refer or relate in any way to any information relating to nurse compensation or terms of employment distributed or received by you at any job fairs.

RESPONSE:


REQUEST FOR PRODUCTION NO. 17: All documents that identify or describe any compensation determinations or decisions made with respect to any nurses as a result of any salary surveys or other nurse compensation information received by you from any source.

RESPONSE:


REQUEST FOR PRODUCTION NO. 18: All documents that refer or relate to any recommendation with respect to any compensation adjustments for nurses; the purposes of any information exchanges in which you participated; the cost of any information exchanges in which you participated; and/or the benefits to you of any information exchanges in which you participated. For purposes of this request, "information exchanges" means giving or receiving of information relating in any way to the compensation or terms of employment of any nurses.

RESPONSE:

Exhibit 23

REQUEST FOR PRODUCTION NO. 19: All documents that constitute recruiting materials relating to nurses generated by you or on your behalf, including but not limited to advertisements for nurse positions, job or vacancy listings, materials distributed at job fairs, documents relating to referral bonuses for employees, and pages from your website relating to nurse recruiting. This request encompasses both successful and unsuccessful recruitment efforts.

RESPONSE:

REQUEST FOR PRODUCTION NO. 20: All documents that refer or relate in any way to your strategies for the recruitment of nurses, including but not limited to documents reflecting the geographic locations from which you recruit nurses and the manner in which you recruit nurses in each geographic location. This request encompasses both successful and unsuccessful recruitment efforts.

RESPONSE:

REQUEST FOR PRODUCTION NO. 21: All documents that refer or relate in any way to any communications received by you reflecting a complaint or grievance of any kind relating in any way to nurse compensation or employment conditions.

RESPONSE:

Exhibit 23

REQUEST FOR PRODUCTION NO. 22: All documents reflecting any market study or analysis that refers or relates in any way to the labor market for hospital employees in the San Antonio area, including but not limited to all market studies that refer or relate in any way to nurse compensation.

RESPONSE:

REQUEST FOR PRODUCTION NO. 23: All documents reflecting any market study or analysis that refers or relates in any way to the market for healthcare services in which each of your San Antonio area hospitals participates.

RESPONSE:

REQUEST FOR PRODUCTION NO. 24: All documents reflecting any study or analysis of nurse job mobility, including but not limited to the residence locations of nurses who work in the San Antonio area and the job locations of nurses who live in the San Antonio area; the proportion of registered nurses working as hospital nurses vs. working as non-hospital nurses in

Exhibit 23

the San Antonio area; and the proportion of registered nurses who live in the San Antonio area but are not employed as nurses.

RESPONSE:

REQUEST FOR PRODUCTION NO. 25: All documents reflecting any analysis, forecast, projection, budget or review concerning any markets for nurse labor, including but not limited to the supply of or demand for this labor, the characteristics of any such markets, the structure of any such markets, or changes in any such markets.

RESPONSE:

REQUEST FOR PRODUCTION NO. 26: All documents that reflect your nurse-to-patient ratios from June 20, 2002 through the present, including both the nurse-to-patient ratios adopted by you as staffing goals and the nurse-to-patient ratios actually achieved, as well as any guidelines or procedures relating to achieving your nurse-to-patient ratios.

RESPONSE:

Exhibit 23

REQUEST FOR PRODUCTION NO. 27: All documents on which you relied, in whole or in part, to establish the nurse-to-patient ratios adopted by you as staffing goals and effective from June 20, 2002 through the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 28: All documents necessary to determine whether you met any or all of your nurse-to-patient ratios from June 20, 2002 through the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 29: All documents in your possession, custody and control that refer to or reflect any nurse-to-patient ratios established, adopted, or recommended by any professional or trade association or governmental entity from June 20, 2002 through the present.

RESPONSE:

Exhibit 23

REQUEST FOR PRODUCTION NO. 30: All documents that reflect your staffing goals and vacancy rates for nurses from January 1, 1996 through the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 31: All documents that reflect the nature of your patient population from June 20, 2002 through the present, including documents identifying your patient care units or departments, patient volumes within those units or departments, the number of patient care days within those units or departments, the geographic region(s) from which your patient population is drawn.

RESPONSE:

REQUEST FOR PRODUCTION NO. 32: All documents that reflect your acute care patient volumes from June 20, 2002 through the present, including documents reflecting the number of inpatient days, the number of admissions, your case mix index, and any other measures of case complexity.

RESPONSE:

Exhibit 23

REQUEST FOR PRODUCTION NO. 33: All documents that reflect your non-acute care patient volumes from June 20, 2002 through the present, including documents reflecting the number of inpatient days, the number of admissions, your case mix index, and any other measures of case complexity.

RESPONSE:

REQUEST FOR PRODUCTION NO. 34: All documents that reflect your outpatient volumes from June 20, 2002 through the present, including the number of outpatient procedures and any measures of the complexity of the outpatient procedures.

RESPONSE:

REQUEST FOR PRODUCTION NO. 35: All documents that reflect your use of agency nurses from June 20, 2002 through the present, including documents reflecting the number of agency nurses employed at your hospitals (broken down based on whether the agency nurse was paid by the hospital or paid by the agency); the shifts to which the agency nurses were assigned to work; how long each agency nurse was employed; the hourly rate(s) paid; for each nurse and shift, the proportion of the hourly rate received by the agency and the proportion received by the nurse; and any guidelines or standards for the employment of agency nurses as opposed to non-agency nurses to perform particular tasks or within particular patient care units or departments

Exhibit 23

(including any limits on the number of agency nurses that may be employed within a particular facility, patient care unit, or department at any given time). For purposes of this request, the term "employed" includes nurses whose services you obtained through a third-party employment agency.

RESPONSE:

REQUEST FOR PRODUCTION NO. 36: All documents that reflect the qualifications the agency nurses must have in order to be qualified to be employed at your hospitals from June 20, 2002 through the present. For purposes of this request, the term "employed" includes nurses whose services you obtained through a third-party employment agency.

RESPONSE:

REQUEST FOR PRODUCTION NO. 37: All documents that reflect your use of part-time nurses as you define the term "part-time," from June 20, 2002 through the present, including documents reflecting the number of part-time nurses employed at your hospitals, the shifts to which the part-time nurses were assigned to work, how long each part-time nurse was employed, the hourly rate(s) and other compensation (monetary and non-monetary) paid, and any guidelines or standards for the employment of part-time nurses as opposed to non-part-time nurses to perform particular tasks or within particular patient care units or departments

Exhibit 23

(including any limits on the number of part-time nurses that may be employed within a particular facility, patient care unit, or department at any given time).

RESPONSE:

REQUEST FOR PRODUCTION NO. 38: All documents that reflect your use of registry nurses from June 20, 2002 through the present, including documents reflecting the number of registry nurses employed at your hospitals, the shifts to which the registry nurses were assigned to work, how long each registry nurse was employed, the hourly rate(s) and other compensation (monetary and non-monetary) paid, and any guidelines or standards for the employment of registry nurses as opposed to non-registry nurses to perform particular tasks or within particular patient care units or departments (including any limits on the number of registry nurses that may be employed within a particular facility, patient care unit, or department at any given time).

RESPONSE:

REQUEST FOR PRODUCTION NO. 39: All documents that reflect your use of floater nurses from June 20, 2002 through the present, including documents reflecting the number of floater nurses employed at your hospitals, the shifts to which the floater nurses were assigned to work, how long each floater nurse was employed, the hourly rate(s) and other compensation (monetary and non-monetary) paid, and any guidelines or standards for the employment of

Exhibit 23

floater nurses as opposed to non-floater nurses to perform particular tasks or within particular patient care units or departments (including any limits on the number of floater nurses that may be employed within a particular facility, patient care unit, or department at any given time).

RESPONSE:

REQUEST FOR PRODUCTION NO. 40:  All documents that reflect your policies and practices from June 20, 2002 through the present respecting whether job duties typically performed by nurses (hereafter "nursing tasks") may be performed by non-nurse employees, such as certified nursing assistants, orderlies and licensed practical (vocational) nurses, including a description of the nursing tasks that may be performed by non-nurse employees, the types of non-nurse employees who may perform the tasks, the circumstances under which the tasks may be performed by non-nurse employees, and the patient care units or departments within which non-nurse employees may perform the tasks.

RESPONSE:

REQUEST FOR PRODUCTION NO. 41:  All documents that constitute, refer or relate in any way to the schedules of compensation, including monetary compensation (e.g., wages, overtime, and bonuses), benefits, and other forms of monetary or non-monetary remuneration, that you paid to non-nurse employees (including but not limited to certified nursing assistants,

Exhibit 23

orderlies, and licensed practical (vocational) nurses) who are authorized to perform nursing tasks (as defined in request 40, above).

RESPONSE:

REQUEST FOR PRODUCTION NO. 42: All documents that refer or relate in any way to the method by which you determined the compensation, including monetary compensation (e.g., wages, overtime, and bonuses), benefits, and other forms of monetary or non-monetary remuneration, that you paid to non-nurse employees (including but not limited to certified nursing assistants, orderlies, and licensed practical (vocational) nurses) who are authorized to perform nursing tasks (as defined in request 40, above).

RESPONSE:

REQUEST FOR PRODUCTION NO. 43: All documents or databases, including documents sufficient to define and explain any code keys, abbreviations, headings or other definitions used in the documents or databases, that contain the following information from January 1, 1996 through the present for all non-nurse employees (including but not limited to certified nursing assistants, orderlies, and licensed practical (vocational) nurses) who are authorized to perform nursing tasks (as defined in request 40, above):

Exhibit 23

   a. Personnel information including but not limited to name, job title(s), hire date, termination date (if any), residence address (including zip code), telephone number, gender, race or ethnicity, marital status, level of certification, and licenses held (and dates obtained);

   b. Job history, including but not limited to past and present job title(s), work location(s) and department(s), and full- or part-time status;

   c. Compensation history, including past and present hourly wage, overtime earnings, shift premiums, bonuses, and other forms of monetary compensation;

   d. Non-monetary compensation history, including benefits.

 <u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 44</u>:  All documents that constitute job descriptions for all positions within your hospitals, including lists of duties and responsibilities for each position, the qualifications required for each position, and the types of patients, patient care units and/or departments to which each position relates.

 <u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 45</u>:  All documents that constitute, refer or relate to schedules of the compensation, including monetary compensation (e.g., wages, overtime, and

Exhibit 23

bonuses), benefits, and other forms of monetary or non-monetary remuneration, that you provided for all positions within your hospitals.

RESPONSE:

REQUEST FOR PRODUCTION NO. 46:    All documents or databases, including documents sufficient to define and explain any code keys, abbreviations, headings or other definitions used in the documents or databases, that contain the following information from January 1, 1996 through the present for all professional, managerial, and technical non-nursing employees (for purposes of this request, "professional, managerial, and technical non-nursing employees" means employees who fall into categories 1.1, 1.2, 2 and 3 as used in the U.S. Equal Employment Opportunity Commission's Employer Information Report ("EEO-1"):

a.    Personnel information including but not limited to name, job title(s), hire date, termination date (if any), residence address (including zip code), telephone number, gender, race or ethnicity, marital status, level of certification, and licenses held (and dates obtained);

b.    Job history, including but not limited to past and present job title(s), work location(s) and department(s), and full- or part-time status;

c.    Compensation history, including past and present hourly wage, overtime earnings, shift premiums, bonuses, and other forms of monetary compensation;

d.    Non-monetary compensation history, including benefits.

Exhibit 23

RESPONSE:

REQUEST FOR PRODUCTION NO. 47: Your document retention policy or policies

from January 1, 1996 through the present.

RESPONSE:

Dated: _____, 2006

KELLER ROHRBACK L.L.P.

By_____
MARK A. GRIFFIN
RAYMOND J. FARROW
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

PERRY & KELLOGG, L.L.P.

LUKE C. KELLOGG
7801 Broadway, Suite 200
San Antonio, Texas 78209
Tel.: (210) 821-3377
Fax: (210) 821-3388

Exhibit 23

MICHAEL D. HAUSFELD
DANIEL A. SMALL
JOSEPH M. SELLERS
CHARLES P. TOMPKINS
ALLYSON B. BAKER
COHEN MILSTEIN HAUSFELD
& TOLL, P.L.L.C.
1100 New York Ave., NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

DAVID P. DEAN
MARY JOYCE CARLSON
JAMES & HOFFMAN
1101 17th St., NW
Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

MICHAEL P. LEHMANN
THOMAS P. DOVE
KIMBERLY A. KRALOWEC
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

DANIEL E. GUSTAFSON
JASON S. KILENE
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel.: (612) 333-8844
Fax: (612) 339-6622

Attorneys for Plaintiffs

Exhibit 24

## FURTH  LEHMANN  &  GRANT  LLP

ATTORNEYS AT LAW

225 BUSH STREET, 15ᵀᴴ FLOOR

SAN FRANCISCO, CALIFORNIA 94104-4249

TELEPHONE (415) 433-2070

FACSIMILE (415) 982-2076

www.furth.com

December 29, 2006

SONOMA COUNTY OFFICE

10300 CHALK HILL ROAD

HEALDSBURG, CA 95448

TELEPHONE (707) 838-4379

FACSIMILE (707) 838-9685

VIA E-MAIL & FACSIMILE

Martin T. Tully, Esq.
Katten Muchin Rosenman
525 W. Monroe Street
Chicago, IL 60661-3693
Facsimile: (312) 577-8674
e-mail: martin.tully@kattenlaw.com

> Re:   *Reed, et al., v. Advocate Health Care, et al.,*
> No. 06 C 3337; *Schultz, et al., v. Evanston*
> *Northwestern Healthcare, et al., No. 06 CV 3569*

Dear Martin:

We write in response to your December 19, 2006, letter purporting to "highlight one significant deficiency" with Plaintiffs' initial e-discovery disclosures. Remarkably, you contend that "Judith Scott, other attorneys or employees at James & Hoffman, the SEIU and the Mintz Group" should have been listed as "key custodians within the control of plaintiffs or their counsel" reasonably expected to possess discoverable electronically stored information.

The short, formal answer to your letter—which merely reiterates what I have previously told you face to face—is that it proceeds from a demonstrably false predicate to unprecedented conclusions and next advances proposed discovery positions that Plaintiffs have a hard time believing you seriously intend to pursue. Nevertheless, since Defendants have embarked down this road, Plaintiffs respond as follows:

(1)  Your contention regarding Judith Scott is false, as I have previously told you, so we can set that claim aside.

(2)  Your contention that Plaintiffs or their counsel control SEIU is also totally incorrect, and patently absurd, so let's likewise set that claim aside.

(3)  As Defendants have been told on multiple occasions, the pre-filing investigation conducted by several of Plaintiffs' counsel, to wit, David Dean and Mary Joyce Carlson of the law firm James & Hoffman, including through its agent the Mintz Group, developed evidence supporting the factual contentions contained in Plaintiffs' Complaint (as is required by Fed. R. Civ. P. 11(b)(3)). Defendants might eventually be able to discover some unprivileged portions of that information, prepared in anticipation of litigation by Plaintiffs'

76094.1

12/29/2006 11:37 FAX 415 982 4        THE FURTH FIRM                    ☑003

Exhibit 24

December 29, 2006
Page 2

attorneys and their agents, but this would be so only upon a clear showing of substantial need
and substantial proof to the satisfaction of the court that Defendants are unable, without undue
hardship, to obtain the substantial equivalent of the materials by other means—a showing that
Defendants have not made and cannot, in our opinion, ever make.

        Defendants' contention that Plaintiffs have somehow waived work product and
attorney-client privilege protections for their pre-filing investigation, one required by law, by
"relying on information or documents obtained during the pre-litigation investigation in
pursuing their claims," is without even an iota of legal substance, such that Plaintiffs question
whether bad faith might lie behind its assertion. In combination with the demonstrably false
contention about Judith Scott and the irrational contention about the SEIU, it suggests that your
letter reflects not simple sloppiness about facts and poor legal conceptualizations, but rather an
attempt to misuse the discovery process in this case to harass individuals and entities with
whom one or more Defendants may have separate disputes, ones independent of this action.
Nevertheless, and as you demanded, James & Hoffman and the Mintz Group will designate
"key custodians," and those entities have already issued directives to preserve potentially
relevant information on the computer systems of those entities, pending Court resolution of the
work product and attorney client privilege issues, should you proceed along the current path.

        (4)    In turn, Plaintiffs hereby give notice that all Defendants should similarly
designate appropriate individuals as "key custodians" of the electronically stored information
on the computer systems of Defendants' law firms, and otherwise comply with the
E-Discovery Order regarding those computer systems. Plaintiffs have reason to believe those
computer systems contain discoverable information, including e-mail communications,
concerning those law firms' investigations of Plaintiffs' claims prior to filing the Answers in
this case—all of which were signed by those firms. Those Answers contain many specific
denials of Plaintiffs' factual contentions, neither disclaiming sufficient information to plead,
nor pleading on information and belief. Thus, and as required under Fed. R. Civ. P. 11(b)(4),
the law firm signatures on those Answers certify to the Court that the Defendants' law firms
undertook a reasonable factual and evidentiary inquiry before filing these Answers and that
such specific denials are warranted by the "evidence" obtained from that investigation. Under
the "reliance" theory of privilege and work product waiver asserted in your December 19
letter, that information, i.e., evidence obtained prior to filing the many specific denials in
Answers in this case, "would not be protected from disclosure by claims of privilege or work
product" in light of the law firms' certifications to the Court.

        Of course, even if Defendants were to assert that the work-product doctrine
applied to such materials, Plaintiffs, unlike Defendants, do not have independent access to the
witnesses interviewed as part of that pre-filing investigation and thus cannot obtain the
substantial equivalent of that information by other means. Therefore, at a minimum, Plaintiffs
should have access to the "fact" portion of any and all of that material now residing on each of
the Defendants' law firms' computer systems.

76094.1

Exhibit 24

December 29, 2006
Page 3

        Moreover, Plaintiffs have reason to believe that some of this same information on the computer systems of Defendants' law firms may well be discoverable pursuant to the crime fraud exception to the attorney-client privilege and the work-product doctrine. Violations of Section 1 of the Sherman Act constitute criminal offenses. Communications that would or might otherwise be protected from disclosure are not protected if they relate to communications in furtherance of a crime or fraud. Here, Defendants' law firms may have committed a fraud on the Court and furthered a criminal act(s) by their clients by specifically denying factual contentions underlying Plaintiffs' Section 1 claim that the law firms knew, or should have known after reasonable inquiry, were true. For instance, the law firm of Miller Shakman, over the signature line of Michael Shakman, specifically denied that Advocate "conducted informal surveys of other hospitals in order to determine what wages those entities were providing to RNs" (Advocate Answer ¶53), a contention at the core of the Section 1 claim against Advocate. Plaintiffs are prepared to make a *prima facie* showing to the Court that this specific denial by Miller Shakman, on behalf of Advocate, is unequivocally false. Presuming only that Miller Shakman complied with its Rule 11 obligation to make a reasonable investigation prior to filing the specific denial of this core contention in the lawsuit, then that denial, when made, was a knowing misstatement of fact and a fraud on the Court in furtherance of a crime under Section 1. In such a circumstance Miller Shakman's knowing misrepresentation to the Court in furtherance of the Defendants' Sherman Act conspiracy might in fact make it liable for the underlying harm caused by the conspiracy. None of the information on Miller Shakman's computer system related to this contention is therefore protected by the attorney-client or work-product protections.

        Of course, even if Defendants decide to claim some or all of the information on their computer systems is privileged or work product, as Plaintiffs anticipate will be the next step in this process, it remains incumbent upon Defendants and their counsel to insure that all such electronically stored information gathered in support of any and all "factual" denials as contained in the various Answers is preserved until the Court is able to resolve the issue after reviewing Plaintiffs' *prima facie* evidence.

                                        Sincerely,

                                        Thomas P. Dove
                                        Marvin Miller

76094.1

Exhibit 25

# LEVY RATNER, P.C.

**Attorneys at Law**
80 Eighth Avenue
New York, New York 10011-5126

Telephone (212) 627-8100
Telecopier (212) 627-8182

Richard A. Levy
Daniel J. Ratner
Daniel Engelstein ◊
Gwynne A. Wilcox ∗
Pamela Jeffrey
Owen M. Rumelt ∗
Kevin Finnegan
Carl J. Levine
David Slutsky ∆
Allyson L. Belovin
Jennifer J. Middleton ◊

Suzanne Hepner ♦
Ezekiel D. Carder ◊
César F. Rosado ∆
Dana E. Lossia ▾
Sara D. Newman ♦

**Senior Counsel:**
Richard Dorn
Paul Schachter □
Denise Reinhardt ∗

**Counsel:**
Anthony DiCaprio
Michael Steven Smith
David P. Horowitz †

January 19, 2007

**BY FACSIMILE**

The Honorable David R. Homer
United States Magistrate Judge
The United States District Court
Northern District of New York
James T. Foley -- U.S. Courthouse
Albany, NY 12207-2924

Re:    **Unger v. Albany Medical Center et al., 06-CV-0765 (TJM/DRH)**
       **Subpoena of 1199SEIU United Healthcare Workers East**

Dear Magistrate Judge Homer:

1199SEIU United Healthcare Workers East ("1199") submits this letter in response to the letter of Defendant Seton Health System, dated January 11, 2007, seeking the production of additional documents from 1199. Not only has 1199 produced all of the non-privileged documents in its possession, custody or control which properly relate to the issue of class certification in this case, it did so despite the outrageously overbroad and objectionable subpoena served upon it. At this stage in the litigation, any further document production from 1199 would be utterly unrelated to the issue of class certification and would serve only to aid Defendants in their mission to invade the privacy rights of 1199 and the hundreds of Albany-area nurses with whom 1199 has communicated over the past five years. In addition to being motivated by illegitimate goals, any further production demands on 1199 would constitute an enormous and undue burden upon a non-party to the lawsuit. 1199 therefore requests that the subpoena at issue be dismissed in its entirety.

As an initial matter, it is important to clarify that despite their affiliation the Service Employees International Union ("SEIU") and 1199 are entirely separate and autonomous entities. 1199 is not a "local office" of the SEIU, as Defendant seems to imagine. Rather, SEIU and 1199 are governed by their own separate constitutions and bylaws, they maintain entirely separate treasuries, occupy separate offices, and have separate documents within their possession, custody and control. This organizational autonomy is well-recognized by law.

{W:\1199\001\04\07005537.DOC}

Exhibit 25

LEVY RATNER, P.C.

The Honorable David R. Homer
January 19, 2007
Page 2



Where, for example, a local union has "a significant degree of autonomy in its management, finances, and business affairs," service of process upon the local or the international will not be deemed to constitute proper service upon the other entity. <u>Bacino v. Amer. Fed. of Musicians,</u> 407 F. Supp. 548, 554 (N.D. Ill. 1976); <u>see also Morgan Drive Away, Inc. v. Int'l Bhd. of Teamsters,</u> 268 F.2d 871 (7th Cir. 1959); <u>Sullivan v. Potter,</u> 2006 WL 785289, *2 (D.D.C. 2006). Neither are local and international unions vicariously liable for the acts of the other. <u>See Rodonich v. House Wreckers Union Local 95,</u> 817 F.2d 967 (2d Cir. 1987).

Thus, the Defendant's continued reference to 1199 and SEIU collectively as "the SEIU" is both misleading and troublesome. The conflation of the two organizations is misleading, of course, with respect to the distinct duty of each entity to produce documents within its own possession, custody or control. Moreover, the fact that SEIU played a role in the genesis of <u>Maderazo v. Vanguard Health System,</u> Civ. Action No. SA06CA0535OG (W.D. Tex.) is of no use in attempting to show that 1199 played a role in the genesis of the instant action. In point of fact, 1199 is not paying any legal fees to support this lawsuit, nor does it have any retainer agreement with James & Hoffman or any other counsel to Plaintiff.

### A. The Subpoena Is Vastly Overbroad On Its Face

On October 26, 2006, the Court issued an Order bifurcating discovery and limiting it to the question of class certification. Rather than conduct discovery on this limited issue, however, the Defendant has chosen to disregard the Court Order entirely and instead to use the discovery phase as an opportunity to gain as much information as possible about the state's largest union of healthcare workers -- information that, despite its irrelevance here, will surely prove useful to each of the Hospital Defendants, and their counsel, in labor disputes that may arise down the road.

Setting aside Request 1, which plainly makes no effort to elicit information tailored to the class certification issue, the following Requests exemplify the shocking breadth of the Defendant's production demands.

♦ Request 12: "All Documents concerning or referring to Communications between or among the SEIU and any member of the putative class in the Lawsuit relating to the persons, entities, matters or subjects identified in Request 1 above."

The notion that 1199 should provide an employer in the healthcare industry with a porthole through which to peer into virtually every communication over the past five years that 1199 has had with any nurse in Albany or beyond -- at least any conversation involving work, or wages -- is patently violative of the rights of non-parties in discovery, of the First Amendment associational rights of nurses, and of the Section 7 rights of workers under the National Labor Relations Act.



Exhibit 25

**LEVY RATNER, P.C.**

The Honorable David R. Homer
January 19, 2007
Page 3

♦ Request 15: "All Documents concerning or referring to Communications between or among [1199] and any RN Employer in the Albany MSA relating to the persons, entities, matters or subjects identified in Request 1 above," and Reqest 16: "All Documents concerning or referring to Communications between or among [1199] and <u>any person or entity</u>, other than those referred to in Requests 2 though 14 above, that relate to any Hospital Defendant or the Named Plaintiff" (emphasis added).

There can be no legitimate reason, related to class certification or otherwise, for the Defendant to have access to every communication 1199 has had with any employer of nurses in the Albany-area, let alone access to every communication 1199 has had with <u>anyone</u> about any of the Defendants in this matter. These requests, among others, are a blatant attempt to invade the privacy rights of 1199 and New York's registered nurses.

The Defendant also seeks, *inter alia*:

♦ Documents concerning 1199's research into nurse wages (Request 19);

♦ Documents analyzing the Albany-area healthcare market (Request 23);

♦ Documents relating to Albany-area nurses who live or work in the Albany MSA and also work outside the Albany MSA (Request 24);

♦ Documents referring to nurses who live outside the Albany MSA, but who would or could work within the Albany MSA (Request 25); and

♦ Documents referring to 1199's employment of nurses (Request 27).

Each of these requests is, again, unreasonably and irrationally overbroad, given that one of 1199's primary missions on behalf of its members is to research and understand wage and employment trends and patterns across the state, and that 1199 employs registered nurses as organizers and officers across New York and beyond, many if not most of whom have never stepped foot in an Albany-area hospital. 1199's analysis of the market for healthcare and its employment of nurse organizers bears no relation to the limited issue of the Plaintiff's adequacy as a potential class representative.

Clearly, the subpoena goes well beyond any legitimate attempt to discover 1199's communications with the named Plaintiff regarding a potential lawsuit. Given its overly broad scope and improper objectives, the subpoena should not be enforced. <u>See Semtek Int'l, Inc. v. Merkuriy Ltd, et al</u>. 1996 WL 238538, *3 (N.D.N.Y); <u>see also New York State Energy Research & Dev. Authority v. Nuclear Fuel Servs., Inc.</u>, 97 F.R.D. 709, 712 (W.D.N.Y. 1983).



Exhibit 25

LEVY RATNER, P.C.

The Honorable David R. Homer
January 19, 2007
Page 4

### B. 1199 Has Produced All Relevant, Non-Privileged Documents And the Motives Behind Any Further Production Request Are Suspect

Despite the impropriety of the subpoena on its face, 1199 has disclosed all non-privileged documents in its possession, custody or control that legitimately relate to class certification. Defendant's claim that 1199 refused to respond to any Request other than Request 11 is flatly inaccurate. 1199's December 18, 2006 letter to Defendant's counsel specifically states an agreement to produce non-privileged documents within 1199's possession, custody or control which respond to Request 11 or to Requests 6-10 to the extent that any responsive documents are relevant to class certification. 1199 has willingly produced all such documents, which consisted of (1) an email from Amy Gladstein, counsel to 1199, to Mary Joyce Carlson, counsel to SEIU, dated January 9, 2006, directing Carlson to speak with Mark Bergen, an 1199 employee, regarding guidelines for speaking to nurses; (2) a reply email dated January 13, 2006, indicating that Bergen had spoken to nurses and that SEIU would wait to see if any nurses are interested; (3) an email from Bergen to Carlson and Gladstein on January 18, 2006; (4) a reply email from Carlson to Bergen on January 19, 2006; (5) an email received by 1199 employees from an employee of SEIU on January 31, 2006 regarding advice from James & Hoffman on the referral of nurses to legal counsel, as well as the attachment to that email, which included a fax cover sheet and a memo from James & Hoffman to SEIU discussing referrals of nurses to counsel and including a sample sign-up sheet.[1]

These documents show that the Plaintiff signed up to receive information about a potential lawsuit on a sign-in sheet that 1199 provided. Defendant's dissatisfaction with 1199's production is evidence that this subpoena is no longer about 1199's communications with the Plaintiff about a potential lawsuit, as that communication has already been disclosed. Rather, the subpoena has become a tool with which to dredge the waters for as much as the Defendants can get on 1199's operations, organizing plans, and membership. In fact, Defendant is asking 1199 to turn over virtually any shred of paper related to its communications with any nurse in Albany, or any nurse who may have worked in Albany, or who may work in Albany in the future; all information regarding current organizing or plans to organize in Albany; as well as any conversations with anyone about anything having to do with nurse wages. The amount of irrelevant material 1199 would need to produce to respond to these improper requests is mountainous. The test laid out in Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 48 (S.D.N.Y. 1996) for establishing undue burden has clearly been met and exceeded, and the Defendant's motives for seeking still further production are purely pretextual. These Requests

---

[1] Because 1199 and SEIU are distinct entities, any communications between counsel for SEIU and counsel for 1199 are not protected by the attorney-client privilege. Likewise, any communication between SEIU and its attorneys that may have been privileged loses that privilege once it is shared with anyone at 1199.



Exhibit 25

LEVY RATNER, P.C.

The Honorable David R. Homer
January 19, 2007
Page 5

have nothing to do with whether the Plaintiff can adequately represent a class of registered nurses and are objectionable on several additional legal grounds.

### C. 1199's Proprietary Information Is Protected

The subpoena is designed to elicit information that is not only irrelevant to the pending proceeding, but also highly confidential and protected. Communications related to 1199's organizing, or lack thereof, of Albany-area workers (implicating Requests 12, 14-19, 21-25 & 27) are likewise both irrelevant and protected from disclosure to healthcare employers, and their counsel, who stand in an adversarial relationship to 1199 in the contexts of collective bargaining and employee representation disputes. See, e.g., In Berbiglia, Inc., 233 NLRB 1476, 1495 (1977) ("requiring the Union to open its files to Respondent would be inconsistent with and subversive of the very essence of collective bargaining...If collective bargaining is to work, the parties must be able to formulate their positions and devise their strategies without fear of exposure); Champ Corp., 291 NLRB 803, 817 (1988), enforced, 933 F.2d 688 (1990); Illinois Educational Labor Relations Board v. Homer Community Consolidated School District No. 208, 547 N.E.2d 182, 183-88 (Ill. 1989).

The use these employer and their law firms can make of such information would significantly dampen 1199's ability now or in the future to effectively represent Albany-area hospital employees. Thus, marking proprietary strategic information "for attorneys' eyes only" goes nowhere toward protecting 1199 from having its secrets exposed to a law firm that represents its adversaries in numerous ongoing and future labor disputes. Ultimately, there is no basis for exposing a non-party to this level of intrusion into its confidential internal documents.

### D. First Amendment Associational and Privacy Rights Are Being Threatened

The subpoena also threatens the First Amendment freedoms of association of Albany-area nurses. The information Defendant is seeking -- including what amounts to a list naming the names of Albany-area nurses who have spoken to the union -- is closely akin to the requests for organizational membership lists that the United State Supreme Court has repeatedly found to have a chilling effect on the freedom of association. See, e.g., NAACP v. Alabama, 357 U.S. 449, 462 (1958) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an]...effective...restraint on freedom of association.") These requests are invalid in the absence of clear and compelling relevance to the matter being investigated. See, e.g., Gibson v. Florida Legislative. Investigation Comm., 372 U.S. 539, 541 (1963); NAACP v. Alabama, 357 U.S. 449 (1958); Bates v. Little Rock, 361 U.S. 516 (1960); Shelton v. Tucker, 364 U.S. 479 (1960); NAACP v. Button, 371 U.S. 415 (1963). The Requests at issue here do not come close to passing the relevance test. The relevance to this lawsuit of 1199's communications with New York nurses far and wide -- including any nurse who potentially "would or could" one day work in Albany (Request 25) -- is practically unfathomable.



Exhibit 25

LEVY RATNER, P.C.

The Honorable David R. Homer
January 19, 2007
Page 6

### E. Nurses Rights Under the National Labor Relations Act Are Being Violated

Finally, the subpoena infringes upon protections guaranteed to workers by federal labor laws. In considering whether an employer's requests for information in the course of civil discovery violates workers' rights under Section 7 of the National Labor Relations Act ("Act"), the NLRB considers whether the requests had "an illegal objective." Guess International 339 NLRB 432 (2003). If the employer would have committed an unfair labor practice ("ULP") by receiving the information, the request, or action for enforcement, is deemed to have had an illegal objective. Id. Here, Defendant is seeking the production from 1199 of a wide range of materials implicating workers' Section 7 rights, such as which nurses have met with union representatives and what was said at those meetings. (Requests 12, 17(ii), 24-25, 27). Were the employer to direct such information requests to employees, it would unquestionably constitute an ULP in violation of §8(a)(1) of the Act. See, e.g., Eddyleon Chocolate Co., 301 NLRB 887, 888 (1991) (employer surveillance of union activity unlawful); Dependable Lists, Inc. 239 NLRB 1304, 1305 (1979) ("There exists no justification...for questions by the employer aimed at determining which of its employees is engaged in protected activity."); Hanover Concrete Co., 241 NLRB 936 (1979) (questioning employees to determine who the union supporters are is held a violation of §8(a)(1)); Campbell Soup Co., 225 NLRB 222, 226 (1976) (employer attempts to determine who attended union meetings is unlawful). The mere fact that the Defendant is seeking this information from 1199 does not make its efforts any less likely to chill the exercise of workers' rights under Section 7 of the Act, nor any less improper. Thus, in that its Requests would constitute a ULP under federal labor law, the Defendant's subpoena has an "illegal objective" and should not be enforced.

Defendant's reference to the NLRB Office of the General Counsel's May 24, 2006 Advice Memorandum is inapposite. The information requests here encompass not only "discovery of communications regarding the lawsuit" or "vis-à-vis Class Counsel," (Advice Memorandum, annexed to Defendants January 11, 2007 letter as Exhibit 17, at 3-4), but rather discovery of, *inter alia*, any communications between Albany-area nurses and 1199, on any topic touching on wages, as far back as January 1, 2002 (Request 12), as well as any other communications 1199 has had with anyone related to Albany-area hospitals (Request 16). Moreover, the issue being considered by the NLRB in the case Defendant cites related to whether or not class counsel should be removed to prevent conflicts of interest from arising, not whether the plaintiff in the case should be prevented from representing a class solely due to the fact of a relationship with a labor union. While the Board assumes in that case that the employer's requests did not have an illegal objective, that assumption is clearly improper here, where the Requests for information are so clearly calculated to elicit confidential and protected documents that bear no relation to the lawsuit, let alone the issue of class certification. Thus, even if the Court determines that this information is somehow relevant, its illegal objective must prevent its disclosure.



Exhibit 25

**LEVY RATNER, P.C.**

The Honorable David R. Homer
January 19, 2007
Page 7

## F.  The Subpoena Should Be Dismissed In Its Entirety

No evidence whatsoever has been adduced to indicate that the Plaintiff may have interests that are in conflict with those of the other nurses she seeks to represent -- let alone that she is "nothing more than a pawn of the SEIU," as Defendant baselessly suggests.  As to the adequacy of the named representative, the interests of the class members need not be identical; the only relevant conflicts are those that relate materially to a plaintiff's claims.  Owner-Operator Indep. Drivers Ass'n, Wood-Chuck Leasing v. Mayflower Transit, Inc., 204 F.R.D. 138 (D. Ind. 2001).  It is hard to see how mere participation in a local labor union such as 1199 raises an issue that would materially relate to Plaintiff's claims under federal antitrust laws.  The fact that the Plaintiff dedicated time and effort to help negotiate a contract for employees of Columbia Memorial Hospital (not a Defendant in this action) is likewise irrelevant to the sincerity of her interest in ending the wage collusion she alleges.  Moreover, if members of the putative class believe that the named Plaintiff does not adequately represent their interests, they may simply choose to opt out of the suit.  Id.

Given that the original purpose of the subpoena has been obviated, that 1199 is a non-party to the lawsuit, that the protection of proprietary strategic information is implicated, that employees' rights to privacy and free association are being interfered with, and that 1199 has in fact responded to the subpoena requests which were proper under the bifurcation order, the subpoena should not be enforced.  Specifically, 1199 respectfully requests that, as the Defendant's third-party subpoena is no longer serving a legitimate purpose in this case and far exceeded the bounds of fair discovery at the time it was issued, it be dismissed in its entirety.

Very truly yours,

Levy Ratner, P.C.

By: _____
Richard A. Levy
Dana E. Lossia

RAL



# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | |
|---|---|
| MARISSA MADERAZO,<br>ROSELIA POLLARD,<br>And BARBARA MILES<br>on behalf of herself and all others<br>similarly situated,<br><br>                  Plaintiff,<br><br>    v.<br><br>VANGUARD HEALTH SYSTEMS a/k/a<br>BAPTIST HEALTH SYSTEMS; VHS<br>ACQUISITION SUBSIDIARY NUMBER 5,<br>INC.; HCA, INC., a/k/a METHODIST<br>HEALTHCARE SYSTEM OF SAN<br>ANTONIO, LTD. L.L.P.; CHRISTUS<br>SANTA ROSA HEALTH CARE CORP.,<br><br>                  Defendants. | **Civil Action No. SA06CA0535OG** |

FILED

FEB - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## PROPOSED PROTECTIVE ORDER GOVERNING
## THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION

Whereas, the Plaintiffs and Defendants in the above-captioned action may seek

discovery or documents, information, or other materials that may contain non-public, confidential,

competitively-sensitive, or proprietary information of another party or of a third party;

Whereas, Plaintiffs and Defendants wish to ensure that confidential information

shall be used only for the purposes of this action and shall not be disclosed or used in any other

way;

Whereas, the Court having found that, in light of the nature of the non-public, confidential, competitively-sensitive, proprietary information that may be sought in discovery, good cause exists for entry of the Protective Order,

IT IS ORDERED that this Protective Order ("Order") shall be entered and limit the disclosure and use of certain discovered information in the above-captioned action (the "Litigation") as hereinafter provided:

1.    Scope

a.    This Order shall govern all documents, the information contained therein, and all other information produced or disclosed during discovery in this Litigation whether revealed in a document, deposition, other testimony, discovery response or otherwise ("Discovery Material"), by any party in this Litigation (the "Producing Party") to any other party (the "Receiving Party") when the same is designated using the procedures set forth herein. This Order is binding upon the parties to the Litigation, as well as their respective attorneys, agents, representatives, officers and employees and others as set forth in this Order.

b.    Any Producing Party shall have the right to identify and designate as "Confidential" any document or other material it produces or provides, or any testimony it gives in this proceeding, which it believes in good faith constitutes, reflects or discloses its confidential and proprietary information, including (i) financial data, marketing and advertising data or plans, strategic or long-range plans, or internal cost, wage, salary, compensation, recruiting and retention data, (ii) non-public private information relating to individuals, such as employee names, social security numbers, home addresses and/or telephone numbers, (iii) information which the Producing Party believes could be used by the Service Employees International Union ("SEIU") or any other

- 2 -

labor organization, their agents, representatives, affiliates or consultants to compromise or jeopardize the Producing Party's competitive business or labor or employee relations interests or the privacy interests of the Producing Party's employees, and (iv) other information understood to be confidential pursuant to Rule 26(c) of the Federal Rules of Civil Procedure ("Confidential Information").

       c.    Any Confidential Information which a Producing Party believes to be extremely sensitive confidential and/or proprietary information, the disclosure of which, even limited to the restrictions placed on the Confidential Information in this Order, would compromise and/or jeopardize the Producing Party's competitive business interests ("Highly Confidential Information") may be designated as "Highly Confidential" by the Producing Party.

       d.    Any Confidential Information or Highly Confidential Information which, if disclosed to counsel who currently represents, or who has represented at any time in the past five years, the Service Employees International Union ("SEIU"), their agents or representatives, consultants and attorneys would compromise or jeopardize the Producing Party's competitive business, or labor or employee relations interests or the privacy interests of the Producing Party's employees, may also be designated as "Not to be Disclosed to Union."

       e.    Any party to this Litigation and any third party may designate as Confidential or Highly Confidential documents or information produced by another party if that Discovery Material (i) either originated from the designating party or third party (or were generated on the designating or third party's behalf), and (ii) and the third party agreed to treat that Discovery Material as confidential, in which case the designating party shall be deemed a Producing Party for purposes of this Order.

- 3 -

  f. A Producing Party's designation of information as "Confidential,"
"Confidential—Not to be Disclosed to Union," "Highly Confidential," or "Highly Confidential—
Not to be Disclosed to Union" shall constitute a representation for purposes of any applicable
professional standards of conduct and guidelines applicable to the parties and their counsel in this
action that the Producing Party has reviewed the document, material or information and has a valid
and good faith basis for the designation.

  2. <u>Designation of Confidentiality</u>

  Documents or information may be designated "Confidential," "Highly Confidential," and/or
"Not to be Disclosed to Union" in the following ways:

  a. A Producing Party shall, if appropriate, designate specific documents as: (i)
"Confidential" by marking the first page and each subsequent page of the document containing any
Confidential Information with the legend "CONFIDENTIAL," or "CONFIDENTIAL—NOT TO
BE DISCLOSED TO UNION;" or as (ii) Highly Confidential" by marking the first page and each
subsequent page of the document containing any Highly Confidential Information with the legend
"HIGHLY CONFIDENTIAL," or "HIGHLY CONFIDENTIAL—NOT TO BE DISCLOSED TO
UNION." All documents produced or disclosed during discovery in this Litigation shall be
identified by Bates number and, to the extent practical, the appropriate designation shall be placed
near the Bates number.

  b. A Producing Party shall designate interrogatory answers and responses to
requests for admissions as "Confidential Information," "Highly Confidential Information," and/or
"Not to be Disclosed to Union," by stating or specifying that the answers or responses or specific
parts of them are "Confidential," "Highly Confidential," and/or "Not to Be Disclosed to Union"

Exhibit 26

and by placing the following legend on each page of interrogatory answers or responses to requests

for admission containing Confidential Information or Highly Confidential Information:

"CONTAINS CONFIDENTIAL INFORMATION," "CONTAINS CONFIDENTIAL

INFORMATION—NOT TO BE DISCLOSED TO UNION," "CONTAINS HIGHLY

CONFIDENTIAL INFORMATION," OR "CONTAINS HIGHLY CONFIDENTIAL

INFORMATION—NOT TO BE DISCLOSED TO UNION."

      c.     In the case of depositions and the information contained in depositions

(including exhibits), counsel for a Producing Party or witness shall designate portions of the

transcript (including exhibits) which contain Confidential Information, Highly Confidential

Information, or Confidential or Highly Confidential Information—Not to be Disclosed to Union as

"Confidential," "Highly Confidential," or "Not to be Disclosed to Union" by making a statement to

such effect on the record in the course of the deposition or by letter within 21 calendar days of

receipt of the official deposition transcript or copy thereof (or written notification that the transcript

is available). The entire deposition transcript (including exhibits) shall be treated as "Highly

Confidential—Not to be Disclosed to Union" under this Order until the expiration of the 21-day

period for designation. The following legend shall be placed on the front of the original deposition

transcript and each copy of the transcript containing Confidential Information, Highly Confidential

Information, or Confidential or Highly Confidential Information—Not to be Disclosed to Union:

"CONTAINS CONFIDENTIAL INFORMATION," "CONTAINS HIGHLY CONFIDENTIAL

INFORMATION," or "CONTAINS CONFIDENTIAL INFORMATION—NOT TO BE

DISCLOSED TO UNION," or "HIGHLY CONFIDENTIAL INFORMATION—NOT TO BE

DISCLOSED TO UNION." If all or part of a videotaped deposition is designated as

"CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "NOT TO BE DISCLOSED TO UNION,"
the video container shall be labeled with the legend provided for in paragraph 2(a) above. When a
deposition transcript contains Confidential or Highly Confidential Information, the Producing
Party shall request the stenographic reporter to separate those portions of the transcript containing
Confidential Information or Highly Confidential Information and bind them separately from the
non-confidential portions.

        d.     To the extent that information is produced in a form rendering it impractical
to label (including electronically stored information produced on electronic or magnetic media)
("Computerized Material"), the Producing Party may designate such material as
"CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "NOT TO BE DISCLOSED TO UNION,"
by cover letter referring generally to such matter or by affixing to such media a label containing the
appropriate legend. Whenever a Receiving Party reduces electronically stored information
designated as "Confidential," "Highly Confidential," or "Not to be Disclosed to Union" to hard-
copy form, the Receiving Party shall mark such hard-copy form with the legend provided for in
paragraph 2(a) above. Whenever any Confidential or Highly Confidential Computerized Material
is copied into another form, the Receiving Party shall also mark those forms with the legend
provided for in paragraph 2(a) above.

        e.     To the extent that any Receiving Party or counsel for the Receiving Party
creates, develops, or otherwise establishes or maintains for review on any electronic system
information designated "Confidential," "Highly Confidential," or "Not to be Disclosed to Union,"
that party and/or its counsel must take all necessary steps to insure that access to such media is
properly restricted to those persons who, by the terms of this Order, may have access to

Confidential Information and/or Highly Confidential Information, and will affix to any media

containing such information a label with the legend as provided for in paragraph 2(a) above.

    3.    <u>Filing of Confidential Information</u>

    All documents and materials containing Confidential or Highly Confidential Information

that are filed with the Court shall be filed under seal pursuant to the following procedures:

        a.    Where possible, only confidential portions of filings with the Court shall be

filed under seal.  Confidential Information or Highly Confidential Information filed under seal

shall be placed in sealed envelopes on which it shall be endorsed with the title to this Litigation,

the words "FILED UNDER SEAL," and a statement substantially in the following form:

> "This envelope is sealed pursuant to order of the Court and contains
> [Confidential Information] or [Highly Confidential Information] or
> [Confidential Information—Not to be Disclosed to Union] or [Highly
> Confidential Information—Not to be Disclosed to Union] filed in this
> case by [name of Party] and is not to be opened or the contents
> thereof to be displayed or revealed to any non-Court personnel except
> by order of the Court."

The envelope shall not be opened without further order of the Court except by persons authorized

to have access to such materials pursuant to paragraphs 5, 6, and 7, as applicable, who shall return

the information to the Clerk in a sealed envelope.  Any envelope containing Confidential or Highly

Confidential Information filed under seal that is an exhibit to a pleading shall also bear the name of

the pleading.  A full and unredacted copy of any such submission shall be provided directly to

chambers, marked "Chambers Copy" and "Contains [Confidential Information] or [Highly

Confidential Information] or [Confidential Information—Not to be Disclosed to Union] or [Highly

Confidential Information—Not to be Disclosed to Union] Subject to Protective Order."

        b.    Within three (3) business days of filing Confidential Information or Highly

Confidential Information, pursuant to paragraph 3(a), the submitting party shall electronically file

Exhibit 26

with the Court, for its public file, a copy of the submitted materials with the Confidential

Information or Highly Confidential Information redacted.  Any Confidential or Highly

Confidential Information produced by third parties pursuant to this Order also shall be redacted

from this public electronic filing.

        c.     If any party objects to identified portions of the materials remaining under

seal, it shall state its objections in a faxed or electronically delivered letter to counsel for all parties

in this Litigation.  The interested parties shall promptly meet and confer to attempt to resolve those

objections and, if they cannot be resolved, shall promptly tender those objections to the Court for

resolution.  A revised public electronic filing, if any, of that submission shall be made by the

submitting party within six business days after the Court's decision resolving that dispute.

      4.     <u>Use of Confidential or Highly Confidential Information</u>

        a.     Confidential or Highly Confidential Information shall not be used by any

person, other than the Producing Party, for any purpose other than conducting this Litigation, and

in no event shall Confidential or Highly Confidential Information be used for any business,

competitive, personal, private, public, organizational or other labor or employee relations purpose.

        b.     Notwithstanding the foregoing, nothing in this Order shall be deemed to

limit or restrict any Producing Party from using its own documents or its own Confidential

Information or Highly Confidential Information for any purpose.  The Producing Party may

withdraw or modify any designation.

      5.     <u>Disclosure of Confidential Information</u>

      Access to information designated as "CONFIDENTIAL" pursuant to this Order shall be

limited to:

- 8 -

      a.     The Court or any other court exercising jurisdiction with respect to this Litigation, Court personnel, jurors, and qualified persons (including necessary clerical personnel), recording, taking or transcribing testimony and argument at any deposition, hearing, trial or appeal in this Litigation;

      b.     Special masters and mediators or other individuals engaged or consulted in settlement of the Litigation;

      c.     Outside counsel of record for the parties in this Litigation (including members or associates of such counsel's firm) or in-house counsel for the parties, as well as their paralegal, investigative, secretarial, and clerical personnel who are engaged in assisting such counsel in this Litigation;

      d.     Outside photocopying, data processing, or graphic production services employed by the parties or their counsel of record to assist in this Litigation;

      e.     Any individual expert or expert consulting firm retained by counsel of record in connection with this Litigation to the extent necessary for that individual expert or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of this Litigation, provided, however, that (i) such disclosure shall be made only to an individual expert, or to such members, partners, employees or agents of an expert consulting firm as such expert consulting firm shall designate as the persons who will undertake the engagement on behalf of the expert consulting firm (the "Designated Expert Personnel"); (ii) the individual expert or Designated Expert Personnel use the information solely in connection with this Litigation; (iii) the individual and/or a representative of each expert consulting firm sign the written assurance attached on Exhibit A on behalf of any Designated Expert Personnel associated

- 9 -

Exhibit 26

with that firm; (iv) excluding any retention for this Litigation, the individual expert and each of the

Designated Expert Personnel is neither (a) a current or former (within the past year from the date

of this Order) employee of any party or any entity which directly or through a parent, subsidiary,

principal, agent, or affiliate competes with any of the Defendants, nor (b) an employee of, affiliated

with, or counsel (in-house or outside) to the SEIU or any other labor organization; and (v) the

individual expert and each of the Designated Expert Personnel will not become an employee of,

consultant to, affiliated with, or counsel (in-house or outside) to the SEIU before the later of (a)

two (2) years from the date that expert or Designated Expert Personnel last receives Confidential or

Highly Confidential Information or (b) during the pendency of this Litigation;

       f.     Any person who (i) authored or is listed as a recipient of the particular

material sought to be disclosed to that person, (ii) is currently employed by the Producing Party,

but only as to Confidential Information to which the employee is lawfully entitled to have access in

connection with his or her employment; (iii) was formerly employed by the Producing Party, but

only as to specific material to which the person had access during his/her employment or (iv) is

referred to in the material, but only as to the specific material in which such person is referenced,

discussed, or mentioned; and

       g.     Any other person to whom the Producing Party agrees in writing or on the

record in advance of the disclosure or the Court directs should have access.

      6.    <u>Disclosure of Highly Confidential Information</u>

      Access to information designated as "HIGHLY CONFIDENTIAL" pursuant to this Order

shall be limited to:

Exhibit 26

a.      The Court or any other court exercising jurisdiction with respect to this Litigation, Court personnel, jurors, and qualified persons (including necessary clerical personnel), recording, taking or transcribing testimony and argument at any deposition, hearing, trial or appeal in this Litigation;

b.      Special masters and mediators or other individuals engaged or consulted in settlement of the Litigation;

c.      Outside counsel of record for the parties in this Litigation (including members or associates of such counsel's firm), as well as their paralegal, investigative, secretarial, and clerical personnel who are engaged in assisting such counsel in this Litigation;

d.      Outside photocopying, data processing, or graphic production services employed by the parties or their counsel of record to assist in this Litigation;

e.      Any individual expert or expert consulting firm retained by counsel of record in connection with this Litigation to the extent necessary for that individual expert or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of this Litigation, provided, however, that (i) such disclosure shall be made only to an individual expert or the Designated Expert Personnel; (ii) the individual expert or Designated Expert Personnel use the information solely in connection with this Litigation; (iii) the individual and each of the Designated Expert Personnel sign the written assurance attached as Exhibit A; (iv) excluding any retention for this Litigation, the individual expert and each of the Designated Expert Personnel is neither (a) a current or former (within the past year from the date of this Order) employee of any party or any entity which directly or through a parent, subsidiary, principal, agent, or affiliate competes with any of the Defendants, nor (b) an employee of, affiliated

with, or counsel (in-house or outside) to the SEIU or any other labor organization; and (v) the individual expert and each of the Designated Expert Personnel will not become an employee of, consultant to, affiliated with, or counsel (in-house or outside) to the SEIU before the later of (a) two (2) years from the date that expert or Designated Expert Personnel last receives Confidential or Highly Confidential Information or (b) during the pendency of this Litigation;

        f.     During deposition, any person who (i) authored or is listed as a recipient of the particular material sought to be disclosed to that person (provided that the document has not been altered since that person authored or received the material), (ii) was formerly employed by the Producing Party, but only as to specific material to which the person had access during his/her employment or (iii) is referred to in the material, but only as to the specific material in which such person is referenced, discussed, or mentioned; and

        g.     Any other person to whom the Producing Party agrees in writing or on the record in advance of the disclosure or the Court directs should have access.

    7.    <u>Disclosure of Confidential or Highly Confidential Information—Not to be Disclosed to Union</u>

        a.     Access to information that is designated as "CONFIDENTIAL—NOT TO BE DISCLOSED TO UNION" shall be limited to those persons identified in Paragraph 5 of this Order except for counsel that currently represents, or has represented at any time in the past five years, the SEIU or any other labor organization in a matter in which the labor organization was adverse to a hospital or healthcare system, including Mary Joyce Carlson, David Dean, and the members, associates, of counsel, and employees of James & Hoffman, P.C.

        b.     Access to information that is designated as "HIGHLY CONFIDENTIAL—NOT TO BE DISCLOSED TO UNION" shall be limited to those persons identified in Paragraph 6

of this Order except for counsel that currently represents, or has represented at any time in the past

five years, the SEIU or any other labor organization in a matter in which the labor organization was

adverse to a hospital or healthcare system, including Mary Joyce Carlson, David Dean, and the

members, associates, of counsel, and employees of James & Hoffman, P.C.

      8.    Notification of Protective Order

          a.    Confidential Information or Highly Confidential Information shall not be

disclosed, described or otherwise made available to an individual expert or expert consulting firm

described in Paragraphs 5(e) or 6(e), unless that expert or firm has executed an Agreement of

Confidentiality in substantially the form attached hereto as Exhibit A. The originals of such

Agreement shall be maintained by counsel for the party who obtained them until the final

resolution of this Litigation and shall be produced to the other party at the time the party produces

its expert reports and responds to expert discovery. This prohibition includes disclosure of the

actual confidential material or the information contained in the material, including, but not limited

to, any disclosure by counsel or experts.

          b.    Confidential Information or Highly Confidential Information shall not be

disclosed to persons who are non-parties pursuant to 5(b); 5(e); 5(f)(i), (ii), (iii) and (iv); and 5(g);

6(b); 6(f)(i), (ii), (iii), and (iv); and 6(g) unless (1) such persons are first provided with a copy of

this Order and (2) disclosing counsel first advises them that they are bound by the provisions of

this Order.

      9.    Use of Confidential or Highly Confidential Information in Court

          a.    If any Receiving Party plans to utilize any Confidential or Highly

Confidential Information at a court hearing, that Receiving Party will use reasonable efforts to

inform the Producing Party of its intent to use such information at least twenty-four (24) hours in

Exhibit 26

advance of the hearing. If no such advance notice is given, the Receiving Party will provide the

Producing Party with an opportunity to approach the Court in confidence, whether in chambers or

sidebar or such other method as the Court shall direct, regarding the use of the Confidential or

Highly Confidential Information before reference is made to any such Confidential or Highly

Confidential Information on the record.

      b.    In the event that any information designated as "Confidential," "Highly

Confidential," or "Not to be Disclosed to Union" is used in any Court proceeding in this Litigation

or any appeal, it shall not lose its status as Confidential, Highly Confidential, or Not to be

Disclosed to Union through that use.

      c.    The rules governing the use of Confidential and Highly Confidential

Information at trial shall be determined at a future date.

    10.    <u>Objections to Designations</u>

      A party shall not be obliged to challenge the propriety of a Confidential Information

designation at the time made, and a failure to do so shall not preclude a subsequent challenge

thereto. In the event a party objects to the designation of any material under this Order, the

objecting party shall state its objections in a letter to counsel for the designating party in this

Litigation, whereupon, the interested parties shall meet and confer in an attempt to resolve any

objection. If the objection is not resolved within fourteen (14) days of transmission of that letter,

the party objecting to the confidential designation may ask the Court for an Order removing the

designation with respect to the challenged discovery materials. If such a request is made, the

Producing Party has the burden of establishing that the designation is proper. If no such request is

made, the material will retain its designation. If the Producing Party agrees to change the

designation, the Producing Party shall send a written notice of the change in designation to all other parties. Any documents or other materials that have been designated "Confidential," "Confidential-Not to be Disclosed to Union," "Highly Confidential," or "Highly Confidential-Not to be Disclosed to Union" shall be treated in the manner designated until such time as the Court rules that they should not be treated as Confidential or Highly Confidential, or the Producing Party agrees to change the designation.

11.    Preservation of Rights and Privileges

Nothing contained in this Order shall affect the right, if any, of any party or witness to make any type of objection, claim, or other response to discovery requests, including, without limitation, interrogatories, requests for admissions, requests for production of documents or questions at a deposition. Nor shall this Order be construed as a waiver by any party of any right to withhold any Confidential Information or Highly Confidential Information as attorney work product or based on a legally cognizable privilege, or of any right which any party may have to assert such privilege at any stage of this Litigation.

12.    Return or Destruction of Materials

Within sixty (60) business days after the final resolution of this Litigation, a Receiving Party shall return all Confidential or Highly Confidential Information to counsel for the Producing Party or, in lieu thereof, the Receiving Party shall certify in writing that it has been destroyed. Counsel shall be entitled to retain pleadings and the exhibits thereto, affidavits, motions, briefs, or other papers filed with the Court, even if they contain Confidential or Highly Confidential Information, so long as they are clearly marked to reflect that they contain information subject to this Order.

Exhibit 26

13.    Correction of Designation and Clawback

    a.    A Producing Party that fails to designate Discovery Material as "Confidential," "Confidential—Not to be Disclosed to Union," "Highly Confidential," or "Highly Confidential—Not to be Disclosed to Union," at the time of its production shall be entitled to make a correction to its designation. Such correction and notice thereof shall be made in writing, accompanied by substitute copies of each item of Discovery Material, appropriately designated. Upon receipt of a notice of correction, the Receiving Party shall place the appropriate marking on the document to reflect its altered confidentiality status and certify that the original and all copies of the document have been appropriately marked. The obligation to treat such material pursuant to the corrected designation shall be prospective only, and those individuals who reviewed the mis-designated discovery material prior to notice of the mis-designation by the Producing Party shall abide by the provisions of this Order with respect to all future use and disclosure of any information contained in the mis-designated materials.

    b.    A Producing Party that inadvertently produces any document or other information during discovery in this Litigation that the Producing Party has a good faith reason to believe is privileged under the attorney-client or other privilege, or protected from discovery as work product, may, upon discovery of such inadvertent production, request the return of such document or information. Upon receipt of a written request for return by the inadvertently Producing Party, the Receiving Party (a) shall return the original and all copies of the documents within thirty (30) days of the request, and shall not use the information for any purpose except upon further order of the Court, or (b) object to the request as described below. In the event the Receiving Party objects to the return of the document, the Receiving Party shall move the Court for

- 16 -

Exhibit 26

an order as to whether the production was inadvertent or whether the document or information is otherwise privileged or protected from discovery. All materials related to the inadvertently produced document or information, and motion, shall be treated as "Highly Confidential—Not to be Disclosed to Union" pursuant to this Order, unless otherwise ordered by the Court. If such a motion is made within thirty (30) days of receiving the notice from the Producing Party of its claim of inadvertent production, the Receiving Party may retain the produced document or information until the Court resolves the motion. However, the Receiving Party shall not use the document or information for any purpose other than the motion except upon further order of the Court. If no such motion is made within thirty (30) days, the document or information and all copies shall be returned to the Producing Party and the Receiving Party will not be entitled to retain the document or information in any way. Failure to move within thirty (30) days and/or return the produced document or information shall not be deemed a waiver of such objection nor preclude subsequent motion by the Receiving Party. If the Receiving Party disclosed the document or information before being notified, it must notify the Producing Party as to the manner in which the material was disclosed and to whom, and certify in writing that it has requested the return of the document or information.

      c.      If Confidential or Highly Confidential Information is disclosed by a Receiving Party to anyone other than in a manner authorized by this Order, the Receiving Party responsible for that disclosure must immediately bring all pertinent facts related to that disclosure to the attention of the Producing Party of the Confidential or Highly Confidential Information and make every reasonable effort to retrieve that Confidential or Highly Confidential Information and to prevent further disclosure.

Exhibit 26

14.   <u>Limitation on Scope of this Order</u>

The restrictions in this Order shall not apply to documents or information that are

publicly available or that are obtained independently by the Receiving Party from a person lawfully

in possession of those documents.

15.   <u>No Admission</u>

A party's compliance with the terms of this Order shall not operate as an admission

that any particular document is or is not (a) confidential, (b) privileged, or (c) admissible in

evidence at trial.

16.   <u>Duty to Notify of Receipt of Subpoena</u>

If any Receiving Party receives a subpoena for documents subject to this Order, the

person subpoenaed must inform the subpoena's issuer of this Order, provide the subpoena's issuer

with the copy of the Order, and give the Producing Party notice of the subpoena within three (3)

business days after its receipt and before it produces any documents in response to the subpoena, so

that the Producing Party has an opportunity to object prior to the production of any responsive

material.

17.   <u>Application of this Order to Non-Parties</u>

This Order shall apply to non-parties who provide discovery, by deposition,

production of documents or otherwise, in this Litigation, if said non-party requests the protection of

this Order as to its Confidential or Highly Confidential Information and complies with the

provisions of this Order.

18.   <u>Continuing Force of this Order</u>

Upon final resolution of this Litigation, the provisions of this Order shall continue to be binding.  This Court expressly retains jurisdiction over this Litigation for enforcement of the provisions of this Order following the final resolution of this Litigation.

19.    Confidential Designations Prior to the Entry of this Order

Until this Order is entered by the Court, any Discovery Material designated as Confidential or Highly Confidential Information that is produced in this litigation shall be protected from disclosure pursuant to the terms of this Order as if ordered by the Court.  If any actions subject to this Order are transferred to another Court, the terms of this Order shall remain in full force and effect unless modified by written agreement of all parties or order of the Court.

20.    Modification of Order

This Order is binding on all parties to this Litigation and on all non-parties who have been served with a copy of this Order, and shall remain in force and effect until modified, superseded, or terminated by consent of the parties or by order of the Court.  This Order shall not prevent a party from applying to the Court for relief therefrom, or from applying to the Court for further or additional protective orders, or from agreeing to modifications of this Order, subject to the approval of the Court.

Nothing in this Order shall prevent a Producing Party from seeking further, greater or lesser protection with respect to the use of any Confidential or Highly Confidential Information, or seeking to prevent Confidential or Highly Confidential Information from being provided to persons described in paragraphs 5, 6, and 7 of this Order.

21.    Applicability to Future Actions

- 19 -

Exhibit 26

The terms of this Order shall be binding upon all current and future parties to this

Litigation and their counsel.  Within ten (10) days of (i) entry of appearance by a new party to the

Litigation, or (ii) notification of the filing in this District of a complaint that arises out of the same

facts alleged in plaintiff's Complaint, plaintiffs' lead counsel shall serve a copy of this Order on

such new party's counsel.

Dated: _____, 2006

IT IS SO ORDERED:


_____

United States District Judge

## **EXHIBIT A**

I hereby certify (i) my understanding that Discovery Material containing Confidential

Information or Highly Confidential Information is being provided to me pursuant to the terms and

restrictions of the Stipulation and Protective Order Governing the Production and Exchange of

Confidential Information ("Order") entered in *Maderazao, et al. v. Vanguard Health Systems, et*

*al.,* United States District Court, Western District of Texas, Civil Action No. SA06CA0535OG,

and (ii) that I have received and read the Order. I understand the terms of the Order, I agree to be

fully bound by the Order, and I hereby submit to the jurisdiction of the Court for purposes of

enforcement of the Order. I understand that violation of the Order may be punishable by contempt

of Court.

Dated: _____    Signature:    _____

Name:    _____

Address:    _____

Exhibit 26

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

|  |  |
|---|---|
| MARISSA MADERAZO, <br> ROSELIA POLLARD, <br> And BARBARA MILES <br> on behalf of herself and all others <br> similarly situated, <br><br>            Plaintiff, <br><br>     v. <br><br> VANGUARD HEALTH SYSTEMS a/k/a <br> BAPTIST HEALTH SYSTEMS; VHS <br> ACQUISITION SUBSIDIARY NUMBER 5, <br> INC.; HCA, INC., a/k/a METHODIST <br> HEALTHCARE SYSTEM OF SAN <br> ANTONIO, LTD. L.L.P.; CHRISTUS <br> SANTA ROSA HEALTH CARE CORP., <br><br>            Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> **Civil Action No. SA06CA0535OG** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## STIPULATION AND PROTECTIVE ORDER GOVERNING
## THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION

Whereas, the Plaintiffs and Defendants in the above-captioned action may seek

discovery or documents, information, or other materials that may contain non-public, confidential,

competitively-sensitive, or proprietary information of another party or of a third party;

Whereas, Plaintiffs and Defendants wish to ensure that confidential information

shall be used only for the purposes of this action and shall not be disclosed or used in any other

way;

Whereas, the parties have stipulated and agreed to the terms, and jointly moved this Court for entry of the following Protective Order, and the Court having found that, in light of the nature of the non-public, confidential, competitively-sensitive, proprietary information that may be sought in discovery, good cause exists for entry of the Protective Order,

IT IS ORDERED that this Protective Order ("Order") shall be entered and limit the disclosure and use of certain discovered information in the above-captioned action (the "Litigation") as hereinafter provided:

1.    Scope

a.    This Order shall govern all documents, the information contained therein, and all other information produced or disclosed during discovery in this Litigation whether revealed in a document, deposition, other testimony, discovery response or otherwise ("Discovery Material"), by any party in this Litigation (the "Producing Party") to any other party (the "Receiving Party") when the same is designated using the procedures set forth herein. This Order is binding upon the parties to the Litigation, as well as their respective attorneys, agents, representatives, officers and employees and others as set forth in this Order.

b.    Any Producing Party shall have the right to identify and designate as "Confidential" any document or other material it produces or provides, or any testimony it gives in this proceeding, which it believes in good faith constitutes, reflects or discloses its confidential and proprietary information, including (i) financial data, marketing and advertising data or plans, strategic or long-range plans, or internal cost, wage, salary, compensation, recruiting and retention data, (ii) non-public private information relating to individuals, such as employee names, social security numbers, home addresses and/or telephone numbers, (iii) information which the Producing

Exhibit 26

Party believes could be used by the Service Employees International Union ("SEIU") or any other

labor organization, their agents, representatives, affiliates or consultants to compromise or

jeopardize the Producing Party's competitive business or labor or employee relations interests or

the privacy interests of the Producing Party's employees, and (iv) other information understood to

be confidential pursuant to Rule 26(c) of the Federal Rules of Civil Procedure ("Confidential

Information").

        c.     Any Confidential Information which a Producing Party believes to be

extremely sensitive confidential and/or proprietary information, the disclosure of which, even

limited to the restrictions placed on the Confidential Information in this Order, would compromise

and/or jeopardize the Producing Party's competitive business interests ("Highly Confidential

Information") may be designated as "Highly Confidential" by the Producing Party.

        d.     Any Confidential Information or Highly Confidential Information which, if

disclosed to counsel who currently represents, or who has represented at any time in the past five

years, the Service Employees International Union ("SEIU"), their agents or representatives,

consultants and attorneys would compromise or jeopardize the Producing Party's competitive

business, or labor or employee relations interests or the privacy interests of the Producing Party's

employees, may also be designated as "Not to be Disclosed to Union."

        e.     Any party to this Litigation and any third party may designate as

Confidential or Highly Confidential documents or information produced by another party if that

Discovery Material (i) either originated from the designating party or third party (or were

generated on the designating or third party's behalf), and (ii) and the third party agreed to treat that

Discovery Material as confidential, in which case the designating party shall be deemed a

Producing Party for purposes of this Order.

f.    A Producing Party's designation of information as "Confidential,"

"Confidential—Not to be Disclosed to Union," "Highly Confidential," or "Highly Confidential—

Not to be Disclosed to Union" shall constitute a representation for purposes of any applicable

professional standards of conduct and guidelines applicable to the parties and their counsel in this

action that the Producing Party has reviewed the document, material or information and has a valid

and good faith basis for the designation.

2.    <u>Designation of Confidentiality</u>

Documents or information may be designated "Confidential," "Highly Confidential," and/or

"Not to be Disclosed to Union" in the following ways:

a.    A Producing Party shall, if appropriate, designate specific documents as: (i)

"Confidential" by marking the first page and each subsequent page of the document containing any

Confidential Information with the legend "CONFIDENTIAL," or "CONFIDENTIAL—NOT TO

BE DISCLOSED TO UNION;" or as (ii) Highly Confidential" by marking the first page and each

subsequent page of the document containing any Highly Confidential Information with the legend

"HIGHLY CONFIDENTIAL," or "HIGHLY CONFIDENTIAL—NOT TO BE DISCLOSED TO

UNION." All documents produced or disclosed during discovery in this Litigation shall be

identified by Bates number and, to the extent practical, the appropriate designation shall be placed

near the Bates number.

b.    A Producing Party shall designate interrogatory answers and responses to

requests for admissions as "Confidential Information," "Highly Confidential Information," and/or

"Not to be Disclosed to Union," by stating or specifying that the answers or responses or specific

parts of them are "Confidential," "Highly Confidential," and/or "Not to Be Disclosed to Union"

and by placing the following legend on each page of interrogatory answers or responses to requests

for admission containing Confidential Information or Highly Confidential Information:

"CONTAINS CONFIDENTIAL INFORMATION," "CONTAINS CONFIDENTIAL

INFORMATION—NOT TO BE DISCLOSED TO UNION," "CONTAINS HIGHLY

CONFIDENTIAL INFORMATION," OR "CONTAINS HIGHLY CONFIDENTIAL

INFORMATION—NOT TO BE DISCLOSED TO UNION."

      c.     In the case of depositions and the information contained in depositions

(including exhibits), counsel for a Producing Party or witness shall designate portions of the

transcript (including exhibits) which contain Confidential Information, Highly Confidential

Information, or Confidential or Highly Confidential Information—Not to be Disclosed to Union as

"Confidential," "Highly Confidential," or "Not to be Disclosed to Union" by making a statement to

such effect on the record in the course of the deposition or by letter within 21 calendar days of

receipt of the official deposition transcript or copy thereof (or written notification that the transcript

is available).  The entire deposition transcript (including exhibits) shall be treated as "Highly

Confidential—Not to be Disclosed to Union" under this Order until the expiration of the 21-day

period for designation.  The following legend shall be placed on the front of the original deposition

transcript and each copy of the transcript containing Confidential Information, Highly Confidential

Information, or Confidential or Highly Confidential Information—Not to be Disclosed to Union:

"CONTAINS CONFIDENTIAL INFORMATION," "CONTAINS HIGHLY CONFIDENTIAL

INFORMATION," or "CONTAINS CONFIDENTIAL INFORMATION—NOT TO BE

DISCLOSED TO UNION," or "HIGHLY CONFIDENTIAL INFORMATION—NOT TO BE

DISCLOSED TO UNION."  If all or part of a videotaped deposition is designated as

"CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "NOT TO BE DISCLOSED TO UNION,"

the video container shall be labeled with the legend provided for in paragraph 2(a) above.  When a

deposition transcript contains Confidential or Highly Confidential Information, the Producing Party shall request the stenographic reporter to separate those portions of the transcript containing Confidential Information or Highly Confidential Information and bind them separately from the non-confidential portions.

        d.    To the extent that information is produced in a form rendering it impractical to label (including electronically stored information produced on electronic or magnetic media) ("Computerized Material"), the Producing Party may designate such material as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "NOT TO BE DISCLOSED TO UNION," by cover letter referring generally to such matter or by affixing to such media a label containing the appropriate legend.  Whenever a Receiving Party reduces electronically stored information designated as "Confidential," "Highly Confidential," or "Not to be Disclosed to Union" to hard-copy form, the Receiving Party shall mark such hard-copy form with the legend provided for in paragraph 2(a) above.  Whenever any Confidential or Highly Confidential Computerized Material is copied into another form, the Receiving Party shall also mark those forms with the legend provided for in paragraph 2(a) above.

        e.    To the extent that any Receiving Party or counsel for the Receiving Party creates, develops, or otherwise establishes or maintains for review on any electronic system information designated "Confidential," "Highly Confidential," or "Not to be Disclosed to Union," that party and/or its counsel must take all necessary steps to insure that access to such media is properly restricted to those persons who, by the terms of this Order, may have access to Confidential Information and/or Highly Confidential Information, and will affix to any media containing such information a label with the legend as provided for in paragraph 2(a) above.

        3.    Filing of Confidential Information

Exhibit 26

All documents and materials containing Confidential or Highly Confidential Information that are filed with the Court shall be filed under seal pursuant to the following procedures:

a.    Where possible, only confidential portions of filings with the Court shall be filed under seal. Confidential Information or Highly Confidential Information filed under seal shall be placed in sealed envelopes on which it shall be endorsed with the title to this Litigation, the words "FILED UNDER SEAL," and a statement substantially in the following form:

"This envelope is sealed pursuant to order of the Court and contains [Confidential Information] or [Highly Confidential Information] or [Confidential Information—Not to be Disclosed to Union] or [Highly Confidential Information—Not to be Disclosed to Union] filed in this case by [name of Party] and is not to be opened or the contents thereof to be displayed or revealed to any non-Court personnel except by order of the Court."

The envelope shall not be opened without further order of the Court except by persons authorized to have access to such materials pursuant to paragraphs 5, 6, and 7, as applicable, who shall return the information to the Clerk in a sealed envelope. Any envelope containing Confidential or Highly Confidential Information filed under seal that is an exhibit to a pleading shall also bear the name of the pleading. A full and unredacted copy of any such submission shall be provided directly to chambers, marked "Chambers Copy" and "Contains [Confidential Information] or [Highly Confidential Information] or [Confidential Information—Not to be Disclosed to Union] or [Highly Confidential Information—Not to be Disclosed to Union] Subject to Protective Order."

b.    Within three (3) business days of filing Confidential Information or Highly Confidential Information, pursuant to paragraph 3(a), the submitting party shall electronically file with the Court, for its public file, a copy of the submitted materials with the Confidential Information or Highly Confidential Information redacted. Any Confidential or Highly

Exhibit 26

Confidential Information produced by third parties pursuant to this Order also shall be redacted from this public electronic filing.

      c.     If any party objects to identified portions of the materials remaining under seal, it shall state its objections in a faxed or electronically delivered letter to counsel for all parties in this Litigation. The interested parties shall promptly meet and confer to attempt to resolve those objections and, if they cannot be resolved, shall promptly tender those objections to the Court for resolution. A revised public electronic filing, if any, of that submission shall be made by the submitting party within six business days after the Court's decision resolving that dispute.

    4.     Use of Confidential or Highly Confidential Information

      a.     Confidential or Highly Confidential Information shall not be used by any person, other than the Producing Party, for any purpose other than conducting this Litigation, and in no event shall Confidential or Highly Confidential Information be used for any business, competitive, personal, private, public, organizational or other labor or employee relations purpose.

      b.     Notwithstanding the foregoing, nothing in this Order shall be deemed to limit or restrict any Producing Party from using its own documents or its own Confidential Information or Highly Confidential Information for any purpose. The Producing Party may withdraw or modify any designation.

    5.     Disclosure of Confidential Information

    Access to information designated as "CONFIDENTIAL" pursuant to this Order shall be limited to:

      a.     The Court or any other court exercising jurisdiction with respect to this Litigation, Court personnel, jurors, and qualified persons (including necessary clerical personnel),

recording, taking or transcribing testimony and argument at any deposition, hearing, trial or appeal in this Litigation;

    b.  Special masters and mediators or other individuals engaged or consulted in settlement of the Litigation;

    c.  Outside counsel of record for the parties in this Litigation (including members or associates of such counsel's firm) or in-house counsel for the parties, as well as their paralegal, investigative, secretarial, and clerical personnel who are engaged in assisting such counsel in this Litigation;

    d.  Outside photocopying, data processing, or graphic production services employed by the parties or their counsel of record to assist in this Litigation;

    e.  Any individual expert or expert consulting firm retained by counsel of record in connection with this Litigation to the extent necessary for that individual expert or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of this Litigation, provided, however, that (i) such disclosure shall be made only to an individual expert, or to such members, partners, employees or agents of an expert consulting firm as such expert consulting firm shall designate as the persons who will undertake the engagement on behalf of the expert consulting firm (the "Designated Expert Personnel"); (ii) the individual expert or Designated Expert Personnel use the information solely in connection with this Litigation; (iii) the individual and/or a representative of each expert consulting firm sign the written assurance attached on Exhibit A on behalf of any Designated Expert Personnel associated with that firm; (iv) excluding any retention for this Litigation, the individual expert and each of the Designated Expert Personnel is neither (a) a current or former (within the past year from the date of this Order) employee of any party or any entity which directly or through a parent, subsidiary,

principal, agent, or affiliate competes with any of the Defendants, nor (b) an employee of, affiliated

with, or counsel (in-house or outside) to the SEIU or any other labor organization; and (v) the

individual expert and each of the Designated Expert Personnel will not become an employee of,

consultant to, affiliated with, or counsel (in-house or outside) to the SEIU before the later of (a)

two (2) years from the date that expert or Designated Expert Personnel last receives Confidential or

Highly Confidential Information or (b) during the pendency of this Litigation;

    f.  Any person who (i) authored or is listed as a recipient of the particular

material sought to be disclosed to that person, (ii) is currently employed by the Producing Party,

but only as to Confidential Information to which the employee is lawfully entitled to have access in

connection with his or her employment; (iii) was formerly employed by the Producing Party, but

only as to specific material to which the person had access during his/her employment or (iv) is

referred to in the material, but only as to the specific material in which such person is referenced,

discussed, or mentioned; and

    g.  Any other person to whom the Producing Party agrees in writing or on the

record in advance of the disclosure or the Court directs should have access.

  6.  <u>Disclosure of Highly Confidential Information</u>

  Access to information designated as "HIGHLY CONFIDENTIAL" pursuant to this Order

shall be limited to:

    a.  The Court or any other court exercising jurisdiction with respect to this

Litigation, Court personnel, jurors, and qualified persons (including necessary clerical personnel),

recording, taking or transcribing testimony and argument at any deposition, hearing, trial or appeal

in this Litigation;

      b.    Special masters and mediators or other individuals engaged or consulted in settlement of the Litigation;

      c.    Outside counsel of record for the parties in this Litigation (including members or associates of such counsel's firm), as well as their paralegal, investigative, secretarial, and clerical personnel who are engaged in assisting such counsel in this Litigation;

      d.    Outside photocopying, data processing, or graphic production services employed by the parties or their counsel of record to assist in this Litigation;

      e.    Any individual expert or expert consulting firm retained by counsel of record in connection with this Litigation to the extent necessary for that individual expert or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of this Litigation, provided, however, that (i) such disclosure shall be made only to an individual expert or the Designated Expert Personnel; (ii) the individual expert or Designated Expert Personnel use the information solely in connection with this Litigation; (iii) the individual and each of the Designated Expert Personnel sign the written assurance attached as Exhibit A; (iv) excluding any retention for this Litigation, the individual expert and each of the Designated Expert Personnel is neither (a) a current or former (within the past year from the date of this Order) employee of any party or any entity which directly or through a parent, subsidiary, principal, agent, or affiliate competes with any of the Defendants, nor (b) an employee of, affiliated with, or counsel (in-house or outside) to the SEIU or any other labor organization; and (v) the individual expert and each of the Designated Expert Personnel will not become an employee of, consultant to, affiliated with, or counsel (in-house or outside) to the SEIU before the later of (a) two (2) years from the date that expert or Designated Expert Personnel last receives Confidential or Highly Confidential Information or (b) during the pendency of this Litigation;

f.    During deposition, any person who (i) authored or is listed as a recipient of the particular material sought to be disclosed to that person (provided that the document has not been altered since that person authored or received the material), (ii) was formerly employed by the Producing Party, but only as to specific material to which the person had access during his/her employment or (iii) is referred to in the material, but only as to the specific material in which such person is referenced, discussed, or mentioned; and

g.    Any other person to whom the Producing Party agrees in writing or on the record in advance of the disclosure or the Court directs should have access.

7.    <u>Disclosure of Confidential or Highly Confidential Information—Not to be Disclosed to Union</u>

h.    Access to information that is designated as "CONFIDENTIAL—NOT TO BE DISCLOSED TO UNION" shall be limited to those persons identified in Paragraph 5 of this Order except that in order to avoid inadvertent disclosure of that information to any unauthorized person, Plaintiff's counsel David P. Dean and any shareholders, partners, members, associates, of counsel, and employees of James & Hoffman, P.C. ("J&H") shall only have access pursuant to the terms provided in the letter from David P. Dean to Michael R. Shumaker, dated December 15, a copy of which is attached hereto and incorporated herein as Exhibit B.

i.    Access to information that is designated as "HIGHLY CONFIDENTIAL— NOT TO BE DISCLOSED TO UNION" shall be limited to those persons identified in Paragraph 6 of this Order except that in order to avoid inadvertent disclosure of that information to any unauthorized person, Plaintiff's counsel David P. Dean and any shareholders, partners, members, associates, of counsel, and employees of J&H shall only have access pursuant to the terms

provided in the letter from David P. Dean to Michael R. Shumaker, dated December 15, 2006, a

copy of which is attached hereto and incorporated herein as Exhibit B.

    8.  <u>Notification of Protective Order</u>

        a.  Confidential Information or Highly Confidential Information shall not be

disclosed, described or otherwise made available to an individual expert or

expert consulting firm described in Paragraphs 5(e) or 6(e), unless that expert or

firm has executed an Agreement of Confidentiality in substantially the form

attached hereto as Exhibit A. The originals of such Agreement shall be

maintained by counsel for the party who obtained them until the final resolution

of this Litigation and shall be produced to the other party at the time the party

produces its expert reports and responds to expert discovery. This prohibition

includes disclosure of the actual confidential material or the information

contained in the material, including, but not limited to, any disclosure by counsel

or experts.

        b.  Confidential Information or Highly Confidential Information shall not be

disclosed to persons who are non-parties pursuant to 5(b); 5(e); 5(f)(i), (ii), (iii)

and (iv); and 5(g); 6(b); 6(f)(i), (ii), (iii), and (iv); and 6(g) unless (1) such

persons are first provided with a copy of this Order and (2) disclosing counsel

first advises them that they are bound by the provisions of this Order.

    9.  <u>Use of Confidential or Highly Confidential Information in Court</u>

        a.  If any Receiving Party plans to utilize any Confidential or Highly Confidential

Information at a court hearing, that Receiving Party will use reasonable efforts

to inform the Producing Party of its intent to use such information at least

twenty-four (24) hours in advance of the hearing. If no such advance notice is given, the Receiving Party will provide the Producing Party with an opportunity to approach the Court in confidence, whether in chambers or sidebar or such other method as the Court shall direct, regarding the use of the Confidential or Highly Confidential Information before reference is made to any such Confidential or Highly Confidential Information on the record.

b. In the event that any information designated as "Confidential," "Highly Confidential," or "Not to be Disclosed to Union" is used in any Court proceeding in this Litigation or any appeal, it shall not lose its status as Confidential, Highly Confidential, or Not to be Disclosed to Union through that use.

c. The rules governing the use of Confidential and Highly Confidential Information at trial shall be determined at a future date.

10. Objections to Designations

A party shall not be obliged to challenge the propriety of a Confidential Information designation at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. In the event a party objects to the designation of any material under this Order, the objecting party shall state its objections in a letter to counsel for the designating party in this Litigation, whereupon, the interested parties shall meet and confer in an attempt to resolve any objection. If the objection is not resolved within fourteen (14) days of transmission of that letter, the party objecting to the confidential designation may ask the Court for an Order removing the designation with respect to the challenged discovery materials. If such a request is made, the Producing Party has the burden of establishing that the designation is proper. If no such request is

made, the material will retain its designation. If the Producing Party agrees to change the

designation, the Producing Party shall send a written notice of the change in designation to all other

parties. Any documents or other materials that have been designated "Confidential,"

"Confidential-Not to be Disclosed to Union," "Highly Confidential," or "Highly Confidential-Not

to be Disclosed to Union" shall be treated in the manner designated until such time as the Court

rules that they should not be treated as Confidential or Highly Confidential, or the Producing Party

agrees to change the designation.

11. Preservation of Rights and Privileges

Nothing contained in this Order shall affect the right, if any, of any party or witness

to make any type of objection, claim, or other response to discovery requests, including, without

limitation, interrogatories, requests for admissions, requests for production of documents or

questions at a deposition. Nor shall this Order be construed as a waiver by any party of any right to

withhold any Confidential Information or Highly Confidential Information as attorney work

product or based on a legally cognizable privilege, or of any right which any party may have to

assert such privilege at any stage of this Litigation.

12. Return or Destruction of Materials

Within sixty (60) business days after the final resolution of this Litigation, a

Receiving Party shall return all Confidential or Highly Confidential Information to counsel for the

Producing Party or, in lieu thereof, the Receiving Party shall certify in writing that it has been

destroyed. Counsel shall be entitled to retain pleadings and the exhibits thereto, affidavits,

motions, briefs, or other papers filed with the Court, even if they contain Confidential or Highly

Confidential Information, so long as they are clearly marked to reflect that they contain information

subject to this Order.

13. Correction of Designation and Clawback

    a.  A Producing Party that fails to designate Discovery Material as "Confidential,"

"Confidential—Not to be Disclosed to Union," "Highly Confidential," or

"Highly Confidential—Not to be Disclosed to Union," at the time of its

production shall be entitled to make a correction to its designation. Such

correction and notice thereof shall be made in writing, accompanied by

substitute copies of each item of Discovery Material, appropriately designated.

Upon receipt of a notice of correction, the Receiving Party shall place the

appropriate marking on the document to reflect its altered confidentiality status

and certify that the original and all copies of the document have been

appropriately marked. The obligation to treat such material pursuant to the

corrected designation shall be prospective only, and those individuals who

reviewed the mis-designated discovery material prior to notice of the mis-

designation by the Producing Party shall abide by the provisions of this Order

with respect to all future use and disclosure of any information contained in the

mis-designated materials.

    b.  A Producing Party that inadvertently produces any document or other

information during discovery in this Litigation that the Producing Party has a

good faith reason to believe is privileged under the attorney-client or other

privilege, or protected from discovery as work product, may, upon discovery of

such inadvertent production, request the return of such document or information.

Upon receipt of a written request for return by the inadvertently Producing

Party, the Receiving Party (a) shall return the original and all copies of the

Exhibit 26

documents within thirty (30) days of the request, and shall not use the information for any purpose except upon further order of the Court, or (b) object to the request as described below.  In the event the Receiving Party objects to the return of the document, the Receiving Party shall move the Court for an order as to whether the production was inadvertent or whether the document or information is otherwise privileged or protected from discovery.  All materials related to the inadvertently produced document or information, and motion, shall be treated as "Highly Confidential—Not to be Disclosed to Union" pursuant to this Order, unless otherwise ordered by the Court.  If such a motion is made within thirty (30) days of receiving the notice from the Producing Party of its claim of inadvertent production, the Receiving Party may retain the produced document or information until the Court resolves the motion. However, the Receiving Party shall not use the document or information for any purpose other than the motion except upon further order of the Court.  If no such motion is made within thirty (30) days, the document or information and all copies shall be returned to the Producing Party and the Receiving Party will not be entitled to retain the document or information in any way.  Failure to move within thirty (30) days and/or return the produced document or information shall not be deemed a waiver of such objection nor preclude subsequent motion by the Receiving Party.  If the Receiving Party disclosed the document or information before being notified, it must notify the Producing Party as to the manner in which the material was disclosed and to whom, and certify in writing that it has requested the return of the document or information.

    c.  If Confidential or Highly Confidential Information is disclosed by a Receiving

Party to anyone other than in a manner authorized by this Order, the Receiving

Party responsible for that disclosure must immediately bring all pertinent facts

related to that disclosure to the attention of the Producing Party of the

Confidential or Highly Confidential Information and make every reasonable

effort to retrieve that Confidential or Highly Confidential Information and to

prevent further disclosure.

14. Limitation on Scope of this Order

The restrictions in this Order shall not apply to documents or information that are

publicly available or that are obtained independently by the Receiving Party from a person lawfully

in possession of those documents.

15. No Admission

A party's compliance with the terms of this Order shall not operate as an admission

that any particular document is or is not (a) confidential, (b) privileged, or (c) admissible in

evidence at trial.

16. Duty to Notify of Receipt of Subpoena

If any Receiving Party receives a subpoena for documents subject to this Order, the

person subpoenaed must inform the subpoena's issuer of this Order, provide the subpoena's issuer

with the copy of the Order, and give the Producing Party notice of the subpoena within three (3)

business days after its receipt and before it produces any documents in response to the subpoena, so

that the Producing Party has an opportunity to object prior to the production of any responsive

material.

17. Application of this Order to Non-Parties

This Order shall apply to non-parties who provide discovery, by deposition, production of documents or otherwise, in this Litigation, if said non-party requests the protection of this Order as to its Confidential or Highly Confidential Information and complies with the provisions of this Order.

18. Continuing Force of this Order

Upon final resolution of this Litigation, the provisions of this Order shall continue to be binding. This Court expressly retains jurisdiction over this Litigation for enforcement of the provisions of this Order following the final resolution of this Litigation.

19. Confidential Designations Prior to the Entry of this Order

Until this Order is entered by the Court, any Discovery Material designated as Confidential or Highly Confidential Information that is produced in this litigation shall be protected from disclosure pursuant to the terms of this Order as if ordered by the Court. If any actions subject to this Order are transferred to another Court, the terms of this Order shall remain in full force and effect unless modified by written agreement of all parties or order of the Court.

20. Modification of Order

This Order is binding on all parties to this Litigation and on all non-parties who have been served with a copy of this Order, and shall remain in force and effect until modified, superseded, or terminated by consent of the parties or by order of the Court. This Order shall not prevent a party from applying to the Court for relief therefrom, or from applying to the Court for further or additional protective orders, or from agreeing to modifications of this Order, subject to the approval of the Court.

Nothing in this Order shall prevent a Producing Party from seeking further, greater or lesser protection with respect to the use of any Confidential or Highly Confidential Information,

or seeking to prevent Confidential or Highly Confidential Information from being provided to persons described in paragraphs 5, 6, and 7 of this Order.

    21. <u>Applicability to Future Actions</u>

        The terms of this Order shall be binding upon all current and future parties to this Litigation and their counsel. Within ten (10) days of (i) entry of appearance by a new party to the Litigation, or (ii) notification of the filing in this District of a complaint that arises out of the same facts alleged in plaintiff's Complaint, plaintiffs' lead counsel shall serve a copy of this Order on such new party's counsel.

Dated: _____, 2006

IT IS SO ORDERED:


_____
United States District Judge

Exhibit 27

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MARJORY UNGER, on behalf of herself and
all others similarly situated,

                                    Plaintiff,          Civil Action No. 06-CV-0765
                                                        (TJM/DRH)

          -against-

ALBANY MEDICAL CENTER; ASCENSION
HEALTH, INC.; CATHOLIC HEALTH EAST;
ELLIS HOSPITAL; NORTHEAST HEALTH;
SETON HEALTH SYSTEM; ST. PETER'S
HEALTH CARE SERVICE,

                                    Defendants.

---

## STIPULATION AND PROTECTIVE ORDER GOVERNING
## THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION

Whereas, the Plaintiffs and Defendants in the above-captioned action may seek

discovery or documents, information, or other materials that may contain non-public, confidential,

competitively-sensitive, or proprietary information of another party or of a third party;

Whereas, Plaintiffs and Defendants wish to ensure that confidential information

shall be used only for the purposes of this action and shall not be disclosed or used in any other

way;

Whereas, the parties have stipulated and agreed to the terms, and jointly moved this

Court for entry of the following Protective Order, and the Court having found that, in light of the

nature of the non-public, confidential, competitively-sensitive, proprietary information that may be

sought in discovery, good cause exists for entry of the Protective Order,

Exhibit 27

IT IS ORDERED that this Protective Order ("Order") shall be entered and limit the

disclosure and use of certain discovered information in the above-captioned action (the

"Litigation") as hereinafter provided:

1.   Scope

a.   This Order shall govern all documents, the information contained therein,

and all other information produced or disclosed during discovery in this Litigation whether

revealed in a document, deposition, other testimony, discovery response or otherwise ("Discovery

Material"), by any party in this Litigation (the "Producing Party") to any other party (the

"Receiving Party") when the same is designated using the procedures set forth herein. This Order

is binding upon the parties to the Litigation, as well as their respective attorneys, agents,

representatives, officers and employees and others as set forth in this Order.

b.   Any Producing Party shall have the right to identify and designate as

"Confidential" any document or other material it produces or provides, or any testimony it gives in

this proceeding, which it believes in good faith constitutes, reflects or discloses its confidential and

proprietary information, including (i) financial data, marketing and advertising data or plans,

strategic or long-range plans, or internal cost, wage, salary, compensation, recruiting and retention

data, (ii) non-public private information relating to individuals, such as employee names, social

security numbers, home addresses and/or telephone numbers, (iii) information which the Producing

Party believes could be used by the Service Employees International Union ("SEIU") or any other

labor organization, their agents, representatives, affiliates or consultants to compromise or

jeopardize the Producing Party's competitive business or labor or employee relations interests or

the privacy interests of the Producing Party's employees, and (iv) other information understood to

Exhibit 27

be confidential pursuant to Rule 26(c) of the Federal Rules of Civil Procedure ("Confidential Information").

      c.     Any Confidential Information which a Producing Party believes to be extremely sensitive confidential and/or proprietary information, the disclosure of which, even limited to the restrictions placed on the Confidential Information in this Order, would compromise and/or jeopardize the Producing Party's competitive business interests ("Highly Confidential Information") may be designated as "Highly Confidential" by the Producing Party.

      d.     Any Confidential Information or Highly Confidential Information which, if disclosed to counsel who currently represents, or who has represented at any time in the past five years, the Service Employees International Union ("SEIU"), their agents or representatives, consultants and attorneys would compromise or jeopardize the Producing Party's competitive business, or labor or employee relations interests or the privacy interests of the Producing Party's employees, may also be designated as "Not to be Disclosed to Union."

      e.     Any party to this Litigation and any third party may designate as Confidential or Highly Confidential documents or information produced by another party if that Discovery Material (i) either originated from the designating party or third party (or were generated on the designating or third party's behalf), and (ii) and the third party agreed to treat that Discovery Material as confidential, in which case the designating party shall be deemed a Producing Party for purposes of this Order.

      f.     A Producing Party's designation of information as "Confidential," "Confidential—Not to be Disclosed to Union," "Highly Confidential," or "Highly Confidential—Not to be Disclosed to Union" shall constitute a representation for purposes of any applicable

- 3 -

Exhibit 27

professional standards of conduct and guidelines applicable to the parties and their counsel in this action that the Producing Party has reviewed the document, material or information and has a valid and good faith basis for the designation.

2.    Designation of Confidentiality

Documents or information may be designated "Confidential," "Highly Confidential," and/or "Not to be Disclosed to Union" in the following ways:

a.    A Producing Party shall, if appropriate, designate specific documents as: (i) "Confidential" by marking the first page and each subsequent page of the document containing any Confidential Information with the legend "CONFIDENTIAL," or "CONFIDENTIAL—NOT TO BE DISCLOSED TO UNION;" or as (ii) Highly Confidential" by marking the first page and each subsequent page of the document containing any Highly Confidential Information with the legend "HIGHLY CONFIDENTIAL," or "HIGHLY CONFIDENTIAL—NOT TO BE DISCLOSED TO UNION." All documents produced or disclosed during discovery in this Litigation shall be identified by Bates number and, to the extent practical, the appropriate designation shall be placed near the Bates number.

b.    A Producing Party shall designate interrogatory answers and responses to requests for admissions as "Confidential Information," "Highly Confidential Information," and/or "Not to be Disclosed to Union," by stating or specifying that the answers or responses or specific parts of them are "Confidential," "Highly Confidential," and/or "Not to Be Disclosed to Union" and by placing the following legend on each page of interrogatory answers or responses to requests for admission containing Confidential Information or Highly Confidential Information: "CONTAINS CONFIDENTIAL INFORMATION," "CONTAINS CONFIDENTIAL

- 4 -

Exhibit 27

INFORMATION—NOT TO BE DISCLOSED TO UNION," "CONTAINS HIGHLY

CONFIDENTIAL INFORMATION," OR "CONTAINS HIGHLY CONFIDENTIAL

INFORMATION—NOT TO BE DISCLOSED TO UNION."

      c.    In the case of depositions and the information contained in depositions

(including exhibits), counsel for a Producing Party or witness shall designate portions of the

transcript (including exhibits) which contain Confidential Information, Highly Confidential

Information, or Confidential or Highly Confidential Information—Not to be Disclosed to Union as

"Confidential," "Highly Confidential," or "Not to be Disclosed to Union" by making a statement to

such effect on the record in the course of the deposition or by letter within 21 calendar days of

receipt of the official deposition transcript or copy thereof (or written notification that the transcript

is available). The entire deposition transcript (including exhibits) shall be treated as "Highly

Confidential—Not to be Disclosed to Union" under this Order until the expiration of the 21-day

period for designation. The following legend shall be placed on the front of the original deposition

transcript and each copy of the transcript containing Confidential Information, Highly Confidential

Information, or Confidential or Highly Confidential Information—Not to be Disclosed to Union:

"CONTAINS CONFIDENTIAL INFORMATION," "CONTAINS HIGHLY CONFIDENTIAL

INFORMATION," or "CONTAINS CONFIDENTIAL INFORMATION—NOT TO BE

DISCLOSED TO UNION," or "HIGHLY CONFIDENTIAL INFORMATION—NOT TO BE

DISCLOSED TO UNION." If all or part of a videotaped deposition is designated as

"CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "NOT TO BE DISCLOSED TO UNION,"

the video container shall be labeled with the legend provided for in paragraph 2(a) above. When a

deposition transcript contains Confidential or Highly Confidential Information, the Producing

- 5 -

Exhibit 27

Party shall request the stenographic reporter to separate those portions of the transcript containing Confidential Information or Highly Confidential Information and bind them separately from the non-confidential portions.

        d.      To the extent that information is produced in a form rendering it impractical to label (including electronically stored information produced on electronic or magnetic media) ("Computerized Material"), the Producing Party may designate such material as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "NOT TO BE DISCLOSED TO UNION," by cover letter referring generally to such matter or by affixing to such media a label containing the appropriate legend. Whenever a Receiving Party reduces electronically stored information designated as "Confidential," "Highly Confidential," or "Not to be Disclosed to Union" to hard-copy form, the Receiving Party shall mark such hard-copy form with the legend provided for in paragraph 2(a) above. Whenever any Confidential or Highly Confidential Computerized Material is copied into another form, the Receiving Party shall also mark those forms with the legend provided for in paragraph 2(a) above.

        e.      To the extent that any Receiving Party or counsel for the Receiving Party creates, develops, or otherwise establishes or maintains for review on any electronic system information designated "Confidential," "Highly Confidential," or "Not to be Disclosed to Union," that party and/or its counsel must take all necessary steps to insure that access to such media is properly restricted to those persons who, by the terms of this Order, may have access to Confidential Information and/or Highly Confidential Information, and will affix to any media containing such information a label with the legend as provided for in paragraph 2(a) above.

        3.      <u>Filing of Confidential Information</u>

Exhibit 27

All documents and materials containing Confidential or Highly Confidential Information that are filed with the Court shall be filed under seal pursuant to the following procedures:

a. Where possible, only confidential portions of filings with the Court shall be filed under seal. Confidential Information or Highly Confidential Information filed under seal shall be placed in sealed envelopes on which it shall be endorsed with the title to this Litigation, the words "FILED UNDER SEAL," and a statement substantially in the following form:

> "This envelope is sealed pursuant to order of the Court and contains [Confidential Information] or [Highly Confidential Information] or [Confidential Information—Not to be Disclosed to Union] or [Highly Confidential Information—Not to be Disclosed to Union] filed in this case by [name of Party] and is not to be opened or the contents thereof to be displayed or revealed to any non-Court personnel except by order of the Court."

The envelope shall not be opened without further order of the Court except by persons authorized to have access to such materials pursuant to paragraphs 5, 6, and 7, as applicable, who shall return the information to the Clerk in a sealed envelope. Any envelope containing Confidential or Highly Confidential Information filed under seal that is an exhibit to a pleading shall also bear the name of the pleading. A full and unredacted copy of any such submission shall be provided directly to chambers, marked "Chambers Copy" and "Contains [Confidential Information] or [Highly Confidential Information] or [Confidential Information—Not to be Disclosed to Union] or [Highly Confidential Information—Not to be Disclosed to Union] Subject to Protective Order."

b. Within three (3) business days of filing Confidential Information or Highly Confidential Information, pursuant to paragraph 3(a), the submitting party shall electronically file with the Court, for its public file, a copy of the submitted materials with the Confidential Information or Highly Confidential Information redacted. Any Confidential or Highly

- 7 -

Exhibit 27

Confidential Information produced by third parties pursuant to this Order also shall be redacted from this public electronic filing.

       c.     If any party objects to identified portions of the materials remaining under seal, it shall state its objections in a faxed or electronically delivered letter to counsel for all parties in this Litigation. The interested parties shall promptly meet and confer to attempt to resolve those objections and, if they cannot be resolved, shall promptly tender those objections to the Court for resolution. A revised public electronic filing, if any, of that submission shall be made by the submitting party within six business days after the Court's decision resolving that dispute.

    4.    Use of Confidential or Highly Confidential Information

       a.     Confidential or Highly Confidential Information shall not be used by any person, other than the Producing Party, for any purpose other than conducting this Litigation, and in no event shall Confidential or Highly Confidential Information be used for any business, competitive, personal, private, public, organizational or other labor or employee relations purpose.

       b.     Notwithstanding the foregoing, nothing in this Order shall be deemed to limit or restrict any Producing Party from using its own documents or its own Confidential Information or Highly Confidential Information for any purpose. The Producing Party may withdraw or modify any designation.

    5.    Disclosure of Confidential Information

Access to information designated as "CONFIDENTIAL" pursuant to this Order shall be limited to:

       a.     The Court or any other court exercising jurisdiction with respect to this Litigation, Court personnel, jurors, and qualified persons (including necessary clerical personnel),

- 8 -

Exhibit 27

recording, taking or transcribing testimony and argument at any deposition, hearing, trial or appeal in this Litigation;

       b.    Special masters and mediators or other individuals engaged or consulted in settlement of the Litigation;

       c.    Outside counsel of record for the parties in this Litigation (including members or associates of such counsel's firm) or in-house counsel for the parties, as well as their paralegal, investigative, secretarial, and clerical personnel who are engaged in assisting such counsel in this Litigation;

       d.    Outside photocopying, data processing, or graphic production services employed by the parties or their counsel of record to assist in this Litigation;

       e.    Any individual expert or expert consulting firm retained by counsel of record in connection with this Litigation to the extent necessary for that individual expert or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of this Litigation, provided, however, that (i) such disclosure shall be made only to an individual expert, or to such members, partners, employees or agents of an expert consulting firm as such expert consulting firm shall designate as the persons who will undertake the engagement on behalf of the expert consulting firm (the "Designated Expert Personnel"); (ii) the individual expert or Designated Expert Personnel use the information solely in connection with this Litigation; (iii) the individual and/or a representative of each expert consulting firm sign the written assurance attached on Exhibit A on behalf of any Designated Expert Personnel associated with that firm; (iv) excluding any retention for this Litigation, the individual expert and each of the Designated Expert Personnel is neither (a) a current or former (within the past year from the date

- 9 -

Exhibit 27

of this Order) employee of any party or any entity which directly or through a parent, subsidiary, principal, agent, or affiliate competes with any of the Defendants, nor (b) an employee of, affiliated with, or counsel (in-house or outside) to the SEIU or any other labor organization; and (v) the individual expert and each of the Designated Expert Personnel will not become an employee of, consultant to, affiliated with, or counsel (in-house or outside) to the SEIU before the later of (a) two (2) years from the date that expert or Designated Expert Personnel last receives Confidential or Highly Confidential Information or (b) during the pendency of this Litigation;

    f.  Any person who (i) authored or is listed as a recipient of the particular material sought to be disclosed to that person, (ii) is currently employed by the Producing Party, but only as to Confidential Information to which the employee is lawfully entitled to have access in connection with his or her employment; (iii) was formerly employed by the Producing Party, but only as to specific material to which the person had access during his/her employment or (iv) is referred to in the material, but only as to the specific material in which such person is referenced, discussed, or mentioned; and

    g.  Any other person to whom the Producing Party agrees in writing or on the record in advance of the disclosure or the Court directs should have access.

   6.  <u>Disclosure of Highly Confidential Information</u>

   Access to information designated as "HIGHLY CONFIDENTIAL" pursuant to this Order shall be limited to:

    a.  The Court or any other court exercising jurisdiction with respect to this Litigation, Court personnel, jurors, and qualified persons (including necessary clerical personnel),

Exhibit 27

recording, taking or transcribing testimony and argument at any deposition, hearing, trial or appeal in this Litigation;

       b.    Special masters and mediators or other individuals engaged or consulted in settlement of the Litigation;

       c.    Outside counsel of record for the parties in this Litigation (including members or associates of such counsel's firm), as well as their paralegal, investigative, secretarial, and clerical personnel who are engaged in assisting such counsel in this Litigation;

       d.    Outside photocopying, data processing, or graphic production services employed by the parties or their counsel of record to assist in this Litigation;

       e.    Any individual expert or expert consulting firm retained by counsel of record in connection with this Litigation to the extent necessary for that individual expert or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of this Litigation, provided, however, that (i) such disclosure shall be made only to an individual expert or the Designated Expert Personnel; (ii) the individual expert or Designated Expert Personnel use the information solely in connection with this Litigation; (iii) the individual and each of the Designated Expert Personnel sign the written assurance attached as Exhibit A; (iv) excluding any retention for this Litigation, the individual expert and each of the Designated Expert Personnel is neither (a) a current or former (within the past year from the date of this Order) employee of any party or any entity which directly or through a parent, subsidiary, principal, agent, or affiliate competes with any of the Defendants, nor (b) an employee of, affiliated with, or counsel (in-house or outside) to the SEIU or any other labor organization; and (v) the individual expert and each of the Designated Expert Personnel will not become an employee of,

Exhibit 27

consultant to, affiliated with, or counsel (in-house or outside) to the SEIU before the later of (a)

two (2) years from the date that expert or Designated Expert Personnel last receives Confidential or

Highly Confidential Information or (b) during the pendency of this Litigation;

> f.     During deposition, any person who (i) authored or is listed as a recipient of

the particular material sought to be disclosed to that person (provided that the document has not

been altered since that person authored or received the material), (ii) was formerly employed by the

Producing Party, but only as to specific material to which the person had access during his/her

employment or (iii) is referred to in the material, but only as to the specific material in which such

person is referenced, discussed, or mentioned; and

> g.     Any other person to whom the Producing Party agrees in writing or on the

record in advance of the disclosure or the Court directs should have access.

> 7.     <u>Disclosure of Confidential or Highly Confidential Information—Not to be Disclosed
> to Union</u>

> a.     Access to information that is designated as "CONFIDENTIAL—NOT TO

BE DISCLOSED TO UNION" shall be limited to those persons identified in Paragraph 5 of this

Order except that in order to avoid inadvertent disclosure of that information to any unauthorized

person, Plaintiff's counsel David P. Dean and any shareholders, partners, members, associates, of

counsel, and employees of James & Hoffman, P.C. ("J&H") shall only have access pursuant to the

terms provided in the letter from David P. Dean to David Marx, Jr., dated November 7, 2006, a

copy of which is attached hereto and incorporated herein as Exhibit B.

> b.     Access to information that is designated as "HIGHLY CONFIDENTIAL—

NOT TO BE DISCLOSED TO UNION" shall be limited to those persons identified in Paragraph 6

- 12 -

Exhibit 27

of this Order except that in order to avoid inadvertent disclosure of that information to any

unauthorized person, Plaintiff's counsel David P. Dean and any shareholders, partners, members,

associates, of counsel, and employees of J&H shall only have access pursuant to the terms

provided in the letter from David P. Dean to David Marx, Jr., dated November 7, 2006, a copy of

which is attached hereto and incorporated herein as Exhibit B.

      8.    <u>Notification of Protective Order</u>

      a.    Confidential Information or Highly Confidential Information shall not be

disclosed, described or otherwise made available to an individual expert or expert consulting firm

described in Paragraphs 5(e) or 6(e), unless that expert or firm has executed an Agreement of

Confidentiality in substantially the form attached hereto as Exhibit A. The originals of such

Agreement shall be maintained by counsel for the party who obtained them until the final

resolution of this Litigation and shall be produced to the other party at the time the party produces

its expert reports and responds to expert discovery. This prohibition includes disclosure of the

actual confidential material or the information contained in the material, including, but not limited

to, any disclosure by counsel or experts.

      b.    Confidential Information or Highly Confidential Information shall not be

disclosed to persons who are non-parties pursuant to 5(b); 5(e); 5(f)(i), (ii), (iii) and (iv); and 5(g);

6(b); 6(f)(i), (ii), (iii), and (iv); and 6(g) unless (1) such persons are first provided with a copy of

this Order and (2) disclosing counsel first advises them that they are bound by the provisions of

this Order.

      9.    <u>Use of Confidential or Highly Confidential Information in Court</u>

Exhibit 27

      a.      If any Receiving Party plans to utilize any Confidential or Highly Confidential Information at a court hearing, that Receiving Party will use reasonable efforts to inform the Producing Party of its intent to use such information at least twenty-four (24) hours in advance of the hearing.  If no such advance notice is given, the Receiving Party will provide the Producing Party with an opportunity to approach the Court in confidence, whether in chambers or sidebar or such other method as the Court shall direct, regarding the use of the Confidential or Highly Confidential Information before reference is made to any such Confidential or Highly Confidential Information on the record.

      b.      In the event that any information designated as "Confidential," "Highly Confidential," or "Not to be Disclosed to Union" is used in any Court proceeding in this Litigation or any appeal, it shall not lose its status as Confidential, Highly Confidential, or Not to be Disclosed to Union through that use.

      c.      The rules governing the use of Confidential and Highly Confidential Information at trial shall be determined at a future date.

    10.    <u>Objections to Designations</u>

      A party shall not be obliged to challenge the propriety of a Confidential Information designation at the time made, and a failure to do so shall not preclude a subsequent challenge thereto.  In the event a party objects to the designation of any material under this Order, the objecting party shall state its objections in a letter to counsel for the designating party in this Litigation, whereupon, the interested parties shall meet and confer in an attempt to resolve any objection.  If the objection is not resolved within fourteen (14) days of transmission of that letter, the party objecting to the confidential designation may ask the Court for an Order removing the

Exhibit 27

designation with respect to the challenged discovery materials. If such a request is made, the

Producing Party has the burden of establishing that the designation is proper. If no such request is

made, the material will retain its designation. If the Producing Party agrees to change the

designation, the Producing Party shall send a written notice of the change in designation to all other

parties. Any documents or other materials that have been designated "Confidential,"

"Confidential-Not to be Disclosed to Union," "Highly Confidential," or "Highly Confidential-Not

to be Disclosed to Union" shall be treated in the manner designated until such time as the Court

rules that they should not be treated as Confidential or Highly Confidential, or the Producing Party

agrees to change the designation.

11.     Preservation of Rights and Privileges

Nothing contained in this Order shall affect the right, if any, of any party or witness

to make any type of objection, claim, or other response to discovery requests, including, without

limitation, interrogatories, requests for admissions, requests for production of documents or

questions at a deposition. Nor shall this Order be construed as a waiver by any party of any right to

withhold any Confidential Information or Highly Confidential Information as attorney work

product or based on a legally cognizable privilege, or of any right which any party may have to

assert such privilege at any stage of this Litigation.

12.     Return or Destruction of Materials

Within sixty (60) business days after the final resolution of this Litigation, a

Receiving Party shall return all Confidential or Highly Confidential Information to counsel for the

Producing Party or, in lieu thereof, the Receiving Party shall certify in writing that it has been

destroyed. Counsel shall be entitled to retain pleadings and the exhibits thereto, affidavits,

- 15 -

Exhibit 27

motions, briefs, or other papers filed with the Court, even if they contain Confidential or Highly

Confidential Information, so long as they are clearly marked to reflect that they contain information

subject to this Order.

13.     Correction of Designation and Clawback

a.     A Producing Party that fails to designate Discovery Material as

"Confidential," "Confidential—Not to be Disclosed to Union," "Highly Confidential," or "Highly

Confidential—Not to be Disclosed to Union," at the time of its production shall be entitled to make

a correction to its designation. Such correction and notice thereof shall be made in writing,

accompanied by substitute copies of each item of Discovery Material, appropriately designated.

Upon receipt of a notice of correction, the Receiving Party shall place the appropriate marking on

the document to reflect its altered confidentiality status and certify that the original and all copies

of the document have been appropriately marked. The obligation to treat such material pursuant to

the corrected designation shall be prospective only, and those individuals who reviewed the mis-

designated discovery material prior to notice of the mis-designation by the Producing Party shall

abide by the provisions of this Order with respect to all future use and disclosure of any

information contained in the mis-designated materials.

b.     A Producing Party that inadvertently produces any document or other

information during discovery in this Litigation that the Producing Party has a good faith reason to

believe is privileged under the attorney-client or other privilege, or protected from discovery as

work product, may, upon discovery of such inadvertent production, request the return of such

document or information. Upon receipt of a written request for return by the inadvertently

Producing Party, the Receiving Party (a) shall return the original and all copies of the documents

- 16 -

Exhibit 27

within thirty (30) days of the request, and shall not use the information for any purpose except upon further order of the Court, or (b) object to the request as described below. In the event the Receiving Party objects to the return of the document, the Receiving Party shall move the Court for an order as to whether the production was inadvertent or whether the document or information is otherwise privileged or protected from discovery. All materials related to the inadvertently produced document or information, and motion, shall be treated as "Highly Confidential—Not to be Disclosed to Union" pursuant to this Order, unless otherwise ordered by the Court. If such a motion is made within thirty (30) days of receiving the notice from the Producing Party of its claim of inadvertent production, the Receiving Party may retain the produced document or information until the Court resolves the motion. However, the Receiving Party shall not use the document or information for any purpose other than the motion except upon further order of the Court. If no such motion is made within thirty (30) days, the document or information and all copies shall be returned to the Producing Party and the Receiving Party will not be entitled to retain the document or information in any way. Failure to move within thirty (30) days and/or return the produced document or information shall not be deemed a waiver of such objection nor preclude subsequent motion by the Receiving Party. If the Receiving Party disclosed the document or information before being notified, it must notify the Producing Party as to the manner in which the material was disclosed and to whom, and certify in writing that it has requested the return of the document or information.

       c.     If Confidential or Highly Confidential Information is disclosed by a Receiving Party to anyone other than in a manner authorized by this Order, the Receiving Party responsible for that disclosure must immediately bring all pertinent facts related to that disclosure

- 17 -

Exhibit 27

to the attention of the Producing Party of the Confidential or Highly Confidential Information and make every reasonable effort to retrieve that Confidential or Highly Confidential Information and to prevent further disclosure.

14.    Limitation on Scope of this Order

The restrictions in this Order shall not apply to documents or information that are publicly available or that are obtained independently by the Receiving Party from a person lawfully in possession of those documents.

15.    No Admission

A party's compliance with the terms of this Order shall not operate as an admission that any particular document is or is not (a) confidential, (b) privileged, or (c) admissible in evidence at trial.

16.    Duty to Notify of Receipt of Subpoena

If any Receiving Party receives a subpoena for documents subject to this Order, the person subpoenaed must inform the subpoena's issuer of this Order, provide the subpoena's issuer with the copy of the Order, and give the Producing Party notice of the subpoena within three (3) business days after its receipt and before it produces any documents in response to the subpoena, so that the Producing Party has an opportunity to object prior to the production of any responsive material.

17.    Application of this Order to Non-Parties

This Order shall apply to non-parties who provide discovery, by deposition, production of documents or otherwise, in this Litigation, if said non-party requests the protection of

- 18 -

Exhibit 27

this Order as to its Confidential or Highly Confidential Information and complies with the provisions of this Order.

      18.    Continuing Force of this Order

        Upon final resolution of this Litigation, the provisions of this Order shall continue to be binding. This Court expressly retains jurisdiction over this Litigation for enforcement of the provisions of this Order following the final resolution of this Litigation.

      19.    Confidential Designations Prior to the Entry of this Order

        Until this Order is entered by the Court, any Discovery Material designated as Confidential or Highly Confidential Information that is produced in this litigation shall be protected from disclosure pursuant to the terms of this Order as if ordered by the Court. If any actions subject to this Order are transferred to another Court, the terms of this Order shall remain in full force and effect unless modified by written agreement of all parties or order of the Court.

      20.    Modification of Order

        This Order is binding on all parties to this Litigation and on all non-parties who have been served with a copy of this Order, and shall remain in force and effect until modified, superseded, or terminated by consent of the parties or by order of the Court. This Order shall not prevent a party from applying to the Court for relief therefrom, or from applying to the Court for further or additional protective orders, or from agreeing to modifications of this Order, subject to the approval of the Court.

        Nothing in this Order shall prevent a Producing Party from seeking further, greater or lesser protection with respect to the use of any Confidential or Highly Confidential Information,

Exhibit 27

or seeking to prevent Confidential or Highly Confidential Information from being provided to persons described in paragraphs 5, 6, and 7 of this Order.

    21.    <u>Applicability to Future Actions</u>

       The terms of this Order shall be binding upon all current and future parties to this Litigation and their counsel.  Within ten (10) days of (i) entry of appearance by a new party to the Litigation, or (ii) notification of the filing in this District of a complaint that arises out of the same facts alleged in plaintiff's Complaint, plaintiffs' lead counsel shall serve a copy of this Order on such new party's counsel.

Dated: *Nov. 17*, 2006

IT IS SO ORDERED:

_____

United States District Judge

Mag.

- 20 -

Exhibit 27

## **EXHIBIT A**

I hereby certify (i) my understanding that Discovery Material containing Confidential

Information or Highly Confidential Information is being provided to me pursuant to the terms and

restrictions of the Stipulation and Protective Order Governing the Production and Exchange of

Confidential Information ("Order") entered in *Unger v. Albany Medical Center, et al.*, United

States District Court, Northern District of New York, Civil Action No. 06-CV-0765 (TJM/DRH),

and (ii) that I have received and read the Order. I understand the terms of the Order, I agree to be

fully bound by the Order, and I hereby submit to the jurisdiction of the Court for purposes of

enforcement of the Order. I understand that violation of the Order may be punishable by contempt

of Court.

Dated: _____        Signature:    _____

                                Name:        _____

                                Address:     _____

CHI99 4736554-4.070881.0012

- 21 -

Exhibit 27

# JAMES & HOFFMAN

A Professional Corporation
1101 17TH STREET, N.W., SUITE 510
WASHINGTON, D.C. 20036-4748

(202) 496-0500
Facsimile: 202-496-0555
www.jamhoff.com

Edgar N. James
Steven K. Hoffman
Judith A. Scott
Kathy L. Krieger
David P. Dean
Marie Chopra
Amy B. Fettig
Sean G. Bajkowski*
Katie B. Feiock

Of Counsel:
Mary Joyce Carlson*
Martha Walfoort
Christy L. Hoffman

* Not Admitted in DC

ejames@jamhoff.com
skhoffman@jamhoff.com
scottj@seiu.org
klkrieger@jamhoff.com
dpdean@jamhoff.com
mchopra@jamhoff.com
abfettig@jamhoff.com
sgbajkowski@jamhoff.com
khfeiock@jamhoff.com

mjcarlson@jamhoff.com
mwalfoort@jamhoff.com
choffman@jamhoff.com

November 7, 2006

David Marx, Jr., Esq.
McDermott Will & Emery
600 13th St., NW
Washington, DC 20005

Re: Unger v. Albany Medical Center, et al. Civ. No. 06-CV-0765 (TJM/DRH) (N.D.N.Y.).

Dear Mr. Marx:

     I write pursuant to Magistrate Judge Homer's October 26 Order that plaintiffs disclose to defendants the identities of employees at James & Hoffman, P.C. (J&H) who will assist in the above-referenced litigation and have access to "Union Confidential" information. As also ordered, I disclose below the steps taken to create "fire walls" to prevent inadvertent disclosure of such information to others at J&H.

     As the partner at J&H responsible for the matter, I will lead the litigation team. Associates Sean Bajkowski and Katie Feiock will be on the team and have access to documents marked "NOT TO BE DISCLOSED TO UNION COUNSEL." Support staff for the team who might be exposed to such documents or to information from such documents are Ben Hensler, a law clerk who may provide intermittent assistance to the team, and Christine Jozwick (Administrative Director), Kathy Phelan (Paralegal), Annette Sabella (Secretary) and Christopher Stuart (Secretary).

     The firm has undertaken the following actions to ensure the adequacy of its fire walls:

1.    All physical files relating to this litigation will be maintained in a separate, locked cabinet(s), and only members of the litigation team will have keys to the cabinet(s).

2.    All electronic files for the case will be stored on a separate drive from all other firm files. Only the password-protected sign-in accounts of the members of the litigation team and designated support staff will be able to view that drive. An additional password, known only to members of the litigation team and the Administrative Director, will be necessary to open the electronic copies of any documents marked "NOT TO BE DISCLOSED TO UNION COUNSEL."

EXHIBIT B---Page 1

Exhibit 27

David Marx, Jr., Esq.
November 7, 2006
Page 2

3.    Neither Judith A. Scott, General Counsel to the Service Employees International Union (SEIU), nor Mary Joyce Carlson will have access to documents marked "NOT TO BE DISCLOSED TO UNION COUNSEL." They will not have keys to the file cabinet(s), access to the separate drive, or the password for opening electronic files. They will maintain their offices at locations separate from the rest of the firm and will not have keys to the firm's offices. In addition to the limitations discussed above, Ms. Scott will be screened from any conversations or communications containing any non-public information about the litigation.

4.    Ms. Carlson will not be exposed to the documents marked "NOT TO BE DISCLOSED TO UNION COUNSEL" – or to the information contained in them. She will have no communications about the litigation with any member of the litigation team except David Dean, and with the Administrative Director as required to complete billing entries or other administrative tasks. Depending on the scope and significance of the defendants' designation of documents as "NOT TO BE DISCLOSED TO UNION COUNSEL" Ms. Carlson's involvement in the prosecution of the litigation may be appropriately narrowed to further avoid the risk of inadvertent disclosure.

5    Any conversations among team members concerning the litigation, other than purely administrative matters (e.g., a request directed to a member of the support staff concerning sending mail), will take place only behind closed doors – either in a conference room or an attorney's office.

6.    Before being given access to documents marked "NOT TO BE DISCLOSED TO UNION COUNSEL." or being involved in activities that might expose him or her to confidential information from such documents, each employee shall be required to read and sign an agreement acknowledging his or her awareness of the fire wall, agreeing to abide by its terms, and accepting that failure to do so may result in discipline, up to and including discharge.

7.    I shall sign the Protective Order incorporating this letter by reference and shall be subject to the contempt powers of the Court for its enforcement.

Sincerely,

David P. Dean

cc:    Dan Small
       Charles Tompkins
       Allyson Baker
       James Towne

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARJORY UNGER, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 06-CV-0765 (N.D.N.Y.) |
| ) | |
| v. ) | |
| ) | |
| ALBANY MEDICAL CENTER, *et al.*, ) | |
| ) | |
| Defendants. ) | ORAL ARGUMENT REQUESTED |
| ) | |
| and ) | 07-56 mix |
| ) | |
| MARISSA MADERAZO, *et al.* ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. SA06CA0535OG (W.D. |
| ) | Tex.) |
| v. ) | |
| ) | |
| VANGUARD HEALTH SYSTEMS, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM THE SERVICE EMPLOYEES INTERNATIONAL UNION

Having considered the Defendants' Motion to Compel Production of Documents from the

Service Employees International Union, the Court hereby grants Defendants' motion.  The

Service Employees International Union ("SEIU"), including its local affiliate, SEIU Local 5,

shall comply forthwith with Defendants' subpoenas, and in doing so, make a good faith effort to

locate and produce all documents responsive to the subpoenas.

Dated: _____, 2007

IT IS SO ORDERED:

_____

United States District Judge